In re Ilias Sarris, Case No. 25-14910 (SLM)
*Certification of Ilias Sarris in Support of Emergency Motion*

# EXHIBIT B

Operating Agreement of Sarris Family, LLC, dated as of December 9, 2020

# OPERATING AGREEMENT OF SARRIS FAMILY LIMITED LIABILITY COMPANY

This OPERATING AGREEMENT (as the same may be from time to time amended, restated, supplemented or otherwise modified, this "Agreement") of SARRIS FAMILY, L.L.C., a New Jersey limited liability company ("Company"), is adopted and effective as of December 9, 2020 (the "Effective Date"), by Michael Sarris, residing at 88 Route 33, Manalapan, NJ 07726 (hereinafter referred to as "Michael"), Ilias Sarris, residing at 7 Lash Place, Denville, NJ 07834 (hereinafter referred to as "Ilias"), Savasti Sarris-Christodoulakis, residing at 35 Willow Brook Road, Freehold, NJ 07728 (hereinafter referred to as "Savasti"), Evdoxia Sarris-Fasouletos, residing at 50 E. Stonehurst Boulevard, Freehold, NJ 07728 (hereinafter referred to as "Evdoxia"), George K. Sarris, II, residing at 47 Rachael Drive, Morganville, NJ 07751 (hereinafter referred to as "George"), and each of whom are hereinafter referred to individually as a "party" or "Member" and collectively "parties" or "Members."

## EXPLANATORY STATEMENT

The parties have agreed to organize and operate a limited liability company in accordance with the provisions of the "New Jersey Revised Uniform Limited Liability Company Act," and subject to the terms and conditions set forth in this Agreement.

NOW, THEREFORE, for good and valuable consideration, the undersigned Members, intending legally to be bound, agree as follows:

## SECTION I

## GENERAL DEFINITIONS

As used in this Agreement, the following terms shall have the meaning respectively ascribed to them:

Definitions:

"Act" means the New Jersey Revised Uniform Limited Liability Company Act, as amended from time to time.

"Affiliate" means, with respect to any person (i) each Person that, directly or indirectly, owns or controls, whether beneficially or as a trustee, guardian or other fiduciary, 5% or more of the voting interests of any Member, (ii) each Person that controls, is controlled by or is under common control with each Person referenced in the preceding subsection (i) or (ii) each of such Person's officers, directors, joint venturers, members and partners. For the purpose of this definition "control" of a Person shall mean the possession, directly or indirectly of the power to direct or cause the direction of its management or policies, whether through the ownership of voting interests, by contract or otherwise. Notwithstanding anything to the contrary contained herein, Affiliate shall not include any creditor of a Member receiving an assignment of membership interest as security for any private loan, or to any individual to whom a transfer of Membership interest is made in circumvention of the requirements for a transfer of Membership interests as provided herein.

"Agreement" means this Operating Agreement, as amended, restated, supplemented or otherwise modified from time to time.

"Code" means the Internal Revenue Code of 1986 as amended or any corresponding provisions of any succeeding law.

"Company" means the limited liability company formed in accordance with this Agreement.

"Extraordinary" means non-recurring expenses or income.

"Interest" means a Member's share of the profits and losses of, and the right to receive distributions from the Company, as set forth in Sections 3.3.

"LLC Percentage Interest" means, as to a particular Member, the percentage set forth after the Member's name on Exhibit A attached hereto.

"Member" means each Person or entity signing this Agreement and any agent of an entity and any person who subsequently is admitted as a Member of the Company.

"Person" means and includes an individual, corporation, partnership, association, limited liability company, trust, estate or other entity.

"Regulations" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

**FORMATION AND NAME, OFFICE; PURPOSE, TERM**

2.1 *Organization.* The parties organized a limited liability company pursuant to the Act and the provisions of this Agreement and, for that purpose caused a certificate of formation to be executed and filed for record with the Secretary of State on ________ ____, 2021 (the "Certificate of Formation").

2.2 *Name of the Company.* The name of the Limited Liability Company shall be "**SARRIS FAMILY, LLC**" (hereinafter the "Company"). The Company may do business under that name.

2.3 *Purpose.* The Company is organized to manage the property where All Seasons Diner II is currently located on and to do any and all things necessary, convenient, or incidental to that purpose.

2.4 *Term.* The term of the Company began upon the filing of the Certification of Formation with the Secretary of State and shall be perpetual unless its existence is sooner terminated as required by law or as set forth in this Agreement.

2.5 *Registered and Principal Office.* The registered and principal office of the Company in the State of New Jersey shall be located at 47 Rachael Drive, Morganville, NJ 07751, or at any other place within the State of New Jersey upon which the Member agrees to or at such other location as the registered agent shall determine in compliance with the Act.

2.6 *Registered Agent.* The name and address of the Company's registered agent in the State of New Jersey shall be **George K. Sarris, II**, located at 47 Rachael Drive, Morganville, NJ 07751.

