UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**STARK & STARK, P.C.**
Joseph H. Lemkin, Esq. (JL-2490)
100 American Metro Blvd.
Hamilton, NJ 08619
(609) 791-7022 (Telephone)
(609) 895-7395 (Facsimile)
jlemkin@stark-stark.com
*Attorneys for George Sarris*

In Re:

ILIAS SARRIS,

Debtor.

Case No. 25-14910 (SLM)

Chapter 7

**OBJECTION TO DEBTOR'S MOTION TO CONVERT AND MEMORANDUM IN SUPPORT OF CROSS-MOTION TO COMPEL COMPLIANCE WITH SETTLEMENT AGREEMENT**

George K. Sarris, II ("George II"), the managing member of Sarris Family, LLC (the "Company") and the submitting competing bidder, through undersigned counsel, respectfully submits this objection to the October 2, 2026, motion of Ilias Sarris (the "Debtor") to convert this Chapter 7 case to a case under Chapter 13 and obtain related relief (the "Motion"). George II also cross-moves to compel compliance with the Settlement Agreement including its higher-and-better-offer provision.

## PRELIMINARY STATEMENT

The Motion should be denied because it is the culmination of a sustained lack of candor concerning a substantial, income-producing asset—not an isolated scheduling error. When the Debtor filed his voluntary petition for chapter 7 relief on May 7, 2025 (the "Petition Date"), his

petition, schedules and statement of financial affairs (the "Schedules") reported only $3,200 in assets, while omitting his 23.67% membership interest in Sarris Family, LLC (the "Company," and that interest, the "LLC Interest") that he now values at approximately $596,000—without a current appraisal of the LLC Interest. The omissions extended across multiple disclosures in the Schedules which expressly require that information: Schedule A/B failed to identify the LLC Interest; the Statement of Financial Affairs failed to identify his LLC membership; and its historical-income response omitted the distributions the Debtor now reports receiving. Each request for such information presented a separate obligation to disclose. Each response left critical information concerning the LLC Interest undisclosed. [Dkt. 1, at 12, 14, 33, 42; Dkt. 33-1, ¶¶ 6–8].

In the Motion, the Debtor makes the LLC Interest the centerpiece of his request for conversion. He insists that the distributions from the LLC Interest supply more than half his personal income and that its preservation is essential to his purported chapter 13 plan. That position exposes the materiality of the information missing from his original disclosures. A generic monthly entry for "Interest and dividends" did not identify the ownership interest, disclose the business connection, or report the historical distributions where the Schedules separately required them. [Dkt. 1, at 27, 33, 42]. The asset now portrayed as indispensable was absent from his asset schedules and business-membership disclosure, and the distributions now invoked to justify relief were glaringly absent from his historical-income response. Nearly seventeen months after the Petition Date—and only after the Trustee's administration was nearly completed and the agreed competitive process threatened his ability to retain the LLC Interest—did the Debtor seek conversion. The Court should not permit him to use the financial significance of the LLC Interest as a reason to convert to Chapter 13, while dismissing the repeated failures by the Debtor to disclose that very significance at the outset of the bankruptcy case.

The history of the Debtor's binding settlement agreement with the Trustee concerning the LLC Interest (the "Settlement Agreement") makes the Motion even more troubling. Before reaching a settlement, the Trustee admonished the Debtor that conversion would be opposed under Supreme Court precedent as well as financial grounds. The Debtor nevertheless entered the Settlement Agreement, subject to higher and better offers from third-parties. The Settlement Agreement expressly acknowledged the Debtor's independent investigation, due diligence, and informed acceptance of its risks. Indeed, when George II submitted a competing offer, the Debtor submitted a second proposal for the LLC Interest with increased consideration and urged approval on revised terms. It was only when competition threatened to overtake his preferred resolution that the Debtor returned to conversion. The Debtor's own memorandum in support of the Motion admits that sequence. [Dkt. 33-9, at 7].

The Debtor's cumulative conduct warrants denial of the Motion. George II also cross-moves to enforce the settlement's higher-and-better-offer provision.