2.7 *Liability as to third parties.* Unless otherwise specified in this Agreement, no Member shall be personally liable for the debts, obligations or liabilities of the Company, including under a judgment, decree or order of a Court.

**SECTION III**

**MEMBERS AND DISTRIBUTIONS**

3.1 *Members.* The name and present mailing address and Percentages of each Member is set forth on Exhibit A attached hereto.

3.2 *Additional Members.* No additional Members shall be admitted to the Company without the unanimous written consent of all the Members, which shall not be unreasonably withheld unless for cause except for lineal descendants of existing LLC Members or adoptees of

existing LLC Members who shall be admitted upon execution of a writing acknowledging and agreeing to all terms of this Operating Agreement and any amendments hereto.

3.3 *Distributions.* All distributions after expenses shall be allocated equally to the members with regard to their respective LLC Percentage Interest which distributions shall be made monthly, to the extent available and provided rents are timely paid by the tenant. The aforementioned distributions shall include all profits, losses and other deductions allocated to the Members for each taxable year with regard to their percentage membership interests.

**SECTION IV**

**MANAGEMENT, RIGHTS, POWERS, AND DUTIES**

4.1. *Management of the Company.*

4.1.1. *Managing Member.* The Company shall, at all times, be managed by at least one (1) manager (the "Managing Member"), who must be a Member of the Company. George is hereby designated to serve as the initial Managing Member until such time as he may resign or be replaced pursuant to the terms of this Agreement. The Managing Member will not be paid for any services that he renders to the Company.

4.1.2 *General Powers.* The Managing Member shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement and the requirements of applicable law, to manage, control, administer, and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs, including, without limitation, for Company purposes, the power to:

4.1.2.1. construct, operate, maintain, finance, and improve, and to own, sell, convey, assign, mortgage, or lease any real estate and any personal property;

4.1.2.2. purchase liability and other insurances to protect the Company's properties and business;

4.1.2.3. execute or modify leases with respect to any part or all of the assets of the Company. In the event the current lease and option associated therewith is not renewed, the Managing Member is authorized to market the property located at 4135 US 9, Freehold, New Jersey (the "Property") for rent with a licensed commercial real estate broker and may enter into a new lease agreement with a new tenant with a minimum monthly rental amount as stated in the Settlement Agreement dated July 30, 2020 ("Settlement Agreement") with a yearly increase of 2% thereafter without the consent of any of the other remaining members of the Company with a maximum term, including any renewal options, of thirty (30) years. Any offer with a rent lower than what is stated in the Settlement Agreement will require the unanimous consent of all Members. Any individual Member or group of Members of the Company shall have a right of first refusal to lease the subject property for the same monthly amount as negotiated with a prospective tenant. In the event the threshold is not met, and the Members cannot agree to the fair market rental value to lease the Property, then the Managing Member shall obtain an appraisal of the Property. If any Member or group of Members do not accept the fair market determination of the first appraisal, then the disagreeing Member or group of Members shall have the right to obtain a second appraisal. Thereafter, the Members may unanimously agree to accept the average of the two appraisals as the fair market rental value of the Property. Alternatively, in the event that the Members cannot unanimously consent to the average of the two appraisals, the two appraisers will pick a third appraiser to determine the fair market value of the Property and that value will be binding for the purposes of the fair market rental value/right of first refusal for the prospective tenant. All appraisals shall be paid for by the Company.

4.1.2.3.1. In the event that the current lease, and any options to renew associated therewith has expired, or the current tenant is in default and/or the current lease is otherwise terminated, and the parties do not unanimously agree to remarket the property for rent as set forth in the Settlement Agreement, then any Member of the Company may demand that the Property be sold for fair market value, which shall be determined as follows:

i. the Managing Member shall have the right to retain a licensed commercial real estate broker to market and sell the property and obtain the highest and best offer.

ii. any Member or group of Members who do not wish to sell the Property shall have a right of first refusal to purchase the selling party's(ies) interest at a price matching the highest and best offer or the fair market value of the Property as determined by the appraisal mechanism set forth below.

iii. If an offer is not obtained within three (3) months from the date the subject property is listed, or if the parties do not unanimously agree to the sale price established by a highest and best offer, then the Managing Member shall obtain an appraisal of the Property. If any Member or group of Members do not accept the fair market determination of the first appraisal, then the disagreeing Member or group of Members shall have the right to obtain a second appraisal. Thereafter, the Members may unanimously agree to accept the average of the two appraisals as the fair market value of the Property. Alternatively, in the event that the Members cannot unanimously consent to the average of the two appraisals, the two appraisers will pick a third appraiser to determine the fair market value of the Property and that value will be binding for the purposes of the fair market value/right of first refusal for the pending sale. All appraisals shall be paid for by the Company.

iv. if the Managing Member has not obtained an offer to purchase the Property that has been agreed to by unanimous consent of the parties, and if any party refuses to accept the fair market value established by the appraisal mechanism set forth in paragraph iii above, then any party may commence an act of partition for the subject property and any party who refused to accept the appraisers valuation above shall pay all legal fees and costs of any other party incurred as a result thereof.