George II seeks meaningful consideration of his proposal, which would pay all claims as well as trustee commissions at closing, through the process in which he was invited to participate, with selection of the successful bidder remaining with the Trustee and the Court. The Debtor should not be permitted to invoke a competitive settlement process while it benefits him and dismantle it when the competition actually works.

## FACTUAL AND PROCEDURAL BACKGROUND

The Debtor commenced this case by filing a voluntary Chapter 7 petition on the Petition Date. On the same date, the Debtor filed his Schedules, including his Statement of Financial Affairs ("SOFA"). Schedule A/B reported total assets of $3,200. Although Item 19 expressly requests

nonpublic business interests, "including an interest in an LLC," the Debtor did not identify his 23.67% interest in the Company. [Dkt. 1, at 1, 12, 14 of 56; Dkt. 33-1, ¶ 4.] Jeffrey A. Lester was appointed Chapter 7 Trustee (the "Trustee") the following day. [Dkt. 19-2, ¶ 7]. The Debtor's original Schedules disclosed a monthly income figure without supplying the corresponding ownership and historical-income information. Schedule I listed $1,669.66 under "Interest and dividends," but did not identify the Company as its source. It also listed $1,581 in Social Security and $970.50 of spousal income, producing combined monthly income of $4,221.16. Schedule J reported expenses of $4,207 and net income of only $14.16. [Dkt. 1, at 27, 30.]

The separate required SOFA responses did not identify the underlying business or its distributions. Question 5 asks for other income, including interest and dividends, for the current year through filing and the two preceding calendar years, with each source separately listed. The Debtor identified only Social Security: $7,905 for 2025 through filing, $20,684 for 2024, and $20,039 for 2023. He did not identify the Company distributions in that response. Further, question 27 expressly asks whether the Debtor had been an LLC member within the preceding four years, but the response identifies neither the Company nor the membership. [Dkt. 1, at 33, 42].

The Debtor also did not advise the Company or George II, as its managing member, of the bankruptcy filing when it occurred, although the Operating Agreement addresses consequences that may follow a member's bankruptcy. Considered together with the omitted schedules, the failure to alert the Company is relevant to the Debtor's candor and the totality of the circumstances. [George II Cert. ¶ 2; Operating Agreement § 5.5.1].

During the course of the Trustee's administration of the estate, he uncovered the Debtor's interest in the Company. The Trustee advised the Debtor the LLC Interest and associated distributions constituted estate property. Per the Trustee's motion in support of the Settlement, the

Debtor originally disputed that position and raised the prospect of conversion to Chapter 13. [Dkt. 19-2, ¶¶ 8–10]. According to the Debtor, that discussion occurred as early as April 2026. [Dkt. 33-1, ¶ 11]. The Trustee informed the Debtor that conversion would be opposed on grounds including bad faith under § 706 and precedential Supreme Court authority, inability to satisfy the Chapter 13 liquidation comparison, and inability to fund administrative expenses. *See*, Lester Cert., Dkt. 19-1, ¶ 10; Dkt. 19-2, at 6–7 n.2.

With conversion already identified as a disputed alternative, the Debtor and Trustee negotiated the Settlement Agreement. They agreed on its terms on August 4, 2026, and the Trustee filed a motion to approve the Settlement Agreement on August 10. Id., ¶ 14; Dkt. 19. In exchange for release of the estate's LLC Interest, the Debtor would pay $65,055.37, allocated as $24,055.37 for unsecured claims, $35,000 for a portion of administrative expenses, and $6,000 for Trustee compensation. The Settlement Agreement required the Debtor to remit $40,000 within ten business days after its approval by the Court, with the balance paid in monthly installments over eighteen months. *Id.*, ¶ 14(i)–(ii); Settlement Agreement ¶¶ 2–3, attached to Lester Cert. as Exhibit A.

The Settlement Agreement expressly preserved competition. As the Trustee stated, "Approval of the Settlement Agreement by this Court is subject to any higher and better offer by any third party made before or at the hearing on approval of the Agreement." Id., at ¶ 14(iii) (citing Settlement Agreement ¶ 4). The Trustee explained that settlement would avoid the expense and uncertainty of litigating both the estate's LLC rights and the anticipated conversion motion. [Dkt. 19-2, ¶¶ 12–13]. The Trustee also reported substantial fees and expenses already incurred concerning the LLC Interest and related issues. Id. ¶ 24.