4.1.2.4. prepay, in whole or in part, refinance, amend, modify, or extend any mortgages or deeds of trust which may affect any asset of the Company and in connection therewith to execute for and on behalf of the Company any extensions, renewals, or modifications of such mortgages or deeds of trust;

4.1.2.5. execute any and all other instruments and documents which may be necessary or in the opinion of the Managing Member desirable to carry out the intent and purpose of this Agreement, including, but not limited to, documents whose operation and effect extend beyond the term of the Company;

4.1.2.6. enter into any kind of activity necessary to, in connection with, or incidental to, the accomplishment of the purposes of the Company and to spend an amount not to exceed $2,000 on legal and $2,000 on accounting related expenses in any calendar year. The Managing Member shall provide the Members with copies of all accounting and legal expenses paid; and

4.1.3. *Extraordinary Transactions.*

Notwithstanding anything to the contrary in this Agreement, the Managing Member shall not undertake any of the following on behalf of the Company without the unanimous written approval of the Members:

4.1.3.1. any expenditure or loan in excess of $5,000.00 of the Company's money on any occasion except that the Managing Member may seek a loan of up to $60,000 to cover any real estate taxes if he is unsuccessful in obtaining the funds from the Members.

4.1.3.2. the admission of additional Members to the Company;

4.1.3.3. the filing of a petition under the United States Bankruptcy Code or an assignment for the benefit of creditors;

4.1.3.4. sale or encumbrance of all or substantially all of the business or the assets of the Company to a third party unless same is accomplished in accordance with the terms of this Agreement.;

4.1.3.5. dissolution of the Company;

4.1.3.6. amendment of this Operating Agreement;

4.1.3.7. entering into any material agreements, or any material amendments, supplements or modifications to any material agreements, with a Managing Member or any Affiliate of a Managing Member except on terms which are intrinsically fair, commercially reasonable and no less favorable to the Company than would be obtained in a comparable arm's-length transaction with an unrelated third party; and

4.1.4. *Removal of a Managing Member*. The Members may only remove a Managing Member then acting for cause which shall be defined as the Managing Member engaged in fraudulent or willful misconduct that adversely and materially affected the Company's business, or the Managing Member willfully and persistently committed a material breach of this Agreement.

4.1.5. *Election of Managing Member*. If a Managing Member is removed pursuant to section 4.1.4, a new Managing Member shall be elected by a unanimous vote of LLC Percentage Interests of the Members. Each Member shall have one vote for each LLC Percentage Interest point owned by that Member. The removed Managing Member shall not be entitled to vote their LLC Percentage Interests.

4.1.6. *No Management by Other Persons or Entities*. Except and only to the extent expressly delegated by the Managing Member or as provided in this Agreement, no person or entity other than the Managing Member and the Members, for the specific purposes set forth elsewhere herein, shall be an agent of the Company or have any right, power or authority to transact any business in the name of the Company or to act for or on behalf of or to bind the Company.

4.1.7. *Power of Attorney*. The Managing Member is granted power of attorney by all Members to execute any and all documents required to be executed by the Company in order to carry out all affairs of the Company in accordance with this Agreement.

4.2 *Fiduciary Duty of the Members*. Each Member owes to the Company and the other Members only the fiduciary duties of care and loyalty set forth in this Section 4.2.

4.2.1 *Duty of Care; Standard of Care*. A Member's duty of care to the Company and the other Members in the conduct and winding up of the Company's business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

4.2.2 *Discharge of Duty of Care*. In discharging his or her duty of care under this Agreement, a Member shall be entitled to reasonably rely in good faith on (a) the terms of this Agreement, (b) Company records and information, (c) information, opinions, reports and statements, including financial statements and other financial data, prepared or provided by

Company employees, attorneys, accountants, other professional advisors or other Members, and (d) other persons whom, at the time of the action, the Member reasonably believed to be competent in the matter in question, and in so doing shall not be deemed to have violated his or her duty of care with respect to the matter in question.

4.2.3. *Duty of Loyalty.* A Member's duty of loyalty to the Company and the others Members is limited to the following:

(a) to account to the Company and hold as trustee for it any property, profit or benefit derived by the Member (i) in the conduct and winding up of the Company's activities, (ii) from a use of the Company's property, and (iii) from an appropriation of a Company opportunity;

(b) to refrain from dealing with the Company in the conduct or winding up of the Company's activities as or on behalf of a person or entity having an interest adverse from the Company (except where the transaction is in accordance with paragraph 4.2.5.); and

(c) to refrain from competing with the Company in the conduct of the Company's business (as described in Section 2.4) for a period of twenty-four (24) months following the resignation, expulsion or other disassociation of the Member.