The Debtor expressly acknowledged the informed nature of his undertaking. The Settlement Agreement states that it was negotiated "in good faith and at arm's length by sophisticated Parties."

Each party acknowledged reliance on its own independent investigation, completion of its own due diligence, and possession of the knowledge and sophistication necessary to "fully evaluate and accept the merits and risks" of the contemplated transactions "without undertaking further discovery." *Id.*, Settlement Agreement ¶ 21.

George II participated in the opportunity expressly preserved by the Settlement Agreement. On September 15, 2026, he filed a limited objection presenting an $85,000 cash offer on the conditions stated in that filing, including approval of the rights conveyed and entry of a final order. [Dkt. 28, at 2–3, 5–6]. Three days later, the Debtor responded to George II's limited objection by acknowledging the higher-and-better-offer condition, proposing $70,055.37 upfront, addressing a proposed exemption waiver, and requesting approval on revised payment terms. [Dkt. 31, at 1–3, 6–7]. His cash proposal was $70,055.37; his separate characterization of approximately $85,555.37 in estate recovery included the asserted value of the exemption waiver. *Id*. at 1–2.

The Debtor's position advanced in response to George II's limited objection emphasized the advantages of immediate performance. He argued that payment upfront eliminated installment collection risk, avoided further delay, and permitted the Trustee to distribute funds and conclude administration promptly. [Dkt. 31, at 3]. Thus, after George II's participation in the process, the Debtor affirmatively sought approval of an enhanced bid.

The Debtor's memorandum in support of the Motion states that he added the LLC Interest to Schedule A/B in September 2026. [Dkt. 33-9, at 3, 6 (citing Dkt. 30)]. On October 2, 2026—nearly seventeen months after the petition and three days before the then-scheduled October 5 auction—the Debtor filed the Motion. The hearing regarding the Settlement Agreement was scheduled for October 6. *Id*. at 3. The Debtor's own explanation connects the Motion to the very competition the Debtor explicitly agreed upon: "Only when George K. Sarris, II's competing bid

overtook the Settlement did the Debtor return to the chapter 13 path." *Id.* at 7.

In the Motion, the Debtor now assigns the LLC Interest an approximate $596,000 value by applying the estate's 23.67% percentage to a gross property-tax assessment and subtracting one K-1 financing allocation. [Dkt. 33-1, ¶¶ 7–8]. That figure is not a current appraisal of the Company or the LLC Interest and does not account for the identity of the assets actually owned by the Company, the outstanding Company debt, or the rights and restrictions attached to the minority interest. It therefore does not establish fair market value. The Debtor also reports Company distributions of $17,774 in 2023, $18,603 in 2024, and $19,786 in 2025 and states that those distributions are more than half his personal income. *Id.* ¶ 6.

The repayment proposal accompanying the Motion differs from the immediate cash payment the Debtor advocated in September. It contemplates up to $90,000 from his wife within thirty days after conversion, up to $1,000 monthly from his son, and up to $500 monthly from himself and his wife over as many as sixty months. *Id*. ¶ 12. The Debtor characterizes his own existing expense figures as unreliable and proposes filing a revised budget after conversion. *Id*. ¶ 9.

George II remains prepared to perform on his cash offer which would satisfy all claims at closing, on the precise terms conveyed to the Trustee and set forth in his supporting certification. That offer—not merely his initial $85,000 proposal—is the competing proposal he asks the Trustee and the Court to consider through the agreed higher-and-better-offer process.

## LEGAL ARGUMENT

### I. THE DEBTOR'S CUMULATIVE CONDUCT WARRANTS DENIAL OF THE MOTION

Section 706(a) of the Bankruptcy Code permits a debtor to convert a previously unconverted Chapter 7 case to Chapter 13, but that authority is expressly limited by § 706(d). The