4.2.4. *No Exclusive Duty to Company.* Each Member shall devote to the Company such time and effort as he or she may from time to time deem necessary. So long as he or she does not violate the duty of loyalty in Section 4.2.3., the Member shall not be required to manage the Company as his or her sole and exclusive function, and the Member may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any other Member shall have any right, by virtue of this Agreement, to share or

participate in such other business interests or activities of the Member or to the income or proceeds derived therefrom.

4.3 *Unanimous Decisions.* Except where this Operating Agreement requires otherwise or as required by applicable law, all decisions of the Members shall be made by way of unanimous vote of the Members.

4.4 *Written Consents in Lieu of Meetings.* In lieu of holding a meeting, the Members may vote or otherwise take action by a written instrument indicating the consent of Members holding the required percentage of LLC Percentage Interests.

4.5 *Notifications.* Any notice, demand, consent, election, offer, approval, request, or other communication (collectively a "notice") required or permitted under this Agreement must be in writing and either delivered personally, sent by overnight express courier (such as Federal Express or United Parcel Services) or sent by overnight express mail, certified or registered mail, postage prepaid, return receipt requested. A notice must be addressed to a Member at his/her last known address on the records of the Company. The initial addresses of the Members are as set forth in the introductory paragraph hereto. A notice to the Company must be addressed to the Company's principal office. A notice delivered personally will be deemed given only when acknowledged in writing by the person to whom it was delivered. A notice that is sent by overnight express courier will be deemed given upon the date confirmed by the courier that such notice was delivered. A notice that is sent by mail will be deemed given three business days after it is mailed. Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.

4.6 *Specific Performance.* The parties recognize that irreparable injury will result from a breach of any provision of this agreement and that money damages will be inadequate to remedy

fully the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach, or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

4.7 *Estoppel Certificate*. Each Member shall, within ten (10) days after written request by any other Member or the Company, deliver to the requesting person a certificate stating, to the Member's knowledge that: (a) this Agreement is in full force and effect except as stated otherwise in the certificate; (b) this Agreement has not been modified except by any instrument or instruments identified in the certificate; and (c) there is no default hereunder by the requesting person, or if there is a default, the nature and extent thereof shall be set forth.

4.8 *Indemnification*. The Company shall indemnify each Member and the Managing Member for any act performed by such Person with respect to Company matters, against any loss, judgments and expenses (including reasonable attorney's fees) except for fraud, gross negligence, willful misconduct, or intentional breach of this Agreement. The Company shall also indemnify any and all non-Member "Company agent" (as presently defined by N.J.S.A. 42:2C-38(1) and as may be amended from time to time) with respect to any loss, damage, claim or liability (including reasonable attorneys' fees) that was not the result of the agent's fraud, gross negligence or willful misconduct, provided that the agent was acting within the scope of his or her agency and in the regular course of Company business.

## SECTION V

## TRANSFER PERMITTED ON SATISFACTION OF CERTAIN CONDITIONS

5.1 *Transfers to Affiliates.* Notwithstanding anything set forth in this Agreement to the contrary, any Member may at any time, and from time to time, transfer all or any portion of or any interest or right in its LLC Percentage Interests to (i) any other Member or (ii) any Affiliate of the Member.

5.2 *Conditions of Transfer other than Provided in Section 5.1.* Except as set forth in Section 5.1, no Member may transfer all or any portion of or any interests or rights in its Membership Rights, and no Member may transfer its Membership Rights unless all the Members consent in writing to such transfer. Any transfer of any Membership Rights in violation of the prohibition contained in this Section V, shall be deemed invalid, null and void, and of no force or effect. Any person to whom Membership Rights are attempted to be transferred in violation of this section shall not be entitled to vote on matters coming before the Members, participate in the management of the Company, receive distributions from the Company or have any other rights in or with respect to the Membership Rights or interest.

5.3 *Right of First Offer.*

A. If an Member (a "Transferor") desires to transfer all or any portion of, or any interest or right in, the Transferor's LLC Percentage Interest (the "Transferor Interest"), the Transferor shall notify the Company of that desire (the "Transfer Notice") prior to offering it for sale to a third party. The Transfer Notice shall describe the Transferor Interest. The Company shall have the option (the "Purchase Option") to purchase all of the Transferor Interest for a price (the "Purchase Price") equal to the fair market value. Notwithstanding anything contained in this

agreement to the contrary, the computation of fair market value shall be subject to the following provisions:

B. The Transferor and the Company shall agree upon the fair market value of the Transferor's Interest. If there is no agreement on the fair market value, the Transferor and the Company shall agree upon a mutually acceptable appraiser within twenty (20) days following the date of the Transfer Notice. In the event the Transferor and Company fail to agree, two (2) appraisers shall be appointed within thirty (30) days following the date of the Transfer Notice, one by the Transferor, and one by the Company. If the Transferor, on the one hand, or the Company, on the other hand, fail to appoint an appraiser within thirty (30) day period specified herein, the sole appraiser appointed within such thirty (30) day period shall be the sole appraiser for the purposes of determining fair market value of the Transferor's Interest to be purchased pursuant to this Section 5.3. The Transferor and the Company shall promptly provide notice of the name of the appraiser so appointed by such party to the other. A third appraiser, if the initial two appraisers are appointed and cannot agree on a determination of value, shall be appointed by the mutual agreement of the first two appraisers so appointed, or, if such first two appraisers fail to agree upon a third appraiser within thirty (30) days following the date of the Transfer Notice, either the Transferor or the Company may demand the appointment of an appraiser be made by the then director of the Regional Office of the American Arbitration Association located nearest to the Company's principal office, in which event the appraiser appointed thereby shall be the third appraiser. Each of the appraisers shall submit to the Transferor and the Company, within thirty (30) days after the final appraiser has been appointed ("Appraisal Period"), a written appraisal (the "Appraisal") of the fair market value of the Transferor's Interest.

C. In connection with any appraisal conducted pursuant to this Agreement, the parties hereto agree that any appraiser appointed hereunder shall be given full access during normal business hours to all information required and relevant to a valuation of the Transferor's Interest.

D. If three appraisers are appointed, the fair market value of the Transferor's Interest in question shall be equal to the numerical average of three appraised determinations; provided, however, that if the difference between any two appraisals is not more than ten percent (10%) of the lower of the two, and the third appraisal differs by more than twenty-five percent (25%) of the lower of the other two appraisals, the numerical average of such two appraisals shall be determinative.

E. Any appraiser, to be qualified to conduct an appraisal hereunder, shall be an independent appraiser (i.e., not affiliated with Sarris Family, LLC, the Members or employees), a M.A.I. appraiser or its equivalent, and shall be reasonably competent as an expert to appraise the value of the Transferor's Interest. If any appraiser initially appointed under this Agreement shall, for any reason, be unable to serve, a successor appraiser shall be promptly appointed in accordance with the procedures pursuant to which the predecessor appraiser was appointed.

Notwithstanding the foregoing, if the determination of the fair market value of the Transferor's Interest by appraisal is not completed and all appraisal reports delivered as provided herein within the Appraisal Period, then all closing, payment, and similar dates subsequent thereto shall be automatically extended one (1) day for each day delivery of the appraisal reports is delayed beyond the end of the Appraisal Period.

F. The cost of the appraiser appointed by each party shall be borne by each such party. The cost of the third appraiser, if any, or the sole appraiser, in the event the Transferor and

the Company mutually agree upon a single appraiser, shall be borne equally by the Transferor and the Company.

G. The Purchase Option shall be and remain irrevocable for a period (the "Offer Period") ending at 11:59 p.m. local time at the Company's principal office on the sixtieth (60th) day following the date of the Transfer Notice is given to the Company.

At any time during the Transfer Period, the Company may elect to exercise the Purchase Option by giving a written notice of its election to the Transferor. The Transferor shall not be deemed Member for the purpose of voting on whether the Company should elect to exercise the purchase option.

H. If the Company elects to exercise the Purchase Option, the Company's notice of its election shall fix a closing date (the "Transfer Closing Date") for the purchase, which shall not be earlier than ten (10) days after the date of the notice of election or more than ninety (90) days after the expiration of the Transfer Period.

I. If the Company elects to exercise the Purchase Option, the Purchase Price shall be paid in cash on the Transfer Closing Date or by the installment method in section 5.7.

J. If the Company fails to exercise the Purchase Option, the Transferor shall be permitted to offer the Transferor Interest to any non-affiliate for a period of ninety (90) days (the "Free Transfer Period") after the expiration of the Transfer Period at a price not less than the Purchase Price; however, such offer must expressly be conditioned upon final approval and consent of the remaining Member(s) pursuant to Section 5.1. If the Transferor does not obtain consent, which consent shall not be unreasonably withheld, delayed or conditioned, and transfers the Transferor Interest within the Free Transfer Period, the Transferor's right to transfer the Transferor Interest pursuant to this section shall cease and terminate.

K. Any transfer of the Transferor Interest made after the last day of the Free Transfer Period or without strict compliance with the terms, provisions and conditions of this section and other terms, provisions and conditions of this section and other terms, provisions and conditions of this agreement shall be null, void and of no force or effect.