latter provision states that, "[n]otwithstanding any other provision of this section, a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter." These provisions must be read together. A debtor's ability to seek conversion does not establish an unconditional entitlement to proceed under Chapter 13; conversion remains subject to the statutory limitations governing relief under that chapter. *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 371–73 (2007). In *Marrama*, the Supreme Court explained that those limitations extend beyond the income and debt requirements of §109(e). Section 1307(c) authorizes dismissal or conversion of a Chapter 13 case "for cause," and its enumerated grounds are nonexclusive. Bad-faith conduct may constitute such cause, including misconduct committed during the preceding Chapter 7 proceeding. A determination that the debtor's bad faith would warrant dismissal or reconversion under § 1307(c) is therefore "tantamount to a ruling that the individual does not qualify as a debtor under Chapter 13." Id., at 373–74. Section 706(d), in turn, supplies the statutory basis to deny conversion at the outset. The Court need not first grant conversion merely to afford relief that the debtor's own misconduct would justify immediately withdrawing. *Id.*, at 374–75.

The circumstances of *Marrama* illustrate the operation of that rule. The debtor made misleading disclosures concerning a valuable property interest and sought conversion after the Chapter 7 trustee announced his intention to recover the property for the estate. The Supreme Court upheld denial of conversion, concluding that the debtor had forfeited his right to proceed under Chapter 13. *Id.*, at 368–70, 374–75. The Court distinguished an unenforceable contractual waiver of conversion from forfeiture resulting from misconduct: "[a] statutory provision protecting a borrower from waiver is not a shield against forfeiture." *Id.* at 374. The Court recognized that prior misconduct can justify denial without requiring the trustee and creditors to await further abuse after

conversion. *Id.* at 375 n.11, 376 n.13.

The Supreme Court subsequently confirmed the statutory foundation of this holding in *Law v. Siegel*, 571 U.S. 415, 425–26 (2014). There, the Court explained that *Marrama* did not authorize bankruptcy courts to disregard express provisions of the Code through general equitable powers. Rather, the debtor's bad faith prevented him from qualifying for Chapter 13 relief and thus from satisfying the express condition imposed by § 706(d). Accordingly, denial of conversion is appropriate where the debtor's conduct supplies cause under § 1307(c), not merely because the Court disapproves of the debtor's conduct in the abstract.

Within the Third Circuit, whether a debtor has acted in bad faith is determined from the totality of the circumstances, not by isolating individual events or accepting the debtor's stated purpose at face value. *In re Lilley*, 91 F.3d 491, 496 (3d Cir. 1996). Relevant considerations include the timing of the filing, the debtor's motive, the effect of the debtor's actions on creditors, the debtor's treatment of creditors before and after filing, and whether the debtor has been forthcoming with the Court and creditors. *Id*. These considerations require examination of the debtor's course of conduct as a whole. Read together, *Lilley* and *Marrama* direct the Court to determine whether that cumulative conduct establishes bad faith constituting cause under § 1307(c) and, consequently, warrants denial of conversion under § 706(d).

Authority in this District reinforces that the Court may consider nondisclosure, timing, motive, and feasibility together. *In re Shafer*, No. 07-14206 (GMB), 2009 WL 1651294, at *7–8 (Bankr. D.N.J. June 10, 2009), conversion was denied where concealed assets, obstruction, inaccurate financial information, and an unworkable plan collectively established atypical, bad faith. *In re Coley*, No. 25-22211 (JNP), 2026 WL 682481 (Bankr. D.N.J. Mar. 10, 2026), likewise denied conversion on a broader record of inaccurate disclosures and abusive purpose. And the

Third Circuit's decision in *In re Culp*, 681 F. App'x 140, 143–44 (3d Cir. 2017), affirmed denial of an eleventh-hour conversion request made after bidding procedures and marketing had begun, where the debtors also failed to substantiate Chapter 13 income.

The record here establishes that cumulative course of atypical conduct. The Debtor omitted an ownership interest he now describes as extraordinarily valuable and essential to his financial survival; negotiated a settlement after express notice that conversion would be opposed; knowingly accepted a higher-and-better-offer condition; and sought conversion when the resulting competition threatened his preferred outcome. These events demonstrate why the Motion is an effort to manipulate the bankruptcy process in bad faith.

The Debtor's disclosure failures bear directly on candor under *Lilley*. Schedule A/B expressly requested the Debtor to identify his LLC interests, and SOFA Question 27 expressly requested information regarding the Debtor's LLC memberships. The Debtor identified neither.