5.4 *Right of First Refusal.*

A. If a Member (a "Transferor") receives a *bona fide* oral or written offer which the Member desires to accept (the "Transferee Offer") from any other person other than an Affiliate (a "Transferee"), whether before, during or after a Free Transfer Period, to purchase all or any portion or any interest or rights of the Transferor's Membership Rights (the " Transferor Interest"), then the Transferor shall give the Company written notice (the "Transfer Notice") of the Transferee Offer containing each of the following:

i. The Transferee's identity;

ii. A true and complete copy of the Transferee Offer;

iii. The Transferor's offer (the "Offer") to sell the Transferor Interest to the Company for a price equal to that contained in the Transferee Offer (the " Purchase Price", and together with the Purchase Price, each, a "Purchase Price"); and

iv. Such other information as the Company may reasonably request.

B. The Offer shall be and remain irrevocable for a period (the "Offer Period") ending 11:59 p.m. local time at the Company's principal office on the thirtieth (30th) day following the date the Transfer Notice is given to the Company. At any time during the Offer Period, the Company may, at its option (the "Option", and together with the Option, each, a "Purchase Option"), accept the Offer, based on the affirmative vote of the Members holding a majority of the LLC Percentage Interests, by giving written notice to the Transferor of its acceptance (the "Offeree

Notice"). The Transferor shall not be deemed a Member for the purpose of voting on whether the Company shall accept the Offer. If the Company accepts the Offer, the Offeree Notice shall fix a closing date (the " Transfer Closing Date") for the purchase, which shall not be earlier than ten (10) or more than ninety (90) days after the expiration of the Offer Period.

C. If the Company accepts the Offer, the Purchase Price shall be paid in immediately available funds on the Transfer Closing Date unless the Company elects prior to or on the Transfer Closing Date to pay the Purchase Price in installments pursuant to the provisions of Section 5.7, and the Transferor Interest shall be transferred to the Company (or its designee) on the Transfer Closing Date.

D. If the Company rejects the Offer and fails to obtain the required consent of the Members, which consent shall not be unreasonably withheld, delayed or conditioned, to the transfer during the Offer period, the Transferor shall notify the Transferee of such rejection and failure of the Members to consent and provide a copy of such notice to the Company, and the Transferor shall not be permitted to transfer the Transferor Interest to the Transferee.

E. If the Company rejects the Offer, but the required Members consent to the Transferor transferring the Transferor Interest to the Transferee contained in the Transferee Offer, then the Transferor may transfer the Transferor Interest to the Transferee for the same or greater price than the Purchase Price and on the same terms and conditions as set forth in the Transfer Notice.

F. Any transfer by the Transferor without strict compliance with the terms, provisions and conditions of this Section 5.4 and the other terms, provisions and conditions of this agreement, shall be null and void and of no force and effect.

5.5.1 *Optional Repurchases.*

(a) Upon the happening of any of the following events (each, a "Triggering Event"), the Company, if directed to do so by the affirmative vote of the Members having a majority of the LLC Percentage Interests (excluding, for the purposes of such vote, the subject Member's LLC Percentage Interests) shall purchase all of the LLC Percentage Interest held by the subject Member in accordance with the terms hereof:

*(i)* *Bankruptcy.* Adjudication of the subject Member as a bankrupt, either voluntary or involuntary;

(ii) *Assignment To Creditors.* Assignment by the subject Member for the benefit of creditors;

(iii) *Transfer Violation.* Violation, or attempted violation, of the terms of Sections 5.1, 5.2, 5.3 or 5.4 by the subject Member; or

(b) The Company (or its designee) shall, if required above, purchase from the Member, and the Member shall sell to the Company (or its designee), all of the subject Member's LLC Percentage Interest at the price determined pursuant to Section 5.3 (as though the subject Member were the Transferor). The Company shall have the option, exercisable by written notice delivered to the subject Member no later than ten (10) days prior to the closing date, to pay the purchase price in installments pursuant to the provisions of Section 5.7.

(c) The closing for the sale of the Membership Rights shall take place at the principal office of the Company at a date designated by the Company, which shall be not more than one hundred twenty (120) days following the occurrence of the Triggering Event.

(d) The recaptured LLC Percentage Interest shall be distributed in accordance with the existing percentage interests to each Member.

5.6 *Admission of Transferee as Member.* Notwithstanding anything contained herein to the contrary, the transfer of any LLC Percentage Interest to a transferee in accordance with the provisions of this Section V shall have the effect of causing such transferee (to the extent not already a Member) to be deemed a replacement Member of the Company and such transferee shall execute such documents and other instruments as the Managing Member may reasonably request to document such admission.

5.7 *Installment Buy outs.* If the Company elects to pay the Purchase Price on an installment basis, the Purchase Price shall be paid by delivering at the initial closing (i) twenty percent (20%) of the Purchase Price in cash or by certified or bank check and (ii) an executed promissory note in the initial principal amount of eighty (80%) percent of the Purchase Price payable to the Transferor in sixty (60) equal monthly installments over five (5) years with an interest rate fixed at the current Mid-Term Applicable Federal Rate for the month the promissory note is to begin or if a Mid-Term Applicable Federal Rate does not exist, then the lowest interest rate allowed by law.