The Debtor's historical-income response likewise omitted distributions he now reports as substantial. The generic Schedule I entry establishes disclosure of a monthly income figure, not completion of the separate ownership, business, and historical-income disclosures. His disagreement over the Trustee's interest did not eliminate the Debtor's duty to identify the interest and state his position concerning it.

The timing in this case bears directly on motive. The conversion option was known by the Debtor and contested by the Trustee before they settled. The Debtor nevertheless accepted the competitive process and later urged approval of the Debtor's enhanced bid after George II participated. The Motion did not follow discovery of a new asset nor discovery of the distributions' importance. It followed the competing proposal that threatened to overtake the settlement. The Debtor's own "[o]nly when" admission supplies that causal connection. [Dkt. 33-9, at 7].

The acknowledgments in the Settlement Agreement eliminate any basis for treating the resulting competition as an unforeseen development. The Settlement Agreement confirms the Debtor's independent investigation, due diligence, and informed acceptance of risk, and expressly subjects approval to higher and better third-party offers. *See,* Settlement Agreement, ¶¶ 4, 21. The Debtor's subsequent request for approval on proposed revised terms confirms his continued support for the process while he sought to prevail within it.

The consequences concern administration, not merely a disappointed purchaser. The Trustee negotiated to avoid the conversion dispute, incurred expense addressing the LLC Interest, and presented a settlement that preserved superior offers. George II participated in reliance on that opportunity. The Debtor now seeks to undo the process after it generated the competition it contemplated. That sequence, considered with the original disclosure failures, warrants statutory denial of the Motion.

## II. THE SETTLEMENT AGREEMENT'S COMPETITIVE PROCESS SHOULD BE ENFORCED.

The Settlement Agreement did not promise the Debtor an unconditional right to reacquire the LLC Interest. It expressly made approval subject to higher and better third-party offers and recorded the Debtor's informed acceptance of the transaction's risks after independent investigation and due diligence. *See,* Settlement Agreement ¶¶ 4, 21. George II hereby seeks enforcement of that promised process, with the successful disposition remaining subject to the Trustee's judgment and this Court's approval.

### A. Good faith bars deliberate frustration of the promised competition.

New Jersey law implies a covenant of good faith and fair dealing in every contract. A party

may not act with a bad motive to deprive the other contracting party of the reasonably expected benefit of the bargain. *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Center Associates*, 182 N.J. 210, 224–26 (2005); *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 244–45 (2001). Here, the bargained-for benefit was the estate's opportunity to receive and evaluate higher and better offers. The Debtor accepted that condition, counterbid after George II participated, and then sought to terminate the process only when the competition threatened his preferred outcome. That sequence supports enforcement of the competitive condition and also informs the § 706(d) good-faith inquiry.

**B. The prevention doctrine bars reliance on nonperformance wrongfully caused.**

New Jersey's prevention doctrine likewise precludes a party from relying on the failure of a condition or performance that the party wrongfully prevented or hindered. *See Wolf v. Marlton Corp.*, 57 N.J. Super. 278, 285 (App. Div. 1959). The Debtor therefore should not be permitted to obstruct completion of the agreed competitive process and then invoke its noncompletion as a basis to escape that process. This doctrine prevents the Debtor from using his own alleged obstruction as a contractual defense.

**C. George II seeks enforcement of the benefit promised to competing bidders.**

A nonparty may enforce a contract under New Jersey law when the contracting parties intended to confer an enforceable benefit rather than an incidental one. *Broadway Maintenance Corp. v. Rutgers*, 90 N.J. 253, 259–62 (1982); N.J.S.A. 2A:15-2. Paragraph 4 expressly contemplates offers by third parties; the Debtor then acknowledged George II's offer and submitted a responsive proposal. Those terms and circumstances support George II's limited claim to meaningful consideration through the promised process, not a guaranteed purchase.