5.8 *Assignments/Successor Interest.* Any permitted assignee or successor to the Membership Rights of a Member shall assume all liabilities and obligations of such Member under this Agreement and shall be bound by same.

## SECTION VI

## DISSOLUTION/TERMINATION OF THE COMPANY

Subject in all instances to the requirements of the Act and all other applicable law:

6.1 *Events of Dissolution.* The Company shall be dissolved upon the happening of the following events:

a. upon the written agreement of all Members;

b. ninety (90) days after the date on which the Company no longer has at least one Member, unless at least one new Member is admitted within that ninety (90) day period; or

c. upon entry of an order or judgment of dissolution.

6.2 *Procedure for Winding Up Company.* If the Company is dissolved, the remaining Members shall wind up its affairs. On winding up of the Company, the assets of the Company shall be distributed as follows:

(a) first, to creditors, including Members and Affiliates of Members, to the extent permitted by law, in satisfaction of liabilities of the Company other than liabilities for which reasonable provision has been made and liabilities of the type referred to in the next two paragraphs;

(b) second, to former Members who have resigned, unpaid distributions to which they became entitled prior to dissolution or resignation, as applicable;

(c) third, to the Members pro rata in proportion to their unreturned Capital Contributions until all of their Capital Contributions have been returned; and

(d) then, to the Members pro rata in proportion to their LLC Percentage Interests.

6.3 *Filing Certificate of Dissolution.* If the Company is dissolved and its affairs wound up, a Member shall, pursuant to the Act, promptly file a Certificate of Dissolution with the Treasurer of the State of New Jersey, wind up the affairs of the Company and file a Statement of Termination. If there are no remaining Members, the Certificate shall be filed by the last Person to be a Member; if there are no remaining Members or a Person who last was a Member, the Certificate shall be filed by the legal or personal representatives of the Person who last was a

Member. If the legal or personal representative declines or fails to wind up the company's activities, a person may be appointed pursuant to N.J.S.A. 42:2C-49(d).

6.4 *Notice of Known Claims.* In winding up its affairs, the Company shall give notice of known claims to claimants, in compliance with N.J.S.A. 42:2C-50(b), simultaneous with its filing of a Certificate of Dissolution and shall follow the procedures of N.J.S.A. 42:2C-50(c) if there are reasonably sufficient grounds to reject the claim of a known claimant.

**SECTION VII**

**CAPITAL CONTRIBUTIONS AND LOANS**

7.1 *Initial Capital Contributions.* Upon the execution of this Agreement, the Members shall have contributed to the Company the amounts set forth on Exhibit A attached hereto.

7.2 *Additional Capital Contributions.* If the Managing Member determines, at any time or from time to time, that the Company requires additional capital contributions, then each Member shall contribute its share of the additional capital contributions in accordance with its LLC Percentage Interest. Such additional capital contribution shall be in writing setting forth the amounts (or property) to be contributed, and shall be attached to the Operating Agreement. Within thirty (30) days after the Managing Member has determined the amount of additional capital contributions required, each Member shall pay its share, in cash or by certified check, to the Company, or by deed transferred to the Company.

7.3 *No Interest on Capital Contribution.* Members shall not be paid interest on their capital contributions.

7.4 *Return of Capital Contributions.* Except as otherwise provided in this Agreement, no Member shall have the right to receive any return of any capital contribution or Capital Account.

7.5 *Maintenance of Capital Accounts.* A separate capital account (each, a "Capital Account") shall be maintained for each Member in accordance Code Section 704(b) and Treasury Regulations Section 1.704-1(b).

7.6 *Withdrawal of Capital.* A Member shall not be entitled to withdraw any part of such Member's Capital Account or to receive any distribution from the Company, except as provided in this Agreement.

**Section VIII**

**Books, Records, Accounting, and Tax Elections**

8.1. *Bank Accounts.* All funds of the Company shall be deposited in a bank account or accounts opened in the Company's name. The Managing Member shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons, by way of a written and signed document, who will have authority with respect to the accounts and the funds therein, if applicable.

8.2. *Books and Records.* The Managing Member shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business. The books and records shall be maintained in accordance with sound accounting practices and shall be available at the Company's principal office for examination by any Member or the Member's duly authorized representative at any and all reasonable times during normal business hours upon three (3) days' notice.

8.3. *Annual Accounting Period.* The annual accounting period of the Company shall be its taxable year. The Company's taxable year shall be selected by the Members, subject to the

requirements and limitations of the Code. The annual accounting period shall be on a calendar year.

## SECTION IX

## MISCELLANEOUS PROVISIONS

9.1 *Assurances.* Each Member shall execute all certificates and other documents and shall do all such filing, recording, publishing and other acts as the Members deem appropriate to comply with the requirements of law for the formation and operation of the company and to comply with any laws, rules and regulations relating to the acquisition, operation, management, modification, or sale of the property of the Company.