## III.THE DEBTOR'S VALUATION LACKS SUPPORT

The Debtor's $596,000 valuation is unsupported by a current appraisal of either the Company or the LLC Interest. It is arithmetic derived from a gross municipal tax assessment, and it does not establish what the Company owns, the Company's net equity after its actual debt, or the value of the Debtor's 23.67% interest subject to the Operating Agreement. The underlying lease and appraisal also raise a material question whether the Company owns the restaurant structure included in the assessment. Accordingly, the figure should not be given dispositive weight on conversion or in evaluating the competing proposals. [Dkt. 33-1 ¶¶ 5, 7–8; Dkt. 33-6; George II Cert. ¶2; Lease; Appraisal; Operating Agreement].

The Operating Agreement likewise does not convert the Debtor's arithmetic into a contractual buyout entitlement or a presumed control premium. The Agreement distinguishes ordinary management authority, reserved decisions, permitted transfers, and specified Company purchase procedures. Nothing cited by the Debtor establishes that a Company purchase was triggered and properly authorized, that the appraiser mechanism supplies a present value, or that the Debtor's 23.67% interest carries unrestricted control. Operating Agreement §§ 4.1.2, 4.3, 5.1–5.5.1. Notwithstanding the foregoing, the Debtor agreed to the Settlement Agreement and its terms should be enforced with the Trustee.

## IV. PROMISED CHAPTER 13 PAYMENTS DO NOT ESTABLISH GOOD FAITH OR FEASIBILITY

The Debtor's newly minted proposed payment plan does not resolve whether his conduct constitutes cause under §§ 706(d) and 1307(c). Nor does it establish the separate confirmation requirements of a good-faith plan and demonstrated ability to perform under § 1325(a)(3) and (6). The motion must be evaluated against both the history of the case and the proposed sources of

actual performance.

The original budget showed monthly net income of $14.16. The Debtor now proposes household contributions of up to $500 while declining to rely on his own expense schedule and promising a revised budget after conversion. Dkt. 33-1, ¶ 9. So, in addition to the Debtor's failure to disclose critical information relating to his interest in the LLC, the Debtor also failed to submit a reliable budget. Seemingly, little, if anything, set forth in the Debtor's schedules could be relied upon. In addition, the remaining funding depends on a contribution from his wife and recurring contributions from his son. The $180,000 figure is a ceiling partly composed of future payments, not funds presently delivered to the estate. Id. ¶ 12.

The Debtor's own September response to George II's initial bid highlights the inconsistency. The Debtor then urged that cash upfront eliminated collection risk and delay and permitted prompt administration. [Dkt. 31, at 3]. The Motion contemplates as many as sixty months to perform his proposed plan. The preference for immediate certainty disappeared when competition threatened the Debtor's receipt of the LLC Interest.

George II is prepared to perform on his  cash offer at closing, on the terms set forth in his certification, offering a definitive path to pay claims and allowed administrative expenses. The Debtor's proposed plan should not obscure George II's separate offer , which warrants meaningful consideration under the agreed competitive process. The Court should not permit future payment assurances to erase the Debtor's conduct or displace the process he knowingly accepted. Accordingly, George II cross-moves to compel compliance with the Settlement Agreement.

## V. A FINAL ADVERSARY JUDGMENT IS NOT A PREREQUISITE TO CONSIDERING THE SETTLEMENT.

The Debtor's request to require a final adversary judgment before the Court may consider the Rule 9019 settlement conflates adjudication of disputed ownership with an already agreed-upon compromise of that dispute. The Trustee's recognition that ownership litigation otherwise might be necessary identifies the risk the settlement was designed to resolve. The very issues that the Debtor seeks to compel resolving through an adversary proceeding – have already been resolved, the Settlement Agreement – which should be enforced.

.

## CONCLUSION

George II respectfully requests an order: (1) denying the Motion under 11 U.S.C. §§ 706(d) and 1307(c); (2) granting the cross-motion and preserving enforcement of the Settlement Agreement's higher-and-better-offer process, subject to the Trustee's judgment and Court approval; (3) recognizing George II's right, as an intended beneficiary or through the Trustee's enforcement, to meaningful consideration of his offer; (4) rejecting a categorical requirement of a final adversary judgment before consideration of the Rule 9019 compromise; and (5) granting other appropriate relief.

Respectfully submitted,

**STARK & STARK**
A Professional Corporation

Date: October 27, 2026

By: /s/ *Joseph H. Lemkin*
Joseph H. Lemkin, Esq.