9.2 *Complete Agreement.* This Agreement constitutes the complete and exclusive statement of the agreement among the Members. It supersedes all prior written or oral statements, including any prior representations, statements, conditions or warranty. Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of all of the Members.

9.3 *Applicable Law.* All questions concerning the construction, validity, interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law and not the law of conflicts, of the State of New Jersey.

9.4 *Section Titles.* The headings, and subheadings herein are inserted as a matter of convenience only and do not define, control or limit the scope of the agreement or the intent of the provisions hereof.

9.5 *Binding Provisions.* This Agreement is binding upon and inures to the benefit of the parties and their respective heirs, executors, administrators, personal and legal representatives, successors and assigns.

9.6 *Jurisdiction and Venue.* Any suit involving any dispute or matter arising under this Agreement may only be brought in the Superior Court of New Jersey, Monmouth County. All Members hereby consent to the exercise of personal jurisdiction by such court with respect to any proceeding.

9.7 *Terms.* Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the person may in the context require.

9.8 *Severability.* Each provision of this Agreement shall be considered separable; and if for any reason any provision or provisions hereunder determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or effect those portions of the agreement that are valid.

9.9 *Days for performance.* If a date or the expiration date of any period that is set out in any provision of this Agreement falls upon a day that is a Saturday, a Sunday or a federal holiday, then, in such event, the date or expiration date of such period shall be extended to the next day that is not a Saturday, a Sunday or a federal holiday.

9.10 *Counterparts.* This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to any other counterpart.

9.11 *Representation.* The law firm of Davison, Eastman, Munoz, Paone, P.A. represents only Michael in connection with the preparation, negotiation and execution of this Agreement.

George is represented by Ansell Grimm and Aaron and Ilias, Evdoxia and Savasti are represented by Hanlon, Niemann & Wright. All parties to this Agreement have engaged independent legal counsel in connection with same prior to signing this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**Sarris Family, Limited Liability Company**
**Operating Agreement**

**EXHIBIT A**
**List of Members, Capital, and Percentages**

| Name of Member and Address | Capital Account as of August 1, 2020 | Percentage Interest |
|---|---|---|
| George K. Sarris, II<br>47 Rachael Drive<br>Morganville, NJ 07751 | $______.00 | 33.33% |
| Michael Sarris<br>88 Route 33<br>Manalapan, NJ 07726 | $______.00 | 29.00% |
| Ilias G. Sarris<br>7 Lash Place<br>Denville, NJ 07834 | $______.00 | 23.67% |
| Evdoxia Sarris-Fasouletos<br>50 E. Stonehurst Boulevard<br>Freehold, NJ 07728 | $______.00 | 7.00% |
| Savasti Sarris-Christodoulakis<br>35 Willow Brook Road<br>Freehold, NJ 07728 | $______.00 | 7.00% |

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the Effective Date.

WITNESS OR ATTEST:

MEMBER:

**MICHAEL SARRIS**

WITNESS OR ATTEST:

MEMBER:

**ILIAS SARRIS**

WITNESS OR ATTEST:

MEMBER:

**EVDOXIA SARRIS-FASOULETOS**

WITNESS OR ATTEST:

MEMBER:

**SAVASTI SARRIS-CHRISTODOULAKIS**

WITNESS OR ATTEST:

MEMBER:

**GEORGE K. SARRIS, II**

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the Effective Date.

| | |
|---|---|
| WITNESS OR ATTEST: | MEMBER: |
| ______________________ | ______________________ MICHAEL SARRIS |
| WITNESS OR ATTEST: | MEMBER: |
| ______________________ | ______________________ ILIAS SARRIS |
| WITNESS OR ATTEST: | MEMBER: |
| ______________________ | ______________________ EVDOXIA SARRIS-FASOULETOS |
| WITNESS OR ATTEST: | MEMBER: |
| ______________________ | ______________________ SAVASTI SARRIS-CHRISTODOULAKIS |
| WITNESS OR ATTEST: | MEMBER: |
| ______________________ | ______________________ GEORGE K. SARRIS, II |

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the Effective Date.

| | |
|---|---|
| WITNESS OR ATTEST: | MEMBER: |
| ______________________ | ______________________ |
| | **MICHAEL SARRIS** |
| WITNESS OR ATTEST: | MEMBER: |
| ______________________ | ______________________ |
| | **ILIAS SARRIS** |
| WITNESS OR ATTEST: | MEMBER: |
| ______________________ | ______________________ |
| | **EVDOXIA SARRIS-FASOULETOS** |
| WITNESS OR ATTEST: | MEMBER: |
| ______________________ | ______________________ |
| | **SAVASTI SARRIS-CHRISTODOULAKIS** |
| WITNESS OR ATTEST: | MEMBER: |
| ______________________ | ______________________ |
| | **GEORGE K. SARRIS, II** |
| | 3/10/2021 |