| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br><br>**STARK & STARK, P.C.**<br>Joseph H. Lemkin, Esq. (JL-2490)<br>100 American Metro Blvd.<br>Hamilton, NJ 08619<br>(609) 791-7022 (Telephone)<br>(609) 895-7395 (Facsimile)<br>jlemkin@stark-stark.com<br>*Attorneys for George Sarris* | |
| In Re:<br><br>ILIAS SARRIS,<br><br>Debtor. | Case No. 25-14910 (SLM)<br><br>Chapter 7 |

**CERTIFICATION OF GEORGE K. SARRIS, II IN SUPPORT OF OBJECTION TO DEBTOR'S MOTION TO CONVERT AND MEMORANDUM IN SUPPORT OF CROSS-MOTION TO COMPEL COMPLIANCE WITH SETTLEMENT AGREEMENT**

I George K. Sarris II, hereby certify as follows:

1. I am a member and the managing member of Sarris Family, LLC (the "Company"). I submit this certification in opposition to the Debtor's motion to convert this case to Chapter 13 and in support of the cross-motion to compel compliance with the Settlement Agreement's higher-and-better-offer process.

2. I have reviewed the Company records and have attached true and correct copies of same to this certification. Attached as **Exhibit "A"** is the Company's December 9, 2020 Operating Agreement. Attached as **Exhibit "B"** is the June 15, 1999 Lease Agreement concerning 4135 Route 9, Freehold, New Jersey. Attached as **Exhibit "C"** is the Stuart Appraisal Company report

concerning portions of Block 6, Lots 30 and 31. Attached as **Exhibit "D"** is the Company's Columbia Bank mortgage statement ending September 29, 2026.

3. The Debtor did not advise me, as the Company's managing member, or the Company of his May 7, 2025 bankruptcy filing when it occurred. The Company was not listed as a notice party in the Debtor's statements and schedules. I also was not listed individually.

4. Through my counsel, I have extended an offer to the Trustee to pay in cash, in full at closing, an amount sufficient to pay all claims and trustee commissions for the bankruptcy estate's entire interest arising from the Debtor's 23.67% membership interest in the Company, including all economic and governance aspects of that interest.

5. My offer is subject to entry of a final order approving the transaction and determining that I am a good-faith purchaser. I am prepared to perform on those and other ordinary terms to be finalized with the Trustee, assuming I am the winning bidder.

**[THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK]**

I hereby certify that the foregoing statements made by me are true. I am aware that if they are willfully false, I am subject to punishment.

Date: October 26, 2026

George K. Sarris II

# Exhibit "A"

# OPERATING AGREEMENT OF SARRIS FAMILY LIMITED LIABILITY COMPANY

This OPERATING AGREEMENT (as the same may be from time to time amended, restated, supplemented or otherwise modified, this "Agreement") of SARRIS FAMILY, L.L.C., a New Jersey limited liability company ("Company"), is adopted and effective as of December 9, 2020 (the "Effective Date"), by Michael Sarris, residing at 88 Route 33, Manalapan, NJ 07726 (hereinafter referred to as "Michael"), Ilias Sarris, residing at 7 Lash Place, Denville, NJ 07834 (hereinafter referred to as "Ilias"), Savasti Sarris-Christodoulakis, residing at 35 Willow Brook Road, Freehold, NJ 07728 (hereinafter referred to as "Savasti"), Evdoxia Sarris-Fasouletos, residing at 50 E. Stonehurst Boulevard, Freehold, NJ 07728 (hereinafter referred to as "Evdoxia"), George K. Sarris, II, residing at 47 Rachael Drive, Morganville, NJ 07751 (hereinafter referred to as "George"), and each of whom are hereinafter referred to individually as a "party" or "Member" and collectively "parties" or "Members."

## EXPLANATORY STATEMENT

The parties have agreed to organize and operate a limited liability company in accordance with the provisions of the "New Jersey Revised Uniform Limited Liability Company Act," and subject to the terms and conditions set forth in this Agreement.

NOW, THEREFORE, for good and valuable consideration, the undersigned Members, intending legally to be bound, agree as follows:

## SECTION I

## GENERAL DEFINITIONS

As used in this Agreement, the following terms shall have the meaning respectively ascribed to them:

Definitions:

"Act" means the New Jersey Revised Uniform Limited Liability Company Act, as amended from time to time.

"Affiliate" means, with respect to any person (i) each Person that, directly or indirectly, owns or controls, whether beneficially or as a trustee, guardian or other fiduciary, 5% or more of the voting interests of any Member, (ii) each Person that controls, is controlled by or is under common control with each Person referenced in the preceding subsection (i) or (ii) each of such Person's officers, directors, joint venturers, members and partners. For the purpose of this definition "control" of a Person shall mean the possession, directly or indirectly of the power to direct or cause the direction of its management or policies, whether through the ownership of voting interests, by contract or otherwise. Notwithstanding anything to the contrary contained herein, Affiliate shall not include any creditor of a Member receiving an assignment of membership interest as security for any private loan, or to any individual to whom a transfer of Membership interest is made in circumvention of the requirements for a transfer of Membership interests as provided herein.

"Agreement" means this Operating Agreement, as amended, restated, supplemented or otherwise modified from time to time.

"Code" means the Internal Revenue Code of 1986 as amended or any corresponding provisions of any succeeding law.

"Company" means the limited liability company formed in accordance with this Agreement.

"Extraordinary" means non-recurring expenses or income.

"Interest" means a Member's share of the profits and losses of, and the right to receive distributions from the Company, as set forth in Sections 3.3.

"LLC Percentage Interest" means, as to a particular Member, the percentage set forth after the Member's name on Exhibit A attached hereto.

"Member" means each Person or entity signing this Agreement and any agent of an entity and any person who subsequently is admitted as a Member of the Company.

"Person" means and includes an individual, corporation, partnership, association, limited liability company, trust, estate or other entity.

"Regulations" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

**FORMATION AND NAME, OFFICE; PURPOSE, TERM**

2.1 *Organization.* The parties organized a limited liability company pursuant to the Act and the provisions of this Agreement and, for that purpose caused a certificate of formation to be executed and filed for record with the Secretary of State on ________ _____, 2021 (the "Certificate of Formation").

2.2 *Name of the Company.* The name of the Limited Liability Company shall be "**SARRIS FAMILY, LLC**" (hereinafter the "Company"). The Company may do business under that name.

2.3 *Purpose.* The Company is organized to manage the property where All Seasons Diner II is currently located on and to do any and all things necessary, convenient, or incidental to that purpose.

2.4 *Term.* The term of the Company began upon the filing of the Certification of Formation with the Secretary of State and shall be perpetual unless its existence is sooner terminated as required by law or as set forth in this Agreement.

2.5 *Registered and Principal Office.* The registered and principal office of the Company in the State of New Jersey shall be located at 47 Rachael Drive, Morganville, NJ 07751, or at any other place within the State of New Jersey upon which the Member agrees to or at such other location as the registered agent shall determine in compliance with the Act.

2.6 *Registered Agent.* The name and address of the Company's registered agent in the State of New Jersey shall be **George K. Sarris, II**, located at 47 Rachael Drive, Morganville, NJ 07751.

2.7 *Liability as to third parties.* Unless otherwise specified in this Agreement, no Member shall be personally liable for the debts, obligations or liabilities of the Company, including under a judgment, decree or order of a Court.

## SECTION III

## MEMBERS AND DISTRIBUTIONS

3.1 *Members.* The name and present mailing address and Percentages of each Member is set forth on Exhibit A attached hereto.

3.2 *Additional Members.* No additional Members shall be admitted to the Company without the unanimous written consent of all the Members, which shall not be unreasonably withheld unless for cause except for lineal descendants of existing LLC Members or adoptees of

existing LLC Members who shall be admitted upon execution of a writing acknowledging and agreeing to all terms of this Operating Agreement and any amendments hereto.

3.3 *Distributions.* All distributions after expenses shall be allocated equally to the members with regard to their respective LLC Percentage Interest which distributions shall be made monthly, to the extent available and provided rents are timely paid by the tenant. The aforementioned distributions shall include all profits, losses and other deductions allocated to the Members for each taxable year with regard to their percentage membership interests.

**SECTION IV**

**MANAGEMENT, RIGHTS, POWERS, AND DUTIES**

4.1. *Management of the Company.*

4.1.1. *Managing Member.* The Company shall, at all times, be managed by at least one (1) manager (the "Managing Member"), who must be a Member of the Company. George is hereby designated to serve as the initial Managing Member until such time as he may resign or be replaced pursuant to the terms of this Agreement. The Managing Member will not be paid for any services that he renders to the Company.

4.1.2 *General Powers.* The Managing Member shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement and the requirements of applicable law, to manage, control, administer, and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs, including, without limitation, for Company purposes, the power to:

4.1.2.1. construct, operate, maintain, finance, and improve, and to own, sell, convey, assign, mortgage, or lease any real estate and any personal property;

4.1.2.2. purchase liability and other insurances to protect the Company's properties and business;

4.1.2.3. execute or modify leases with respect to any part or all of the assets of the Company. In the event the current lease and option associated therewith is not renewed, the Managing Member is authorized to market the property located at 4135 US 9, Freehold, New Jersey (the "Property") for rent with a licensed commercial real estate broker and may enter into a new lease agreement with a new tenant with a minimum monthly rental amount as stated in the Settlement Agreement dated July 30, 2020 ("Settlement Agreement") with a yearly increase of 2% thereafter without the consent of any of the other remaining members of the Company with a maximum term, including any renewal options, of thirty (30) years. Any offer with a rent lower than what is stated in the Settlement Agreement will require the unanimous consent of all Members. Any individual Member or group of Members of the Company shall have a right of first refusal to lease the subject property for the same monthly amount as negotiated with a prospective tenant. In the event the threshold is not met, and the Members cannot agree to the fair market rental value to lease the Property, then the Managing Member shall obtain an appraisal of the Property. If any Member or group of Members do not accept the fair market determination of the first appraisal, then the disagreeing Member or group of Members shall have the right to obtain a second appraisal. Thereafter, the Members may unanimously agree to accept the average of the two appraisals as the fair market rental value of the Property. Alternatively, in the event that the Members cannot unanimously consent to the average of the two appraisals, the two appraisers will pick a third appraiser to determine the fair market value of the Property and that value will be binding for the purposes of the fair market rental value/right of first refusal for the prospective tenant. All appraisals shall be paid for by the Company.

4.1.2.3.1. In the event that the current lease, and any options to renew associated therewith has expired, or the current tenant is in default and/or the current lease is otherwise terminated, and the parties do not unanimously agree to remarket the property for rent as set forth in the Settlement Agreement, then any Member of the Company may demand that the Property be sold for fair market value, which shall be determined as follows:

i. the Managing Member shall have the right to retain a licensed commercial real estate broker to market and sell the property and obtain the highest and best offer.

ii. any Member or group of Members who do not wish to sell the Property shall have a right of first refusal to purchase the selling party's(ies) interest at a price matching the highest and best offer or the fair market value of the Property as determined by the appraisal mechanism set forth below.

iii. If an offer is not obtained within three (3) months from the date the subject property is listed, or if the parties do not unanimously agree to the sale price established by a highest and best offer, then the Managing Member shall obtain an appraisal of the Property. If any Member or group of Members do not accept the fair market determination of the first appraisal, then the disagreeing Member or group of Members shall have the right to obtain a second appraisal. Thereafter, the Members may unanimously agree to accept the average of the two appraisals as the fair market value of the Property. Alternatively, in the event that the Members cannot unanimously consent to the average of the two appraisals, the two appraisers will pick a third appraiser to determine the fair market value of the Property and that value will be binding for the purposes of the fair market value/right of first refusal for the pending sale. All appraisals shall be paid for by the Company.

iv. if the Managing Member has not obtained an offer to purchase the Property that has been agreed to by unanimous consent of the parties, and if any party refuses to accept the fair market value established by the appraisal mechanism set forth in paragraph iii above, then any party may commence an act of partition for the subject property and any party who refused to accept the appraisers valuation above shall pay all legal fees and costs of any other party incurred as a result thereof.

4.1.2.4. prepay, in whole or in part, refinance, amend, modify, or extend any mortgages or deeds of trust which may affect any asset of the Company and in connection therewith to execute for and on behalf of the Company any extensions, renewals, or modifications of such mortgages or deeds of trust;

4.1.2.5. execute any and all other instruments and documents which may be necessary or in the opinion of the Managing Member desirable to carry out the intent and purpose of this Agreement, including, but not limited to, documents whose operation and effect extend beyond the term of the Company;

4.1.2.6. enter into any kind of activity necessary to, in connection with, or incidental to, the accomplishment of the purposes of the Company and to spend an amount not to exceed $2,000 on legal and $2,000 on accounting related expenses in any calendar year. The Managing Member shall provide the Members with copies of all accounting and legal expenses paid; and

4.1.3. *Extraordinary Transactions.*

Notwithstanding anything to the contrary in this Agreement, the Managing Member shall not undertake any of the following on behalf of the Company without the unanimous written approval of the Members:

4.1.3.1. any expenditure or loan in excess of $5,000.00 of the Company's money on any occasion except that the Managing Member may seek a loan of up to $60,000 to cover any real estate taxes if he is unsuccessful in obtaining the funds from the Members.

4.1.3.2. the admission of additional Members to the Company;

4.1.3.3. the filing of a petition under the United States Bankruptcy Code or an assignment for the benefit of creditors;

4.1.3.4. sale or encumbrance of all or substantially all of the business or the assets of the Company to a third party unless same is accomplished in accordance with the terms of this Agreement.;

4.1.3.5. dissolution of the Company;

4.1.3.6. amendment of this Operating Agreement;

4.1.3.7. entering into any material agreements, or any material amendments, supplements or modifications to any material agreements, with a Managing Member or any Affiliate of a Managing Member except on terms which are intrinsically fair, commercially reasonable and no less favorable to the Company than would be obtained in a comparable arm's-length transaction with an unrelated third party; and

4.1.4. *Removal of a Managing Member*. The Members may only remove a Managing Member then acting for cause which shall be defined as the Managing Member engaged in fraudulent or willful misconduct that adversely and materially affected the Company's business, or the Managing Member willfully and persistently committed a material breach of this Agreement.

4.1.5. *Election of Managing Member*. If a Managing Member is removed pursuant to section 4.1.4, a new Managing Member shall be elected by a unanimous vote of LLC Percentage Interests of the Members. Each Member shall have one vote for each LLC Percentage Interest point owned by that Member. The removed Managing Member shall not be entitled to vote their LLC Percentage Interests.

4.1.6. *No Management by Other Persons or Entities*. Except and only to the extent expressly delegated by the Managing Member or as provided in this Agreement, no person or entity other than the Managing Member and the Members, for the specific purposes set forth elsewhere herein, shall be an agent of the Company or have any right, power or authority to transact any business in the name of the Company or to act for or on behalf of or to bind the Company.

4.1.7. *Power of Attorney.* The Managing Member is granted power of attorney by all Members to execute any and all documents required to be executed by the Company in order to carry out all affairs of the Company in accordance with this Agreement.

4.2 *Fiduciary Duty of the Members.* Each Member owes to the Company and the other Members only the fiduciary duties of care and loyalty set forth in this Section 4.2.

4.2.1 *Duty of Care; Standard of Care.* A Member's duty of care to the Company and the other Members in the conduct and winding up of the Company's business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

4.2.2 *Discharge of Duty of Care*. In discharging his or her duty of care under this Agreement, a Member shall be entitled to reasonably rely in good faith on (a) the terms of this Agreement, (b) Company records and information, (c) information, opinions, reports and statements, including financial statements and other financial data, prepared or provided by

Company employees, attorneys, accountants, other professional advisors or other Members, and (d) other persons whom, at the time of the action, the Member reasonably believed to be competent in the matter in question, and in so doing shall not be deemed to have violated his or her duty of care with respect to the matter in question.

4.2.3. *Duty of Loyalty.* A Member's duty of loyalty to the Company and the others Members is limited to the following:

(a) to account to the Company and hold as trustee for it any property, profit or benefit derived by the Member (i) in the conduct and winding up of the Company's activities, (ii) from a use of the Company's property, and (iii) from an appropriation of a Company opportunity;

(b) to refrain from dealing with the Company in the conduct or winding up of the Company's activities as or on behalf of a person or entity having an interest adverse from the Company (except where the transaction is in accordance with paragraph 4.2.5.); and

(c) to refrain from competing with the Company in the conduct of the Company's business (as described in Section 2.4) for a period of twenty-four (24) months following the resignation, expulsion or other disassociation of the Member.

4.2.4. *No Exclusive Duty to Company.* Each Member shall devote to the Company such time and effort as he or she may from time to time deem necessary. So long as he or she does not violate the duty of loyalty in Section 4.2.3., the Member shall not be required to manage the Company as his or her sole and exclusive function, and the Member may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any other Member shall have any right, by virtue of this Agreement, to share or

participate in such other business interests or activities of the Member or to the income or proceeds derived therefrom.

4.3 *Unanimous Decisions.* Except where this Operating Agreement requires otherwise or as required by applicable law, all decisions of the Members shall be made by way of unanimous vote of the Members.

4.4 *Written Consents in Lieu of Meetings.* In lieu of holding a meeting, the Members may vote or otherwise take action by a written instrument indicating the consent of Members holding the required percentage of LLC Percentage Interests.

4.5 *Notifications.* Any notice, demand, consent, election, offer, approval, request, or other communication (collectively a "notice") required or permitted under this Agreement must be in writing and either delivered personally, sent by overnight express courier (such as Federal Express or United Parcel Services) or sent by overnight express mail, certified or registered mail, postage prepaid, return receipt requested. A notice must be addressed to a Member at his/her last known address on the records of the Company. The initial addresses of the Members are as set forth in the introductory paragraph hereto. A notice to the Company must be addressed to the Company's principal office. A notice delivered personally will be deemed given only when acknowledged in writing by the person to whom it was delivered. A notice that is sent by overnight express courier will be deemed given upon the date confirmed by the courier that such notice was delivered. A notice that is sent by mail will be deemed given three business days after it is mailed. Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.

4.6 *Specific Performance.* The parties recognize that irreparable injury will result from a breach of any provision of this agreement and that money damages will be inadequate to remedy

fully the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach, or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

4.7 *Estoppel Certificate.* Each Member shall, within ten (10) days after written request by any other Member or the Company, deliver to the requesting person a certificate stating, to the Member's knowledge that: (a) this Agreement is in full force and effect except as stated otherwise in the certificate; (b) this Agreement has not been modified except by any instrument or instruments identified in the certificate; and (c) there is no default hereunder by the requesting person, or if there is a default, the nature and extent thereof shall be set forth.

4.8 *Indemnification.* The Company shall indemnify each Member and the Managing Member for any act performed by such Person with respect to Company matters, against any loss, judgments and expenses (including reasonable attorney's fees) except for fraud, gross negligence, willful misconduct, or intentional breach of this Agreement. The Company shall also indemnify any and all non-Member "Company agent" (as presently defined by N.J.S.A. 42:2C-38(1) and as may be amended from time to time) with respect to any loss, damage, claim or liability (including reasonable attorneys' fees) that was not the result of the agent's fraud, gross negligence or willful misconduct, provided that the agent was acting within the scope of his or her agency and in the regular course of Company business.

## SECTION V

## TRANSFER PERMITTED ON SATISFACTION OF CERTAIN CONDITIONS

5.1 *Transfers to Affiliates.* Notwithstanding anything set forth in this Agreement to the contrary, any Member may at any time, and from time to time, transfer all or any portion of or any interest or right in its LLC Percentage Interests to (i) any other Member or (ii) any Affiliate of the Member.

5.2 *Conditions of Transfer other than Provided in Section 5.1.* Except as set forth in Section 5.1, no Member may transfer all or any portion of or any interests or rights in its Membership Rights, and no Member may transfer its Membership Rights unless all the Members consent in writing to such transfer. Any transfer of any Membership Rights in violation of the prohibition contained in this Section V, shall be deemed invalid, null and void, and of no force or effect. Any person to whom Membership Rights are attempted to be transferred in violation of this section shall not be entitled to vote on matters coming before the Members, participate in the management of the Company, receive distributions from the Company or have any other rights in or with respect to the Membership Rights or interest.

5.3 *Right of First Offer.*

A. If an Member (a "Transferor") desires to transfer all or any portion of, or any interest or right in, the Transferor's LLC Percentage Interest (the "Transferor Interest"), the Transferor shall notify the Company of that desire (the "Transfer Notice") prior to offering it for sale to a third party. The Transfer Notice shall describe the Transferor Interest. The Company shall have the option (the "Purchase Option") to purchase all of the Transferor Interest for a price (the "Purchase Price") equal to the fair market value. Notwithstanding anything contained in this

agreement to the contrary, the computation of fair market value shall be subject to the following provisions:

B. The Transferor and the Company shall agree upon the fair market value of the Transferor's Interest. If there is no agreement on the fair market value, the Transferor and the Company shall agree upon a mutually acceptable appraiser within twenty (20) days following the date of the Transfer Notice. In the event the Transferor and Company fail to agree, two (2) appraisers shall be appointed within thirty (30) days following the date of the Transfer Notice, one by the Transferor, and one by the Company. If the Transferor, on the one hand, or the Company, on the other hand, fail to appoint an appraiser within thirty (30) day period specified herein, the sole appraiser appointed within such thirty (30) day period shall be the sole appraiser for the purposes of determining fair market value of the Transferor's Interest to be purchased pursuant to this Section 5.3. The Transferor and the Company shall promptly provide notice of the name of the appraiser so appointed by such party to the other. A third appraiser, if the initial two appraisers are appointed and cannot agree on a determination of value, shall be appointed by the mutual agreement of the first two appraisers so appointed, or, if such first two appraisers fail to agree upon a third appraiser within thirty (30) days following the date of the Transfer Notice, either the Transferor or the Company may demand the appointment of an appraiser be made by the then director of the Regional Office of the American Arbitration Association located nearest to the Company's principal office, in which event the appraiser appointed thereby shall be the third appraiser. Each of the appraisers shall submit to the Transferor and the Company, within thirty (30) days after the final appraiser has been appointed ("Appraisal Period"), a written appraisal (the "Appraisal") of the fair market value of the Transferor's Interest.

C. In connection with any appraisal conducted pursuant to this Agreement, the parties hereto agree that any appraiser appointed hereunder shall be given full access during normal business hours to all information required and relevant to a valuation of the Transferor's Interest.

D. If three appraisers are appointed, the fair market value of the Transferor's Interest in question shall be equal to the numerical average of three appraised determinations; provided, however, that if the difference between any two appraisals is not more than ten percent (10%) of the lower of the two, and the third appraisal differs by more than twenty-five percent (25%) of the lower of the other two appraisals, the numerical average of such two appraisals shall be determinative.

E. Any appraiser, to be qualified to conduct an appraisal hereunder, shall be an independent appraiser (i.e., not affiliated with Sarris Family, LLC, the Members or employees), a M.A.I. appraiser or its equivalent, and shall be reasonably competent as an expert to appraise the value of the Transferor's Interest. If any appraiser initially appointed under this Agreement shall, for any reason, be unable to serve, a successor appraiser shall be promptly appointed in accordance with the procedures pursuant to which the predecessor appraiser was appointed.

Notwithstanding the foregoing, if the determination of the fair market value of the Transferor's Interest by appraisal is not completed and all appraisal reports delivered as provided herein within the Appraisal Period, then all closing, payment, and similar dates subsequent thereto shall be automatically extended one (1) day for each day delivery of the appraisal reports is delayed beyond the end of the Appraisal Period.

F. The cost of the appraiser appointed by each party shall be borne by each such party. The cost of the third appraiser, if any, or the sole appraiser, in the event the Transferor and

the Company mutually agree upon a single appraiser, shall be borne equally by the Transferor and the Company.

G. The Purchase Option shall be and remain irrevocable for a period (the "Offer Period") ending at 11:59 p.m. local time at the Company's principal office on the sixtieth (60th) day following the date of the Transfer Notice is given to the Company.

At any time during the Transfer Period, the Company may elect to exercise the Purchase Option by giving a written notice of its election to the Transferor. The Transferor shall not be deemed Member for the purpose of voting on whether the Company should elect to exercise the purchase option.

H. If the Company elects to exercise the Purchase Option, the Company's notice of its election shall fix a closing date (the "Transfer Closing Date") for the purchase, which shall not be earlier than ten (10) days after the date of the notice of election or more than ninety (90) days after the expiration of the Transfer Period.

I. If the Company elects to exercise the Purchase Option, the Purchase Price shall be paid in cash on the Transfer Closing Date or by the installment method in section 5.7.

J. If the Company fails to exercise the Purchase Option, the Transferor shall be permitted to offer the Transferor Interest to any non-affiliate for a period of ninety (90) days (the "Free Transfer Period") after the expiration of the Transfer Period at a price not less than the Purchase Price; however, such offer must expressly be conditioned upon final approval and consent of the remaining Member(s) pursuant to Section 5.1. If the Transferor does not obtain consent, which consent shall not be unreasonably withheld, delayed or conditioned, and transfers the Transferor Interest within the Free Transfer Period, the Transferor's right to transfer the Transferor Interest pursuant to this section shall cease and terminate.

K. Any transfer of the Transferor Interest made after the last day of the Free Transfer Period or without strict compliance with the terms, provisions and conditions of this section and other terms, provisions and conditions of this section and other terms, provisions and conditions of this agreement shall be null, void and of no force or effect.

5.4 *Right of First Refusal.*

A. If a Member (a "Transferor") receives a *bona fide* oral or written offer which the Member desires to accept (the "Transferee Offer") from any other person other than an Affiliate (a "Transferee"), whether before, during or after a Free Transfer Period, to purchase all or any portion or any interest or rights of the Transferor's Membership Rights (the " Transferor Interest"), then the Transferor shall give the Company written notice (the "Transfer Notice") of the Transferee Offer containing each of the following:

i. The Transferee's identity;

ii. A true and complete copy of the Transferee Offer;

iii. The Transferor's offer (the "Offer") to sell the Transferor Interest to the Company for a price equal to that contained in the Transferee Offer (the " Purchase Price", and together with the Purchase Price, each, a "Purchase Price"); and

iv. Such other information as the Company may reasonably request.

B. The Offer shall be and remain irrevocable for a period (the "Offer Period") ending 11:59 p.m. local time at the Company's principal office on the thirtieth (30th) day following the date the Transfer Notice is given to the Company. At any time during the Offer Period, the Company may, at its option (the "Option", and together with the Option, each, a "Purchase Option"), accept the Offer, based on the affirmative vote of the Members holding a majority of the LLC Percentage Interests, by giving written notice to the Transferor of its acceptance (the "Offeree

Notice"). The Transferor shall not be deemed a Member for the purpose of voting on whether the Company shall accept the Offer. If the Company accepts the Offer, the Offeree Notice shall fix a closing date (the " Transfer Closing Date") for the purchase, which shall not be earlier than ten (10) or more than ninety (90) days after the expiration of the Offer Period.

C. If the Company accepts the Offer, the Purchase Price shall be paid in immediately available funds on the Transfer Closing Date unless the Company elects prior to or on the Transfer Closing Date to pay the Purchase Price in installments pursuant to the provisions of Section 5.7, and the Transferor Interest shall be transferred to the Company (or its designee) on the Transfer Closing Date.

D. If the Company rejects the Offer and fails to obtain the required consent of the Members, which consent shall not be unreasonably withheld, delayed or conditioned, to the transfer during the Offer period, the Transferor shall notify the Transferee of such rejection and failure of the Members to consent and provide a copy of such notice to the Company, and the Transferor shall not be permitted to transfer the Transferor Interest to the Transferee.

E. If the Company rejects the Offer, but the required Members consent to the Transferor transferring the Transferor Interest to the Transferee contained in the Transferee Offer, then the Transferor may transfer the Transferor Interest to the Transferee for the same or greater price than the Purchase Price and on the same terms and conditions as set forth in the Transfer Notice.

F. Any transfer by the Transferor without strict compliance with the terms, provisions and conditions of this Section 5.4 and the other terms, provisions and conditions of this agreement, shall be null and void and of no force and effect.

5.5.1 *Optional Repurchases.*

(a) Upon the happening of any of the following events (each, a "Triggering Event"), the Company, if directed to do so by the affirmative vote of the Members having a majority of the LLC Percentage Interests (excluding, for the purposes of such vote, the subject Member's LLC Percentage Interests) shall purchase all of the LLC Percentage Interest held by the subject Member in accordance with the terms hereof:

*(i)* *Bankruptcy.* Adjudication of the subject Member as a bankrupt, either voluntary or involuntary;

(ii) *Assignment To Creditors.* Assignment by the subject Member for the benefit of creditors;

(iii) *Transfer Violation.* Violation, or attempted violation, of the terms of Sections 5.1, 5.2, 5.3 or 5.4 by the subject Member; or

(b) The Company (or its designee) shall, if required above, purchase from the Member, and the Member shall sell to the Company (or its designee), all of the subject Member's LLC Percentage Interest at the price determined pursuant to Section 5.3 (as though the subject Member were the Transferor). The Company shall have the option, exercisable by written notice delivered to the subject Member no later than ten (10) days prior to the closing date, to pay the purchase price in installments pursuant to the provisions of Section 5.7.

(c) The closing for the sale of the Membership Rights shall take place at the principal office of the Company at a date designated by the Company, which shall be not more than one hundred twenty (120) days following the occurrence of the Triggering Event.

(d) The recaptured LLC Percentage Interest shall be distributed in accordance with the existing percentage interests to each Member.

5.6 *Admission of Transferee as Member.* Notwithstanding anything contained herein to the contrary, the transfer of any LLC Percentage Interest to a transferee in accordance with the provisions of this Section V shall have the effect of causing such transferee (to the extent not already a Member) to be deemed a replacement Member of the Company and such transferee shall execute such documents and other instruments as the Managing Member may reasonably request to document such admission.

5.7 *Installment Buy outs.* If the Company elects to pay the Purchase Price on an installment basis, the Purchase Price shall be paid by delivering at the initial closing (i) twenty percent (20%) of the Purchase Price in cash or by certified or bank check and (ii) an executed promissory note in the initial principal amount of eighty (80%) percent of the Purchase Price payable to the Transferor in sixty (60) equal monthly installments over five (5) years with an interest rate fixed at the current Mid-Term Applicable Federal Rate for the month the promissory note is to begin or if a Mid-Term Applicable Federal Rate does not exist, then the lowest interest rate allowed by law.

5.8 *Assignments/Successor Interest.* Any permitted assignee or successor to the Membership Rights of a Member shall assume all liabilities and obligations of such Member under this Agreement and shall be bound by same.

## SECTION VI

## DISSOLUTION/TERMINATION OF THE COMPANY

Subject in all instances to the requirements of the Act and all other applicable law:

6.1 *Events of Dissolution.* The Company shall be dissolved upon the happening of the following events:

a. upon the written agreement of all Members;

b. ninety (90) days after the date on which the Company no longer has at least one Member, unless at least one new Member is admitted within that ninety (90) day period; or

c. upon entry of an order or judgment of dissolution.

6.2 *Procedure for Winding Up Company.* If the Company is dissolved, the remaining Members shall wind up its affairs. On winding up of the Company, the assets of the Company shall be distributed as follows:

(a) first, to creditors, including Members and Affiliates of Members, to the extent permitted by law, in satisfaction of liabilities of the Company other than liabilities for which reasonable provision has been made and liabilities of the type referred to in the next two paragraphs;

(b) second, to former Members who have resigned, unpaid distributions to which they became entitled prior to dissolution or resignation, as applicable;

(c) third, to the Members pro rata in proportion to their unreturned Capital Contributions until all of their Capital Contributions have been returned; and

(d) then, to the Members pro rata in proportion to their LLC Percentage Interests.

6.3 *Filing Certificate of Dissolution.* If the Company is dissolved and its affairs wound up, a Member shall, pursuant to the Act, promptly file a Certificate of Dissolution with the Treasurer of the State of New Jersey, wind up the affairs of the Company and file a Statement of Termination. If there are no remaining Members, the Certificate shall be filed by the last Person to be a Member; if there are no remaining Members or a Person who last was a Member, the Certificate shall be filed by the legal or personal representatives of the Person who last was a

Member. If the legal or personal representative declines or fails to wind up the company's activities, a person may be appointed pursuant to N.J.S.A. 42:2C-49(d).

6.4 *Notice of Known Claims.* In winding up its affairs, the Company shall give notice of known claims to claimants, in compliance with N.J.S.A. 42:2C-50(b), simultaneous with its filing of a Certificate of Dissolution and shall follow the procedures of N.J.S.A. 42:2C-50(c) if there are reasonably sufficient grounds to reject the claim of a known claimant.

**SECTION VII**

**CAPITAL CONTRIBUTIONS AND LOANS**

7.1 *Initial Capital Contributions.* Upon the execution of this Agreement, the Members shall have contributed to the Company the amounts set forth on Exhibit A attached hereto.

7.2 *Additional Capital Contributions.* If the Managing Member determines, at any time or from time to time, that the Company requires additional capital contributions, then each Member shall contribute its share of the additional capital contributions in accordance with its LLC Percentage Interest. Such additional capital contribution shall be in writing setting forth the amounts (or property) to be contributed, and shall be attached to the Operating Agreement. Within thirty (30) days after the Managing Member has determined the amount of additional capital contributions required, each Member shall pay its share, in cash or by certified check, to the Company, or by deed transferred to the Company.

7.3 *No Interest on Capital Contribution.* Members shall not be paid interest on their capital contributions.

7.4 *Return of Capital Contributions.* Except as otherwise provided in this Agreement, no Member shall have the right to receive any return of any capital contribution or Capital Account.

7.5 *Maintenance of Capital Accounts.* A separate capital account (each, a "Capital Account") shall be maintained for each Member in accordance Code Section 704(b) and Treasury Regulations Section 1.704-1(b).

7.6 *Withdrawal of Capital.* A Member shall not be entitled to withdraw any part of such Member's Capital Account or to receive any distribution from the Company, except as provided in this Agreement.

**Section VIII**

**Books, Records, Accounting, and Tax Elections**

8.1. *Bank Accounts.* All funds of the Company shall be deposited in a bank account or accounts opened in the Company's name. The Managing Member shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons, by way of a written and signed document, who will have authority with respect to the accounts and the funds therein, if applicable.

8.2. *Books and Records.* The Managing Member shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business. The books and records shall be maintained in accordance with sound accounting practices and shall be available at the Company's principal office for examination by any Member or the Member's duly authorized representative at any and all reasonable times during normal business hours upon three (3) days' notice.

8.3. *Annual Accounting Period.* The annual accounting period of the Company shall be its taxable year. The Company's taxable year shall be selected by the Members, subject to the

requirements and limitations of the Code. The annual accounting period shall be on a calendar year.

## SECTION IX

## MISCELLANEOUS PROVISIONS

9.1 *Assurances.* Each Member shall execute all certificates and other documents and shall do all such filing, recording, publishing and other acts as the Members deem appropriate to comply with the requirements of law for the formation and operation of the company and to comply with any laws, rules and regulations relating to the acquisition, operation, management, modification, or sale of the property of the Company.

9.2 *Complete Agreement.* This Agreement constitutes the complete and exclusive statement of the agreement among the Members. It supersedes all prior written or oral statements, including any prior representations, statements, conditions or warranty. Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of all of the Members.

9.3 *Applicable Law.* All questions concerning the construction, validity, interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law and not the law of conflicts, of the State of New Jersey.

9.4 *Section Titles.* The headings, and subheadings herein are inserted as a matter of convenience only and do not define, control or limit the scope of the agreement or the intent of the provisions hereof.

9.5 *Binding Provisions.* This Agreement is binding upon and inures to the benefit of the parties and their respective heirs, executors, administrators, personal and legal representatives, successors and assigns.

9.6 *Jurisdiction and Venue.* Any suit involving any dispute or matter arising under this Agreement may only be brought in the Superior Court of New Jersey, Monmouth County. All Members hereby consent to the exercise of personal jurisdiction by such court with respect to any proceeding.

9.7 *Terms.* Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the person may in the context require.

9.8 *Severability.* Each provision of this Agreement shall be considered separable; and if for any reason any provision or provisions hereunder determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or effect those portions of the agreement that are valid.

9.9 *Days for performance.* If a date or the expiration date of any period that is set out in any provision of this Agreement falls upon a day that is a Saturday, a Sunday or a federal holiday, then, in such event, the date or expiration date of such period shall be extended to the next day that is not a Saturday, a Sunday or a federal holiday.

9.10 *Counterparts.* This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to any other counterpart.

9.11 *Representation.* The law firm of Davison, Eastman, Munoz, Paone, P.A. represents only Michael in connection with the preparation, negotiation and execution of this Agreement.

George is represented by Ansell Grimm and Aaron and Ilias, Evdoxia and Savasti are represented by Hanlon, Niemann & Wright. All parties to this Agreement have engaged independent legal counsel in connection with same prior to signing this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**Sarris Family, Limited Liability Company**
**Operating Agreement**

**EXHIBIT A**
**List of Members, Capital, and Percentages**

| Name of Member and Address | Capital Account as of August 1, 2020 | Percentage Interest |
|---|---|---|
| George K. Sarris, II<br>47 Rachael Drive<br>Morganville, NJ 07751 | $______.00 | [redacted] |
| Michael Sarris<br>88 Route 33<br>Manalapan, NJ 07726 | $______.00 | |
| Ilias G. Sarris<br>7 Lash Place<br>Denville, NJ 07834 | $______.00 | |
| Evdoxia Sarris-Fasouletos<br>50 E. Stonehurst Boulevard<br>Freehold, NJ 07728 | $______.00 | |
| Savasti Sarris-Christodoulakis<br>35 Willow Brook Road<br>Freehold, NJ 07728 | $______.00 | |

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the Effective Date.

WITNESS OR ATTEST: MEMBER:

MICHAEL SARRIS

WITNESS OR ATTEST: MEMBER:

ILIAS SARRIS

WITNESS OR ATTEST: MEMBER:

EVDOXIA SARRIS-FASOULETOS

WITNESS OR ATTEST: MEMBER:

SAVASTI SARRIS-CHRISTODOULAKIS

WITNESS OR ATTEST: MEMBER:

GEORGE K. SARRIS, II

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the Effective Date.

WITNESS OR ATTEST: ______________________

MEMBER: ______________________
**MICHAEL SARRIS**

WITNESS OR ATTEST: ______________________
(WIFE)

MEMBER: ______________________
**ILIAS SARRIS**

WITNESS OR ATTEST: ______________________

MEMBER: P.O.A. Maria [illegible]
**EVDOXIA SARRIS-FASOULETOS**

WITNESS OR ATTEST: ______________________

MEMBER: ______________________
**SEVASTI SARRIS-CHRISTODOULAKIS**

WITNESS OR ATTEST: ______________________

MEMBER: ______________________
**GEORGE K. SARRIS, II**

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the Effective Date.

WITNESS OR ATTEST: MEMBER:

______________________ ______________________
**MICHAEL SARRIS**

WITNESS OR ATTEST: MEMBER:

______________________ ______________________
**ILIAS SARRIS**

WITNESS OR ATTEST: MEMBER:

______________________ ______________________
**EVDOXIA SARRIS-FASOULETOS**

WITNESS OR ATTEST: MEMBER:

______________________ ______________________
**SAVASTI SARRIS-CHRISTODOULAKIS**

WITNESS OR ATTEST: MEMBER:

______________________ ______________________
**GEORGE K. SARRIS, II**
3/10/2021

# Exhibit “B”

All Seasons

THIS LEASE AGREEMENT, made the 15th day of June, 1999, between

GEORGE SARRIS, residing or located at 19 Willowbrook Road, in the Township of Freehold, County of Monmouth and State of New Jersey 07728, herein designated as the Lessor.

AND

ADELPHIA & ELIAS L.L.C., located at 7 Highland Drive, in the Township of Jackson, County of Ocean and State of New Jersey 08527, herein designated as the Lessee;

WITNESSETH that, the Lessor does hereby lease to the Lessee and the Lessee does hereby rent from the Lessor, the following described premises:

Certain real property located at Route 9 North, Freehold, New Jersey, known as Block 6 Lot 31 Freehold Township, Monmouth County, New Jersey, including a fifty (50') foot easement from D.C.H. for a future double driveway for ingress and access. The term of this lease is thirty (30) years, commencing on June 15, 1999 and ending on June 14, 2029. A diner is presently operating on the property. Said diner is being sold to the Tenant simultaneous with the signing of this lease. The property being leased shall only be used by the Tenant to continue the diner/restaurant business being sold while any monies for the sale of the business remain outstanding. The property shall not be used for any other purpose.

Upon the following Conditions and Covenants:

1st. The Tenant covenants and agrees to pay to the Landlord, as rent for and during the term hereof, the sum of $ 2,880,000.00 in the following manner:

$5,500.00 per month for the first five years;
$6,500.00 per month for sixth through tenth year;
$7,500.00 per month for eleventh through fifteen year;
$8,500.00 per month for the sixteenth through twentieth year;
$9,500.00 per month for the twenty-first through twenty-fifth year;
$10,500.00 per month for the twenty-sixth through thirtieth year.

Due and payable on the fifteenth (15th) day of each month, payable in advance. The Tenant shall pay, as additional rent, a late charge of five (5%) percent of any payment not

received by the landlord by the fifteenth (15th) day of any month. Said payment to be made with the monthly rent. The Tenant has the option to extend the lease for two (2) five-year periods at the conclusion of the thirty (30) year term. The rent for the first option period shall be $720,000.00, payable at the rate of $12,000.00 per month. The rent for the second option period shall be $840,000.00, payable at the rate of $14,000.00 per month. All other terms of this lease shall apply to each option period exercised by the Tenant.

1.1 This lease is contingent upon the purchase of the business by the Tenant.

1.2 A breach of this lease, if material, shall be a default in the Note, and a default in the Note shall be a breach of this lease.

2nd. The Tenant has examined the premises and has entered into this lease without any representation on the part of the Landlord as to the condition thereof, except as set forth herein. The Tenant shall take good care of the premises and shall at the Tenant's own cost and expense, make all repairs, and shall maintain the premises in good condition and state of repair, and at the end or other expiration of the term hereof, shall deliver up the rented premises in good order and condition. The Tenant shall neither encumber nor obstruct the sidewalks, driveways, yards, or entrances of the premises and shall maintain the same in a clean condition, free from debris, trash, refuse, snow and ice. The Tenant's right of possession is subject to all easements and right of ways of record, along with all facts revealed by an accurate survey or inspection of the property. The Tenant's right of possession is further subject to any exceptions contained in all policies of title insurance insuring the subject property.

2.1 Once the indebtedness to Landlord/Seller is paid off, Tenant/Purchaser's obligation shall run to maintain the parking area and landscaping; however, the Tenant/Purchaser shall at all times be responsible to abate at its expense any violations for which it receives notice from any governmental entity on the building or grounds. This provision shall survive closing.

2.2. Landlord/Seller represents that to the best of his knowledge he knows of no environmental violations or hazardous or toxic waste on the property prior to his ownership and that during this ownership from 1976 to date he has been in possession and has no knowledge of any environmental violations.

2.3 Landlord/Seller shall be responsible to make the following repairs: None

2.4 Landlord/Seller represents that except for the repairs noted in 2.3 above, Seller knows of no structural defects in the premises.

2.5 Landlord/Seller represents that there are no underground oil tanks on the property and that the septic system has been properly decommissioned. The Landlord/Seller shall hold the Tenant/Purchaser harmless for any requirement to remove the septic.

3rd. In case of the destruction of or damage of any kind whatsoever to the premises, caused by the carelessness, negligence or improper conduct on the part of the Tenant or the Tenant's agents, employees, guests, licensees, invitees, subtenants, assignees or successors, the Tenant shall repair the said damage or replace or restore any destroyed parts of the premises, as speedily as possible, at the Tenant's own cost and expense.

4th. No alterations, additions, improvements, containers, storage tanks, television or radio antennas, heavy equipment, apparatus or fixtures, shall be installed, attached or placed upon or under the leased premises, unless it meets all legal requirements. At the termination of this lease the Tenant shall at his own expense remove any such item from the premises and restore the premises to its original condition. Any property not removed shall become the property of the Landlord.

5th. The Tenant shall have the right to expand the diner and install any signs he believes are necessary for the improvement of his business. Before any expansion or installation of signs the Tenant shall give notice to the Landlord. Any expansion or signs installed by the Tenant shall at all times conform with all municipal ordinances or other laws and regulations applicable thereto.

6th. The Tenant shall pay when due all property taxes, fire insurance premiums, and the rents or charges for water or other utilities used by the Tenant, which are, or may be, assessed or imposed upon the leased premises or which are, or may be, charged to the Landlord by the suppliers thereof during the term hereof. If not paid, such rents or charges shall be added to and become payable as additional rent with the installment of rent next due or within 30 days of demand therefor, whichever occurs sooner.

6.1 If Tenant fails to pay property taxes for any quarter, then and in that event, Landlord shall have the right to have the Tenant pay with each note payment 1/12th of the property taxes and provide for an escrow for 3 months in advance.

6.2 If Landlord receives notice of cancellation of any required insurances for any reason, Landlord shall have the right to demand that 1/12th of the insurance premium be paid to it monthly including sufficient escrow to pay for the policy 1 year in advance.

7th. The Tenant shall promptly comply with all laws, ordinances, rules, regulations, requirements and directives of all Federal, State and Municipal Governments and all Public Authorities and all of their departments, bureaus and subdivisions, applicable to and affecting the said premises, their use and occupancy, for the corrections, prevention and abatement of nuisances, violations or other grievances in, upon or connected with the said premises during the term hereof; and shall promptly comply with all orders, regulations, requirements and directives of the Board of Fire Underwriters or similar authority and of any insurance companies which have issued or are about to issue policies of insurance covering the said premises and its contents, for the prevention of fire or other casualty damage or injury, at the Tenant's own cost and expense.

7.1 If Tenant receives any notice of violations, Tenant must remedy or abate same. If summonses are issued, Tenant will be responsible to pay fines and/or reasonable attorney's fees or risk being in breach of this lease.

7.2 The Tenant intends to use the Premises as a Diner/Restaurant. The Landlord states that this use does not violate any applicable zoning ordinance, building code or other law. The Tenant will obtain and pay for all inspections required by law and provide copies of same to Landlord. Tenant agrees to correct any violations of law at the Tenant's own expense.

8th. The Tenant, at Tenant's own cost and expense, shall obtain or provide and keep in full force for the benefit of the Landlord, during the term hereof, general public liability insurance insuring the Landlord against any all liability or claims of liability arising out of, occasioned by or resulting from any accident or otherwise in or about the leased premises, for injuries to any person or persons, for limits of not less than $2,000,000.00 for injuries to one person and $2,000,000.00 for injuries to more than one person, in any one accident or occurrence, and for loss or damage to the property of any person or persons, for not less than $2,000,000.00. The policy or policies of insurance shall be of a company or companies authorized to do business in this State and shall be delivered to the Landlord, together with evidence of the payment of the premiums therefor not less than fifteen days prior to the commencement of the term hereof or the date when the Tenant shall either into possession, whichever occurs sooner. At least fifteen days prior to the expiration or termination date of any policy, the Tenant shall deliver a renewal or replacement policy with proof of the payment of the premium therefor. The Tenant also agrees to and shall save, hold and keep harmless and indemnify the Landlord

from and for any and all payments expenses costs, attorney fees and from and for any and all claims and liability for losses or damage to property or injuries to persons occasioned wholly or in part by or resulting from any acts or omissions by the damage to property or injuries to person occasioned wholly or in part by or resulting from any acts or omissions by the Tenant or the Tenant's agents, employees, guests, licensees, invitees, subTenants, assignees or successors, or for any cause or reason whatsoever arising out of or by reason of the occupancy by the Tenant and the conduct of the Tenant's business.

8.2 landlord shall be noted as additional insured on all policies. If Landlord receives notice of cancellation for any reason, Seller shall have the right to demand that 1/12th of the insurance premium be paid to it monthly including sufficient escrow to pay for the policy 1 year in advance.

9th. The Tenant may assign, mortgage or hypothecate this lease, or sublet or sublease the premises or any part thereof, provided that Tenant remains liable thereon.

10th. The Tenant shall not occupy or use the leased premises or any part thereof, nor permit or suffer the same to be occupied or used, for any purposes other than as herein limited, nor for any purpose deemed unlawful, disreputable, or extra hazardous, on account of fire or other casualty.

11th. This lease shall not be a lien against the premises in respect to any mortgages that may hereafter be placed upon said premises. The recording of such mortgage or mortgages shall have preference and precedence and be superior and prior in lien to this lease, irrespective of the date of recording, and the Tenant agrees to execute any instruments, without cost, which may be deemed necessary or desirable, to further effect the subordination of this lease to any such mortgage or mortgages. A refusal by the Tenant to execute such instruments shall entitle the Landlord to the option of canceling this lease, and the term hereof is hereby expressly limited accordingly.

12th. If the land and premises leased herein, or of which the leased premises are a part, or any portion thereof, shall be taken under eminent domain or condemnation proceedings, or if suit or other action shall be instituted for the taking or condemnation thereof, or if in lieu of any formal condemnation proceedings or actions, the Landlord shall grant an option to purchase and/or shall sell and convey the said premises, or any portion thereof, to the governmental or other public authority, agency, body or public utility, seeking to take said land and premises or any portion thereof, then this lease shall continue in effect and the parties

shall be entitled to such claim or claims which may be awarded as damages as the result of such condemnation to which that party is entitled by law.

The parties shall notify each other in the event of any condemnation contact by any entity and each shall keep the other fully informed of the proceedings. There shall be no consent to sale without both parties agreement and both will participate in commissioner hearings and legal proceedings at their own cost and expense.

13th. In case of fire or other casualty, the Tenant shall give immediate notice to the Landlord.

14th. If the Tenant shall fail or refuse to comply with and perform any conditions and covenants of the within lease, the Landlord may, if the Landlord so elects, carry out and perform such conditions and covenants, at the cost and expense of the Tenant, and the said cost and expense shall be payable on demand, or at the option of the Landlord shall be added to the installment of rent due immediately thereafter but in no case later than one month after such demand, whichever occurs sooner, and shall be due and payable as such. This remedy shall be in addition to such other remedies as the Landlord may have hereunder by reason of the breach by the Tenant of any of the covenants and conditions in this lease contained.

15th. Any equipment, fixtures, goods or other property of the Tenant, not removed by the Tenant upon the termination of this lease, or upon any quitting, vacating or abandonment of the premises by the Tenant, or upon the Tenant's eviction, shall be considered as abandoned and the Landlord shall have the right, without any notice to the Tenant, to sell or otherwise dispose of the same, at the expense of the Tenant, and shall not be accountable to the Tenant for any part of the proceeds of such sale, if any.

16th. If there should occur any default on the part of the Tenant in the performance of any conditions and covenants herein contained, or if during the term hereof the premises or any part thereof shall be or become abandoned or deserted, vacated or vacant, or should the Tenant be evicted by summary proceedings or otherwise, the Landlord may either by force or otherwise, without being liable for prosecution therefor, or for damages, re-enter the said premises and the same have and again posses and enjoy; and as agent for the Tenant or otherwise, re-let the premises and receive the rents therefor and apply the same, first to the payment of such expenses, reasonable attorney fees and costs, as the Landlord may have been put to in re-entering and repossessing the same and in making such repairs and alterations as

may be necessary; and second to the payment of the rents due hereunder. The Tenant shall remain liable for such rents as may be in arrears and also the rents as may accrue subsequent to the re-entry by the Landlord, to the extent of the difference between the rents reserved hereunder and the rents if any, received by the Landlord during the remainder of the unexpired term hereof, after deducting the aforementioned expenses, fees and costs; the same to be paid as such deficiencies arise and are ascertained each month.

If the Tenant surrenders the premises in operating order with all collateral intact, providing for an orderly transfer, there shall be no suit against Tenant for monetary damages.

17th. Upon the occurrence of any of the contingencies set forth in the preceding clause, or should the Tenant be adjudicated a bankrupt, insolvent or placed in receivership, or should proceedings be instituted by or against the Tenant for bankruptcy, insolvency, receivership, agreement of composition or assignment for the benefit of creditors, or if this lease or the estate of the Tenant hereunder shall pass to another by virtue of any court proceedings, writ of execution, levy, sale, or by operation of law, the Landlord may, if the Landlord so elects, at any time thereafter, terminate this lease and the term hereof, upon giving to the tenant or any trustee, receiver, assignee or other person in charge of or acting as custodian of the assets or property of the Tenant, five days notice in writing, of the landlord's intention so to do. Upon the giving of such notice, this lease and the term hereof shall end on the date fixed in such notice as if the said date was the date originally fixed in this lease for the expiration hereof; and the Landlord shall have the right to remove all persons, good, fixtures and chattels therefrom, by force to otherwise, without liability for damages.

18th. The tenant acknowledges that no services are to be furnished or supplied by the landlord.

19th. The various rights, remedies, options and elections of the Landlord, expressed herein, are cumulative, and the failure of the Landlord to enforce strict performance by the Tenant of the conditions and covenants of this lease or to exercise any election or option or to resort or have recourse to any remedy herein conferred or the acceptance by the landlord of any installment of rent after any breach by the Tenant, in any one or more instances, shall not be construed or deemed to be a waiver or relinquishment for the future by the Landlord of any such conditions and covenants options, elections or remedies, but the same shall continue in full force and effect.

20th. This lease and the obligation of the Tenant to pay the rent hereunder and to comply with the covenants and conditions hereof, shall not be affected, curtailed, impaired or excused

by reason of any rule, order, regulation or preemption by any governmental entity, authority, department, agency or subdivision or for any delay which may arise by reason of negotiations for the adjustment of any fire or other casualty loss or because of strikes or other labor trouble or for any cause beyond the control of the Landlord.

20.1 The Tenant has brought to the attention of the Landlord and the Landlord has verified that there is a possibility that during the term of this agreement the State of New Jersey may take action which will result in the re-alignment of U.S. Highway 9. In the event there is actual construction work performed by the State of New Jersey beginning during the first six years of the term of this agreement and such work interferes with the Tenant's operation of the diner business that is the subject of this agreement, then and in that event, the Tenant will be permitted to defer six monthly payments on the note. These payments will be made at the end of the term of the note only and not lease and will extend said term by six months.

In the event there is actual construction work performed by the State of New Jersey beginning during the seventh through the twelfth year of the term of the note and security agreement referred to in this agreement and such work interferes with the Tenant's operation of the diner business that is the subject of this agreement, then and in that event, the Tenant will be permitted to defer three monthly payments on the note. These payments will be made at the end of the term of the note only and will extend said term by three months.

21st. The terms, conditions, covenants and provisions of this lease shall be deemed to be severable. If any clause or provision herein contained shall be adjudged to be invalid or unenforceable by a court of competent jurisdiction or by operation of any applicable law, it shall not affect the validity of any other clause or provision herein, but such other clauses or provision shall remain in full force and effect.

22nd. All notices required under the terms of this lease shall be given and shall be complete by mailing such notices by certified or registered mail, return receipt requested, to the address of the parties as shown at the head of this lease, or to such other address as may be designated in writing, which notice of change of address shall be given in the same manner. Any notice to landlord shall also be faxed and mailed, certified, return receipt requested, to Vincent E. Halleran, Jr., 56 West Main Street, P.O. Box 1059, Freehold, NJ 07728 (fax number 732-431-3561).

23rd. The Landlord covenants and represents that the landlord is the owner of the premises herein leased and has the right and authority to enter into, execute and deliver this lease; and does further covenant that the Tenant on paying the rent and performing the conditions and covenants herein contained, shall and may peaceably and quietly have, hold land enjoy the leased premises for the term aforementioned.

24th. This lease and the Agreement for Sale of Assets contains the entire contract between the parties. No representative, agent, or employee of the landlord has been authorized to make any representations or promises with reference to the within letting or to vary, alter or modify the terms hereof. No additions, changes or modifications, renewals or extensions hereof, shall be binding unless reduced to writing and signed by the landlord and the Tenant.

24.1 A default in the Note shall constitute a breach of this lease.

24.2 A breach of this lease shall constitute a default of the Note.

25th. The Tenant shall pay all taxes levied against the property when the same come due, providing Landlord with proof of payment each half year. The said sum shall be considered as additional rent and shall be paid in as many equal installments as there are tax bills issued by the taxing authorities.

26th. If any mechanics' or other liens shall be created or filed against the leased premises by reason of labor performed or materials furnished for the Tenant in the erection, construction, completion, alteration, repair or additions to any building or improvement, the Tenant shall within fifteen (15) days thereafter, at the Tenant's own cost and expense, cause such lien or liens to be satisfied and discharged of record together with any Notices of Intention that may have been filed. Failure so to do, shall entitle the landlord to resort to such remedies as are provided herein in the case of any default of this lease, in addition to such as are permitted by law.

27th. The Tenant waives all rights of recovery against the Landlord or Landlord's agents, employees or other representatives, for any loss, damages or injury of any nature whatsoever to property or person for which the Tenant is insured. The Tenant shall obtain from the Tenant's insurance carriers and will deliver to the landlord, waivers of the subrogation rights under the respective policies.

27.1 The Tenant shall maintain fire and extended coverage insurance in an amount not less than $1,850,000, or replacement value, whichever is greater, for the benefit of the Landlord to protect against total destruction of the building. The total amount due (including prepayment penalty) will be paid to the Landlord unless the building is totally re-built. The building must be rebuilt for not less than existing square footage and at least the same occupancy.

28th. The Landlord may pursue the relief or remedy sought in any invalid clause, by conforming the said clause with the provision of the statues or the regulations of any governmental agency in such case made and provided as if the particular provisions of the applicable statues or regulations were set forth herein at length.

29th. In all references herein to any parties, persons, entities or corporations the use of any particular gender or the plural or singular number is intended to include the appropriate gender or number as the text of the within instrument may require. All the terms, covenants and conditions herein contained shall be for and shall insure to the benefit of and shall bind the respective parties hereto, and their heirs, executors, administrators, personal or legal representatives, successors and assigns.

30th. If, at any time during the term of this lease, the Landlord decides to sell the subject property, the Tenant shall have the right of first refusal to purchase on the same terms and conditions that the landlord offers to a third party. The landlord shall notify the Tenant of Landlord's decision to sell the property. The Tenant shall then have a period of thirty (30) days to notify the Landlord of Tenant's decision. If the Tenant decides to purchase, notification of said decision shall be accompanied by a deposit similar to that required in connection with the offer to a third party.

30.1 Tenant shall have the right to meet any bona fide offer from a third party for the premises. Tenant must accept within thirty (30) days of receipt of notice along with a copy of the offer from Landlord, with closing to occur within sixty (60) days, or this right is deemed waived.

*In Witness Whereof*, the parties hereto have hereunto set their hands and seals or caused these presents to be signed by their proper corporate officers and their proper corporate seal to be hereto affixed, the day and year first above written.

Signed, Sealed and Delivered
in the presence of or Attested by:

GEORGE SARRIS

ADELPHIA & ELIAS L.L.C.
By: ~~Elias Pahountis~~, Member

Member
NICK PAHOUNTIS

Member
WILLIAM PAHOUNTIS

# ASSIGNMENT OF LEASE

THIS ASSIGNMENT OF LEASE is made on the 22 day of June 2009 by and between ADELPHIA AND ELIAS, LLC, having an address at ______________________, New Jersey (hereinafter referred to as the "Assignor") and the ALL SEASONS DINER & RESTAURANT II, INC. having an address 176 Wycoff Road, Eatontown, New Jersey 07724 (hereinafter referred to as the "Assignee").

KNOWN ALL MEN BY THESE PRESENTS that for and in consideration of the sum of TEN DOLLARS and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor by these presents does grant, convey, assign and transfer and set over unto the Assignee all of Assignors interests as tenant under a certain ground lease, dated June 15, 1999 by and between by George Sarris, as Lessor ("Sarris"), and Assignor for premises for land located at 4135 Route 9 North, Freehold Township, New Jersey 07728 ("Assigned Lease"). A copy of the Assigned Lease is attached hereto and made a part hereof. Assignor by its execution hereby warrants and represents the following:

(a) There is no lease security deposit now being held by Landlord

(b) Assignor has paid all sums due and owing to Landlord under the Assigned Lease through the date hereof.

(c) Assignor has the right to execute this Assignment without securing the consent of any other individual or entity for same to be in full force and effect.

(d) Assignor agrees to hold Assignee harmless from any and all lost, cost or damage arising out of or related to any untrue statements made by Assignor in the within Assignment of Lease.



**EXHIBIT "G"**

Assignee by its execution hereof assume all of the obligations of Assignor as lessee under the Assigned Lease and agrees to hold Assignor harmless from any and all loss, cost or damage arising out of or related to Assignees failure to comply with the terms of the Assigned Lease.

IN WITNESS WHEREOF, Assignor and Assignee have executed the within Assignment of Lease with Consent as of the day and year first above written.

Witness:

ADELPHIA & ELIAS, LLC, Assignor

By: ______________________
Managing Member

ALL SEASONS DINER & RESTAURANT II, INC.

MIHAIL HATZIMINAS

By: ______________________
MICHAEL ZAVOLAS, President

::ODMA\PCDOCS\GHCDOCS\692069\1



**EXHIBIT "G"**

# Exhibit “C”




**APPRAISAL REPORT**

Hypothetical Sub-Lots 30A & 31A
(Parts of Block 6 Lots 30 & 31)
Freehold Township
Monmouth County
New Jersey 07728

**REQUESTED BY**

Mr. George Sarris
47 Rachael Drive,
Morganville, NJ 07751

**PREPARED BY**

Michael Pallitto
Stuart Appraisal Company
42 E. Main Street
Freehold, NJ 07728
Internal File # 18629

**Date of Inspection**: July 5, 2023

**Date of Value**: July 5, 2023

**Date of Report**: August 7, 2023

Stuart Appraisal COMPANY

Mr. George Sarris
47 Rachael Drive
Morganville, NJ 07751

August 7, 2023

Re: Hypothetical Sub-Lots 30A & 31A
(Parts of Block 6 Lots 30 & 31)
Freehold Township
Monmouth County, New Jersey 07728

Dear Mr. Sarris:

As per your request, *Stuart Appraisal Company* has completed an appraisal of the above referenced properties. The purpose of this appraisal is to determine the partial interest value of a portion of the land area of Block 6 Lot 31 as well a portion of Block 6 Lot 30, both of which will be defined in more detail throughout this report. It is the understanding of the appraiser that the appraisal is to be used to assist the client with a business decision regarding a potential "land swap".

***As noted above, the purpose of this appraisal is to assist the client in a business decision regarding a potential land swap. As a land swap would like require subdivision prior to the consummation of a sale, we will consider the two partial interests being valued as "hypothetical sub-lots" and will refer to them as such throughout this appraisal report. The portion of Block 6 Lot 31 that will be valued in this appraisal will be identified and referenced as Hypothetical Sub-Lot 31A and the portion of Block 6 Lot 30 that will be valued herein will be identified and referenced throughout this report as Hypothetical Sub-Lot 30A. The appraiser will utilize these identifiers solely for convenience, reader clarity, and reference purposes.***

***It must be noted that the land areas valued herein were determined by a hand drawn "Subdivision Sketch" prepared by James E. Henry of Dynamic Engineering Consultants PC on August 1, 2023. The legal description identifying the exact dimensions of the "hypothetical sub-lots" are unknown as the appraiser was only provided a conceptual sketch.***

The parcel identified on the official tax rolls of Freehold Township as Block 6 Lot 31 a.k.a 4135 Route 9, consists of 82,643 square foot or 1.8972-acre interior parcel of land situated within the CMX-3A zoning district. The parcel is generally rectangular, contains 280 feet of frontage along the northbound side of Route 9. It is worth noting that this parcel is improved with a 9,537 square foot restaurant improvement, however only the underlying land will be considered in this valuation. There are several easements on the site which are described further in the site section of this appraisal.

The portion to be valued by this appraisal, identified throughout as "Hypothetical Sub-Lot 31A", consists of 21,791+/- square feet or 0.5003 +/- acres. This portion of Block 6 Lot 31 runs along the rear border of the site, is land-locked, mostly wooded and has no street frontage.

The parcel identified on the official tax rolls of Freehold Township as Block 6 Lot 30 a.k.a 4151 Route 9, consists of 461,480 square foot or 10.5941-acre parcel of land situated within the CMX-3A zoning district. The parcel is irregular in shape and surrounds Block 6 Lot 31 to the north, east & south. It has 603.55 feet of frontage along Route 9 which is north of Lot 31, 78.78 feet along Route 9 to the south of Lot 31, and 81.02 feet along the Route 9 / Englishtown Road "on-ramp". According to Department of Environmental Protection data, the site is encumbered by approximately 1.96 acres of wetlands. There are several easements on the site which are described further in the site section of this appraisal. Its worth mentioning that Block 6 Lot 30 also contains a separately assessed / taxed billboard on the site. This is not relevant to nor is considered in this appraisal report.

The portion to be valued by this appraisal, identified throughout as "Hypothetical Sub-Lot 30A", consists of 29,552 +/- square feet or 0.6784 +/- acres. This portion of Block 6 Lot 30 is situated south of Block 6 Lot 31, includes the 176.17 feet of frontage along Route 9, as well 81.02 feet of frontage along the Route 9 / Englishtown Road "on-ramp". The vast majority of this sub-lot is improved with a parking lot that is adjacent to the parking lot situated on Block 6 Lot 31.

As the pieces of land being valued herein are not individual parcels, in order to determine an opinion of value, the appraiser will consider each subject portion of land to be a "hypothetical sub-lot" and utilize a valuation technique that is similar to that known as a "diminution in value". As such, the values of the "hypothetical sub-lots" will be the difference in value between the "before" and "after" land values. See below.

| "Before" Value | - | "After" Value | = | Value of "Hypothetical Sub-Lot" |
|---|---|---|---|---|
| "As-is" Land Value of Block 6 Lot 31<br><br>(82,643 SF or 1.8972 AC) | - | Land Value of Block 6 Lot 31 MINUS area of "hypothetical sub-lot"<br><br>(60,852 SF or 1.3970 AC) | = | Value of "Hypothetical Sub-Lot" Identified herein as "Lot 31A"<br><br>(21,791 SF or 0.5003 AC) |

| "Before" Value | - | "After" Value | = | Value of "Hypothetical Sub-Lot" |
|---|---|---|---|---|
| "As-is" Land Value of Block 6 Lot 30<br><br>(461,480 SF or 10.5941 AC) | - | Land Value of Block 6 Lot 30 MINUS area of "hypothetical sub-lot"<br><br>(431,928 SF or 9.9157 AC) | = | Value of "Hypothetical Sub-Lot" Identified herein as "Lot 30A"<br><br>(29,552 SF or 0.6784 AC) |

**This appraisal employs the following hypothetical condition(s):**

## HYPOTHETICAL CONDITIONS

| | |
|---|---|
| **Hypothetical Condition 1** | *As noted throughout this appraisal report, the appraiser has been requested to value partial interests of Block 6 Lot 30 & Block 6 Lot 31. These partial interests / portions of the parcels were identified by a hand drawn "Subdivision Sketch" prepared by James E. Henry of Dynamic Engineering Consultants PC on August 1, 2023. The legal description identifying the exact dimensions of the "hypothetical sub-lots" are unknown as the appraiser was only provided a conceptual sketch. The values of such hypothetical sub-lots are premised on the hypothetical condition that "hypothetical sub-lot 31A" is the 21,791 square foot piece of land as identified in "red" within the provided "subdivision sketch" and that "hypothetical sub-lot 30A" is the 29,552 square feet piece of land as identified in "purple" within the provided "subdivision sketch". The appraiser has only utilized the information indicated within the "Subdivision Sketch" and any deviation from such is not intended and should not be implied.* |
| **Hypothetical Condition 2** | *In order to determine an "after" value of both Block 6 Lot 31 and Block 6 Lot 30 whereby the parcels are valued following the hypothetical subdivision of the hypothetical sub-lots, we must rely on the information within the provided "Subdivision Sketch". Considering such, the "after" values of both Lot 30 & 31 are premised on the hypothetical condition that Block 6 Lot 31 has been subdivided and the site area of this lot following the subdivision is 60,852 square feet or 1.3970 acres and the site area of Block 6 Lot 30 following the hypothetical subdivision is 431,928 square feet or 9.9157 acres. The appraiser has only utilized the information indicated within the "Subdivision Sketch" and any deviation from such is not intended and should not be implied.* |

A hypothetical condition is defined by the USPAP (2020/2021 Edition, The Appraisal Foundation) "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results but is used for the purpose of analysis."

**THE CONCLUSIONS AND FINDINGS OF THIS REPORT ARE NOT TO BE RELAYED, TRANSMITTED, OR COMMUNICATED IN ANY FASHION WITHOUT THE EXPLICT EXPRESSION OF THE EXTRAORDINARY ASSUMPTION AND HYPOTHETICAL CONCLUSIONS EMPLOYED. STUART APPRAISAL COMPANY ASSUMES NO LIABILITY FOR ANY IMPROPER OR UNITENDED USE OR COMMUNICATION OF THE OPINIONS AND CONCLUSIONS PRESENTED THROUGHOUT THIS APPRAISAL REPORT.**

Stuart Appraisal Company



**This appraisal employs the following extraordinary assumptions (s):**

## EXTRAORDINARY ASSUMPTIONS

| | |
|---|---|
| **Extraordinary Assumption 1** | *As shown within the sale history & tax assessment sections of this appraisal, Block 6 Lot 31 sold in October 2021 for $350,000. The parcel was never exposed to the open market prior to the sale. The sale price was significantly below the 2021 assessed value however the current assessment has been lowered to be in-line with the sale price. The appraiser was not able to communicate with any parties involved with the sale nor the Freehold Township Tax Assessor. The appraiser was only able to utilize information that is publicly available or provided regarding this parcel. Information available to the appraiser does not indicate there are any significant limitations or issues with the parcel that would dramatically impact value or development potential of the site. As such, this appraisal is premised on the extraordinary assumption that Block 6 Lot 30 is not impacted by any significant limitations or detrimental environmental issues that could impact the parcel's value or marketability. If future information proves to the contrary, this could significantly impact the opinions and conclusions herein whereby the appraiser reserves the right to alter this appraisal if deemed appropriate and necessary. The appraiser highly recommends that the client and/or the client's legal representatives interview the owner of Block 6 Lot 30 and/or the Freehold Township Tax Assessor to determine if any such issues exists.* |

An extraordinary assumption is defined by the USPAP (2020/2021 Edition, The Appraisal Foundation) "an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions"

**THE CONCLUSIONS AND FINDINGS OF THIS REPORT ARE NOT TO BE RELAYED, TRANSMITTED, OR COMMUNICATED IN ANY FASHION WITHOUT THE EXPLICT EXPRESSION OF THE EXTRAORDINARY ASSUMPTION AND HYPOTHETICAL CONCLUSIONS EMPLOYED. STUART APPRAISAL COMPANY ASSUMES NO LIABILITY FOR ANY IMPROPER OR UNITENDED USE OR COMMUNICATION OF THE OPINIONS AND CONCLUSIONS PRESENTED THROUGHOUT THIS APPRAISAL REPORT.**

This report is submitted with the attached assumptions and contingent and limiting conditions found in the addenda. Acceptance of the report is considered by the appraiser as acceptance of said limiting conditions.

Stuart Appraisal Company has not previously appraised the property that is the subject of this appraisal report within the five years prior to the effective date of this appraisal. We have no present or prospective interest in or bias with respect to the property that is the subject of this report, and we have no personal interest in or bias with respect to the parties involved with this assignment.

Stuart Appraisal COMPANY



Please refer to the attached appraisal report, plus exhibits, for documentation of the value estimate contained herein. It has been a pleasure to assist you in this assignment. If you have any questions concerning the analysis, or if Stuart Appraisal Company can be of further service, please contact us.

Based on our inspection of the subject property, the investigation and analyses undertaken, and subject to the “Limiting Conditions” and “Extraordinary Assumptions” as set forth in this report, it is our opinion:

| VALUE CONCLUSION(S) | | | | |
|---|---|---|---|---|
| “Before” Land Value Block 6 Lot 31 | - | “After” Land Value Block 6 Lot 31 | = | Value of “Hypothetical Sub-Lot 31A” |
| $880,000 | - | $750,000 | = | **$130,000** |

| VALUE CONCLUSION(S) | | | | |
|---|---|---|---|---|
| “Before” Land Value Block 6 Lot 30 | - | “After” Land Value Block 6 Lot 30 | = | Value of “Hypothetical Sub-Lot 30A” |
| $2,370,000 | - | $1,985,000 | = | **$385,000** |

We certify that we have no present or contemplated future interest in the property and that our employment and compensation are in no way contingent upon the value reported.

Sincerely,

Michael R. Pallitto, SCGREA
42RG00253700

# Table of Contents

SUMMARY OF SALIENT FACTS AND FEATURES ..... 2
SUBJECT PHOTOGRAPHS ..... 4
SCOPE OF THE APPRAISAL ..... 7
PURPOSE AND OBJECTIVE OF THE APPRAISAL ..... 8
INTENDED USE ..... 8
INTENDED USER ..... 8
PROPERTY INFORMATION SOURCES ..... 11
PROPERTY INSPECTION ..... 11
PROPERTY IDENTIFICATION ..... 12
OWNERSHIP AND SALES HISTORY ..... 14
PROPERTY TAX ASSESSMENTS ..... 15
CENSUS TRACT & MSA ..... 18
TOWNSHIP OF FREEHOLD ZONING ..... 19
REGIONAL DATA – MONMOUTH COUNTY ..... 21
LOCAL DATA – TOWNSHIP OF FREEHOLD ..... 25
NEIGHBORHOOD MARKET ..... 29
SUBJECT SITE DESCRIPTION ..... 32
PROVIDED SUBDIVISION SKETCH ..... 42
EXCERPT FROM PROVIDED SUBDIVISION SKETCH ..... 43
DESCRIPTION OF THE SUBJECTS IMPROVEMENTS (BLOCK 6 LOT 31) ..... 44
DESCRIPTION OF THE SUBJECTS IMPROVEMENTS (BLOCK 6 LOT 30) ..... 44
HIGHEST AND BEST USE ..... 45
APPROACH TO VALUE - THE VALUATION PROCESS ..... 47
SALES COMPARISON APPROACH – BLOCK 6 LOT 31 "BEFORE" LAND VALUE ..... 49
SALES COMPARISON APPROACH – BLOCK 6 LOT 31 "AFTER" LAND VALUE ..... 61
HYPOTHETICAL SUB-LOT 31A VALUE CONCLUSION ..... 66
SALES COMPARISON APPROACH – BLOCK 6 LOT 30 "BEFORE" LAND VALUE ..... 68
SALES COMPARISON APPROACH – BLOCK 6 LOT 30 "AFTER" LAND VALUE ..... 80
HYPOTHETICAL SUB-LOT 30A VALUE CONCLUSION ..... 85
RECONCILIATION AND FINAL VALUE ESTIMATE ..... 87
ESTIMATED EXPOSURE TIME ..... 88
ESTIMATED MARKETING PERIOD ..... 89
EXTRAORDINARY ASSUMPTIONS & HYPOTHETICAL CONDITIONS ..... 90
EXTRAORDINARY ASSUMPTIONS & HYPOTHETICAL CONDITIONS ..... 91
CERTIFICATION ..... 92
ASSUMPTIONS & DISCLOSURES ..... 94
CONTINGENT & LIMITING CONDITIONS ..... 95

**Addendum: Engagement Letter, Lease, Qualifications**

# SUMMARY OF SALIENT FACTS AND FEATURES

## PROPERTY IDENTIFICATION

| | |
|---|---|
| **Property Type** | Land |
| **Property Subtype** | Hypothetical Sub-Lots |
| **Address** | Portions of 4135 & 4151 Route 9 |
| **City, State Zip** | Freehold Township, New Jersey , 07728 |
| **County** | Monmouth County |
| **Legal Description** | Portions of Block 6 Lot 31 & 30 |

## CURRENT AS-IS SITE DESCRIPTIONS

| | | |
|---|---|---|
| **Assessor Parcel Number** | 17-00006-0000-00031 | |
| **Land Area** | **Square Feet** | **Acres** |
| **Usable** | 82,643 | 1.8972 |
| **Unusable** | 0 | 0.0000 |
| **Total** | 82,643 | 1.8972 |

| | | |
|---|---|---|
| **Assessor Parcel Number** | 17-00006-0000-00030 | |
| **Land Area** | **Square Feet** | **Acres** |
| **Usable** | 376,102 | 8.6341 |
| **Unusable (Wetlands)** | 85,378 | 1.9600 |
| **Total** | 461,480 | 10.5941 |

## SUBJECT HYPOTHETICAL SUB-LOT DESCRIPTIONS

| | | |
|---|---|---|
| **Assessor Parcel Number** | Part of 17-00006-0000-00031 | |
| | ***To be identified throughout this report as Lot 31A*** | |
| **Land Area** | **Square Feet** | **Acres** |
| **Usable** | 21,791 | 0.5003 |
| **Excess** | 0 | 0.0000 |
| **Total** | 21,791 | 0.5003 |

| | | |
|---|---|---|
| **Assessor Parcel Number** | Part of 17-00006-0000-00030 | |
| | ***To be identified throughout this report as Lot 30A*** | |
| **Land Area** | **Square Feet** | **Acres** |
| **Usable** | 29,552 | 0.6784 |
| **Unusable** | 0 | 0.0000 |
| **Total** | 29,552 | 0.6784 |

| | |
|---|---|
| **Zoning** | Corporate Multi-Use - 3 Acres (CMX-3A) |
| **Shape** | Rectangular |
| **Topography** | Level to Sloping |
| **Flood Zone** | Zone X (Unshaded) |

## SUMMARY OF SALIENT FACTS AND FEATURES

| EXPOSURE & MARKETING TIME | |
|---|---|
| Exposure Time | Not Applicable |
| Marketing Time | Not Applicable |

| DATES | |
|---|---|
| Date Of Value | July 5, 2023 |
| Inspection Date | July 5, 2023 |
| Date Of Report | August 7, 2023 |

| SALES COMPARISON APPROACH (BLOCK 6 LOT 31) | |
|---|---|
| **BLOCK 6 LOT 31 – "AS-IS" / "BEFORE" LAND VALUE** | **$880,000** |
| **BLOCK 6 LOT 31 – HYPOTHETICAL "AFTER" LAND VALUE** | **$750,000** |
| **INDICATED VALUE OF HYPOTHETICAL SUB-LOT 31A** | **$130,000** |

| SALES COMPARISON APPROACH (BLOCK 6 LOT 30) | |
|---|---|
| **BLOCK 6 LOT 30 – "AS-IS" / "BEFORE" LAND VALUE** | **$2,370,000** |
| **BLOCK 6 LOT 30 – HYPOTHETICAL "AFTER" LAND VALUE** | **$1,985,000** |
| **INDICATED VALUE OF HYPOTHETICAL SUB-LOT 30A** | **$385,000** |

**APPRAISERS** - Michael R. Pallitto, SCGREA - 42RG00253700

**Effect of Novel Coronavirus (COVID-19)**
On March 13, 2020, the United States Government declared a "National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak", which was in effect on the Effective Date of this Appraisal Report. This appraisal report was performed pursuant to the Uniform Standards of Professional Appraisal Practice ("USPAP") and was based on information and comparable sales available on that date. At this time, the effect of COVID-19 on the future value of the Subject Property or the value of the real estate market in the area of the Subject Property is unknown and not possible to predict.

## SUBJECT PHOTOGRAPHS



View of Block 6 Lot 30 (North of Lot 31)



View of Block 6 Lot 30 (South of Lot 31)
Portion identified as "Sub-Lot 30A"



View of Block 6 Lot 31



View of Block 6 Lot 31
Portion identified as "Sub-Lot 31A"



Aerial View of Block 6 Lot 30




Aerial View of Block 6 Lot 31

## SUBJECT PHOTOGRAPHS



View of Route 9
4135 Route 9, Freehold, NJ 07728



Alternate View of Route 9
4135 Route 9, Freehold, NJ 07728

**SUBJECT PHOTOGRAPHS**



View of Route 9 Leading to Access Easement
4135 Route 9, Freehold, NJ 07728



View of Route 9 On-Ramp/Access Easement Via Lot 30
4135 Route 9, Freehold, NJ 07728

## SCOPE OF THE APPRAISAL

The scope of the appraisal includes the required research and subsequent analysis to prepare an appraisal report, for its stated purpose and use, in conformity with the Standards of Professional Practice of the Appraisal Institute and the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. In the case of the subject property, the steps involved in its analysis are summarized as follows:

1. Michael Pallitto, SCGREA made an inspection of the subject property on July 5, 2023. It was at this time that the subject photographs were taken. The information concerning the size, shape of the site and the information concerning the improvements is based on physical inspection and township data.

2. Subject Tax Assessment and its current tax status were verified with the Freehold Township Tax Assessor and Tax Collector Offices, respectively. The ownership, sales history and description were obtained from the Monmouth County Clerk's Office.

3. The prevailing zoning regulations were verified with the Freehold Township Planning and Zoning Office.

4. The definition of Market Value is included in the report.

5. City of… data is based on The New Jersey Municipal Data Book and information as supplied by the Freehold Township Planning Board. The Neighborhood Description was based on a physical inspection of the neighborhood, as of the date of this appraisal.

6. Subject property data is based on the appraiser's physical inspection.

7. In estimating the Highest and Best Use of the subject, the appraisers have considered the data collected in the previous steps listed above.

8. In the use of the Sales Comparison Approach, the data used was collected from the files of Stuart Appraisal Company and from various municipalities' Tax Assessors. The data was verified to the extent possible with the appropriate parties.

9. After analyzing the data summarized in this report, a reconciliation of the Value Estimates as derived in each employed Approach to Value was made that resulted in the derived value estimate.

***As the pieces of land being valued herein are not individual parcels, in order to determine an opinion of value, the appraiser will consider each subject portion of land to be a "hypothetical sub-lot" and utilize a valuation technique that is similar to that known as a "diminution in value". As such, the values of the "hypothetical sub-lots" will be the difference in value between the "before" and "after" land values.***

## PURPOSE AND OBJECTIVE OF THE APPRAISAL

It is the purpose of this appraisal to estimate the "as is" current market value of the subject property. It is the appraiser's understanding that the appraisal is to be used to assist with Internal Business Decision Regarding Possible Land Swap / Purchase.

## PROPERTY RIGHTS BEING APPRAISED

The property rights being appraised are those of a Fee Simple Estate.

## DEFINITION OF OWNERSHIP INTEREST

**Fee Simple Estate** is defined as:

Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.

***Source:*** *The Dictionary of Real Estate Appraisal, Seventh Edition, published by the American Institute, 2022.*

## INTENDED USE

The intended use of the appraisal report is Assist with Internal Business Decision Regarding Possible Land Swap / Purchase.

## INTENDED USER

The intended user is Sarris Family LLC c/o Mr. George Sarris. The report is not to be used by any other parties than the intended user.

## DEFINITION OF MARKET VALUE

"Market value" means the most probable price which a property should bring in a competitive and open market under all condition's requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation as of a sale of a specified date and the passing of title from seller to buyer under conditions whereby:

1. buyer and seller are typically motivated;
2. both parties are well informed or well advised, and acting in what they consider their best interests;
3. a reasonable time is allowed for exposure in the open market;
4. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

## DEFINITION OF MARKET VALUE (Continued)

5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Substitution of another currency for United States dollars in the fourth condition is appropriate in other countries or in reports addressed to clients from other countries.

(*Source*: *The Dictionary of Real Estate Appraisal, Seventh Edition, Appraisal Institute, 2022*)

## DEFINITION OF PARTIAL INTEREST

Divided or undivided rights in real estate that represent less than the whole, i.e., a fractional interest such as a tenancy in common or easement.

(*Source*: *The Dictionary of Real Estate Appraisal, Seventh Edition, Appraisal Institute, 2022*)

## DIMINUTION IN VALUE

The difference between the unimpaired and impaired values of the property being appraised. This difference can be due to the increased risk and/or costs attributable to the property's environmental condition.

(*Source*: *The Dictionary of Real Estate Appraisal, Seventh Edition, Appraisal Institute, 2022*)

## CONFIDENTIALITY

The appraiser(s) were not entitled to divulge the material (evaluation or valuation) content of this report and analytical findings or conclusions, or give a copy of this report to anyone other than the client or his designee, as specified in writing, except as may be required by the Appraisal Institute, as they may request in confidence for ethic enforcement, or by a court of law with the power of subpoena. All conclusions and opinions concerning the analyses as set forth herein are prepared by the appraisers whose signatures appear. No change of any item in the report shall be made by anyone other than the appraiser, and the firm shall have no responsibility if any such unauthorized change is made. Whenever the appraiser(s) opinion herein with respect to the existence or absence of fact is qualified by the phrase or phrases "to the best of the appraiser(s) knowledge", "it appears" or "indicated", it is intended to indicate that, during the course of our review and investigation of the property, no information has come to the appraiser(s) attention which would give us actual knowledge of the existence or absence of such facts. **The client shall notify the appraiser(s) of any error, omission or invalid data herein within 10 days of receipt and return of the report, along with all copies, to the appraiser(s) for corrections prior to any use whatsoever. Neither the appraiser(s) name nor this report may be used in connection with any financing plans which would be classified as a public offering under State or Federal Security Laws.**

## COMPETENCY PROVISION

We are aware of the competency provision of the Uniform Standards of Professional Appraisal Practice (USPAP). The author of this report meets those standards. It is our opinion that we are fully competent to perform this appraisal, due to the fact that: We have full knowledge and experience in the nature of this assignment; all necessary and appropriate steps have been taken in order to complete the assignment competently; and we do not lack any knowledge or experience that would prohibit this assignment from being completed in a professional and competent manner, or where a biased or misleading opinion of value would be rendered.

## COPIES, PUBLICATION, DISTRIBUTION, USE OF REPORT

Possession of this report, or any copy thereof, does not carry with it the right of publication, nor may it be used for other than its intended use. The physical report remains the property of the firm for the use of the client, with the fee being for the analytical services only. This report may not be used for any purpose by any person or corporation other than the client of the party to whom the report is addressed. Additional copies may not be made without the written consent of an officer of the firm, and then only in its entirety.

## PROPERTY INFORMATION SOURCES

| | |
|---|---|
| Property Assessment/Tax | Monmouth County Assessor |
| Zoning / Land Use | Freehold Township Zoning |
| Site Size | Provided Survey / Subdivision Sketch |
| Building Size | Not Applicable |
| Supply & Demand | CoStar |
| Flood Map | STDB On-Line |
| Demographics | STDB On-Line |
| Comparable Information | CoStar/MLS/Property Records/Agents |
| Legal Description | Freehold Township Tax Assessor |
| | |
| Purchase & Sale Document | Not Applicable |
| Rent Roll | Not Provided |
| Lease Documents | Client |
| Operating Statements | Not Provided |
| Income/Expense Statements | Not Provided |
| Physical Inspection Report | Not Provided |
| Building Plans/Specs | Not Provided |
| Architectural Plans | Not Provided |
| Construction Costs/Budget | Not Provided |
| Title Report | Not Provided |
| Phase I Environmental Report | Not Provided |
| Phase II Environmental Report | Not Provided |

## PROPERTY INSPECTION

| APPRAISER | | EXTENT OF INSPECTION | DATE |
|---|---|---|---|
| Michael Pallitto | | Interior & Exterior | July 5, 2023 |
| **OTHER** | **TITLE** | **EXTENT OF INSPECTION** | **DATE** |
| Michael Cefalu | Associate | Interior & Exterior | July 5, 2023 |

## PROPERTY IDENTIFICATION

The subject property is located in the Freehold Township and is represented on the Official Tax Rolls as follows:

***Hypothetical Sub-Lot #31A***

*This hypothetical parcel is a 21,791 square foot portion of the parcel identified below. The section is located to the rear of the improvement. Official legal description is unknown. Please refer to the subdivision sketch shown below for a visual of the hypothetical parcel's location.*

| | |
|---|---|
| Address: | Part of 4135 Route 9, Freehold Township<br>Monmouth County, New Jersey 07728 |
| Assessor's Parcel Number: | Part of 17-00006-0000-00031 |
| Legal Description: | Part of Block 6 Lot 31 |

****For convenience purposes only, we have identified / referred to this hypothetical parcel as Lot 31A throughout this appraisal report.***



## PROPERTY IDENTIFICATION

The subject property is located in the Freehold Township and is represented on the Official Tax Rolls as follows:

***Hypothetical Sub-Lot #30A***

*This hypothetical parcel is a 29,552 square foot portion of the parcel identified below. The section is located to the rear of the improvement. Official legal description is unknown. Please refer to the subdivision sketch shown below for a visual of the hypothetical parcel's location.*

| | |
|---|---|
| Address: | Part of 4151 Route 9, Freehold Township<br>Monmouth County, New Jersey 07728 |
| Assessor's Parcel Number: | Part of 17-00006-0000-00030 |
| Legal Description: | Part of Block 6 Lot 30 |

****For convenience purposes only, we have identified / referred to this hypothetical parcel as Lot 30A throughout this appraisal report.***



## OWNERSHIP AND SALES HISTORY

***Block 6 Lot 31***

| | |
|---|---|
| **Previous Owner** | The George Sarris Intervivos Revocable Trust |
| **Current Owner** | Sarris Family, LLC |
| **Last Sale Date** | October 14, 2022 |
| **Last Known Sale Price** | $1 |
| **Document Number** | Book 9622 Page 2359 |
| **Deed Type** | Non-Arm's Length |
| **Sale History** | The last sale of the subject property occurred on October 14, 2022 for a nominal amount. This transaction is recorded in the Monmouth County Book of Deeds as Book 9622 Page 2359. This was a non-arm's length transfer of convenience between related parties. There have been no other sales of the subject property within the five years prior to the effective date of this appraisal. |

***Block 6 Lot 30***

| | |
|---|---|
| **Previous Owner** | DCH Investments, Inc |
| **Current Owner** | RW Route 9 RE, LLC |
| **Last Sale Date** | July 20, 2021 |
| **Last Known Sale Price** | $350,000 |
| **Document Number** | Book 9534 Page 6867 |
| **Deed Type** | |
| **Sale History** | The last sale of the subject property occurred on July 20, 2021 for $350,000. This transaction is recorded in the Monmouth County Book of Deeds as Book 9534 Page 6867. This transaction appears to have been non-arm's length given the analysis herein however such could not be confirmed with parties involved in the sale. The property was not publicly listed prior to the sale. There have been no other sales of the subject property within the five years prior to the effective date of this appraisal. |

***Current Disposition / Negotiations of Both Parcels***

Per information provided by the client, there have been talks with the ownership of Lot 30 regarding a potential land swap. The land swap would consist of the portions of land identified herein as "Hypothetical Sub-Lot 31A" and "Hypothetical Sub-Lot 30A". The appraiser was not made privy to any formal offers made between the two parties however was informed that negotiations date back many years as the land swap was discussed between the former ownership of both properties.

## PROPERTY TAX ASSESSMENTS

***Block 6 Lot 31***

The following is the subject's 2023 current assessment and 2023 real estate taxes. The 2023 tax rate was $1.855, and per the New Jersey Table of Equalized values the 2022 equalization ratio is 100%.

| 4135 ROUTE 9, FREEHOLD TOWNSHIP NJ (BLOCK 6 LOT 31) | |
|---|---|
| **Taxing Authority:** | Freehold Township |
| **2023 Land Assessment:** | $945,000.00 |
| **2023 Improvement Assessment:** | $1,787,500.00 |
| **2023 Total Assessment:** | $2,732,500.00 |
| **2023 Tax Rate:** | 1.855% |
| **2023 Annual Taxes:** | $50,687.88 |
| **Latest Equalization Ratio:** | 100% |
| **Latest Equalized Value:** | $2,732,500 |

**SUBJECT PROPERTY ASSESSMENT AND TAX HISTORY**

| YEAR | TOTAL ASSESSED VALUE | TAX RATE | TAXES | TAXES/SF | CHANGE |
|---|---|---|---|---|---|
| 2022 | $2,732,500 | 2.015% | $55,060 | $5.77 | -6.5% |
| 2021 | $2,732,500 | 2.156% | $58,913 | $6.18 | -0.4% |
| 2020 | $2,732,500 | 2.165% | $59,159 | $6.20 | -0.2% |
| 2019 | $2,732,500 | 2.169% | $59,268 | $6.21 | -3.7% |
| 2018 | $2,732,500 | 2.253% | $61,563 | $6.46 | - |

As of the effective date of this appraisal, per the Freehold Township Tax Collector's Office, the subject is current on all real estate taxes. The next payment for the 2023 Third Quarter is due August 1, 2023.

**It is not the purpose of this appraisal to determine if the subject property is fairly assessed.**

## PROPERTY TAX ASSESSMENTS

***Block 6 Lot 30***

The following is the subject's 2023 current assessment and 2023 real estate taxes. The 2023 tax rate was $1.855, and per the New Jersey Table of Equalized values the 2022 equalization ratio is 100%.

| 4151 ROUTE 9, FREEHOLD TOWNSHIP NJ (BLOCK 6 LOT 30) | |
|---|---|
| **Taxing Authority:** | Freehold Township |
| **2023 Land Assessment:** | $392,700 |
| **2023 Improvement Assessment:** | $0 |
| **2023 Total Assessment:** | $392,700 |
| **2023 Tax Rate:** | 1.855% |
| **2023 Annual Taxes:** | $7,284.59 |
| **Latest Equalization Ratio:** | 100% |
| **Latest Equalized Value:** | $392,700 |

| SUBJECT PROPERTY ASSESSMENT AND TAX HISTORY | | | | | |
|---|---|---|---|---|---|
| YEAR | TOTAL ASSESSED VALUE | TAX RATE | TAXES | TAXES/SF | CHANGE |
| 2022 | $378,100 | 2.015% | $7,619 | $0.80 | -71.2% |
| 2021 | $1,226,100 | 2.156% | $26,435 | $2.77 | -24.8% |
| 2020 | $1,623,200 | 2.165% | $35,142 | $3.68 | 6.2% |
| 2019 | $1,525,200 | 2.169% | $33,082 | $3.47 | -3.6% |
| 2018 | $1,523,500 | 2.253% | $34,324 | $3.60 | - |

As of the effective date of this appraisal, per the Freehold Township Tax Collector's Office, the subject is current on all real estate taxes. The next payment for the 2023 Third Quarter is due August 1, 2023.

**It is not the purpose of this appraisal to determine if the subject property is fairly assessed.**

**It is worth noting that Block 6 Lot 30's assessments significantly changed following the sale of the parcel in 2021. Property records indicate that the site is in need of extension site work however the appraiser was unable to reach the Freehold Township Tax Assessor to discuss the details of such. The appraiser highly recommends the client and/or client's representatives contact the Freehold Township Tax Assessor to discuss such before the consummation of any sale and/or land swap.**

**TAX MAP EXCERPT**



## FLOOD DATA

According to FEMA Flood Mapping, the subject property lies within Community Panel Number 34025C0143F, dated 9/25/2009 and is located in Zone X (Unshaded), an area determined to be outside 500-year floodplain determined to be outside the 1% and 2% annual chance floodplains. However, the appraisers are not experts in this field and a flood certification is recommended.




## CENSUS TRACT & MSA

| | | | |
|---|---|---|---|
| **Street Address** | 4135 & 4151 Route 9 | **MSA/MD Code** | **35154** |
| **City Name** | Freehold Township | **State Code** | **34** |
| **State Abbreviation** | NJ | **County Code** | **025** |
| **Zip Code** | 07728 | **Tract Code** | **8104.01** |

## TOWNSHIP OF FREEHOLD ZONING

As per the official Township of Freehold zoning map, the subject is situated within the Corporate Multi-Use Development Zones (CMX-3). A brief description of the zone is shown below with the full code shown in the addendum of this report.

## ZONING INFORMATION

**Zone Name:** CMX-3A; Corporate Multi-Use Development Zones

**Permitted Uses:** An abbreviated list of permitted uses include finance & insurance offices, real estate offices, cable/television services, professional/scientific/technical services, a variety of business serves, a variety of health services, a variety of social services, elementary & secondary schools, corporate offices, conference/convention centers, houses of worship, a variety of integrated limited business / support services, a variety of food services, a variety of personal sales / service establishments, fitness & recreational sports centers, etc.

| Description | Requirement |
|---|---|
| Minimum Lot Area: | 3 acres |
| Minimum Lot Width: | 300 feet |
| Minimum Lot Frontage: | 300 feet |
| Minimum Lot Depth: | 400 feet |
| Maximum Lot Coverage: | 20% |
| Maximum Impervious Coverage: | 65% |
| Maximum Floor Area Ratio: | 0.20 |
| Maximum Building Height: | 40 ft. / 2 stories |
| Minimum Front Yard Setback: | 10 feet |
| Minimum Side Yard Setback: | 50 feet |
| Minimum Rear Yard Setback: | 50 feet |
| Minimum Width Buffer Zone | 50 feet |
| Minimum Principal Building Size | 5,000 square feet |
| Scenic Corridor Buffer | 50 feet |

Block 6 Lot 31 falls short of minimum lot requirements and is considered pre-existing, legal non-conforming. Block 6 Lot 30 appears to be a legal and conforming parcels.

It should be noted that neither of the "hypothetical sub-lots" noted herein would be considered stand-alone parcels capable of being developed individually as both fall significantly short of minimum requirements.

***It should be noted, however, that we are not experts in the interpretation of zoning ordinances. The determination of zoning compliance is beyond the scope of real estate appraisal. Furthermore, we know of no deed restrictions, public or private, that limit the subject's use. The research required to determine whether or not such restrictions exist is also beyond the scope of this appraisal assignment. Deed restrictions are a legal matter and only a title examination by an attorney or a title company can usually uncover such restrictive covenants. Thus, we recommend a title search to determine if any such restrictions do exist.***

**FREEHOLD TOWNSHIP ZONING MAP EXCERPTS**



## REGIONAL DATA – MONMOUTH COUNTY



Monmouth County is a county located on the coast of central New Jersey. According to the United States Census Bureau, Monmouth County has a total area of 665.32 square miles including 468.79 square miles of land and 196.53 square miles of water (29.54%). The county ajoins: Middlesex County (northwest), Ocean County (south), Mercer County (west), Burlington County (southwest), Richmond County, New York (north), and Long Island (northeast) ; Kings County, New York, Queens County, New York.

The county has an approximate total of 3,354.67 miles of roadways, of which 2,762.31 miles were maintained by the municipality, 360.42 miles by Monmouth County, 204.89 miles by New Jersey Department of Transportation, and 27.05 miles by the New Jersey Turnpike Authority.

#### POPULATION

During 2020 the population of the county increased by 2.1%. The current population of Monmouth County is as follows:

| | POPULATION | CHANGE | PERCENT CHANGE |
|---|---|---|---|
| 1990 | 553,124 | - | - |
| 2000 | 615,301 | 62,177 | 11.2% |
| 2010 | 630,380 | 15,079 | 2.5% |
| 2020 | 643,615 | 13,235 | 2.1% |

*U.S. Census Bureau & 2020 American Community Survey*

The current population of 643,615 indicates an increase of 2.1% from the 2010 census figures. The population has increased over the past decade.

#### HOUSEHOLDS & INCOME

The total households and income levels within the county are as follows:

| | |
|---|---|
| Total Households | 250,738 |
| Median Household Income | $108,000 |
| Per Capita Income | $58,398 |

*Source: 2021 American Community Survey*

The typical Monmouth County resident is 43.7 years of age with a per capita income of $58,398. The median household income in Monmouth County is $108,000 and the median family income is $140,606. As the chart on the following page shows the county has income levels that are above the State averages.

## REGIONAL DATA – MONMOUTH COUNTY

### LAND USES

According to the New Jersey Municipal Data Book, the real estate uses are divided as follows:

***Land Use within Monmouth County***

| CLASS | TOTAL PARCELS | % OF TOTAL |
|---|---|---|
| Vacant Land | 9,426 | 3.96% |
| Residential | 214,127 | 89.93% |
| Farm | 3,898 | 1.64% |
| Commercial | 9,189 | 3.86% |
| Industrial | 501 | 0.21% |
| Apartments | 957 | 0.40% |
| *Total* | *238,098* | |

*Source: NJACTB-February 2022*

As the above table shows, Monmouth County is comprised mainly of residential properties.

### EMPLOYMENT

An analysis of the labor force in Monmouth County is summarized as follows:

***Labor Force within Monmouth County***

| CATEGORY | NUMBER | % OF TOTAL |
|---|---|---|
| Managers & Professionals | 171,499 | 52.8 |
| Technicians, Sales & Administrative support | 64,774 | 20.0% |
| Service Occupations | 43,521 | 13.4% |
| Farming, Fishing & Forestry | 781 | 0.2% |
| Precision Production, Craft & Repair | 24,168 | 7.4% |
| Operators, Fabricators & Laborers | 20,702 | 6.4% |
| Self-employed persons | 14,286 | 4.4% |
| *Total* | *339,731* | |

*Source: NJ Municipal Data Book*

The make-up of this labor force is typical of most communities within the county with a high percentage of managers and professionals.

## REGIONAL DATA – MONMOUTH COUNTY

### HOUSING, CONSTRUCTION & LOCAL DEVELOPMENT

The county has a mixture of various property types. There are a total 269,883 housing units within the county. Of these 250,738 are occupied units, 189,905 are owner occupied (75.7%) with the remaining being rental units.

| HOUSING OCCUPANCY | | |
|---|---|---|
| Total housing units | 269,883 | 269,883 |
| Occupied housing units | 250,738 | 92.9% |
| Vacant housing units | 19,145 | 7.1% |
| Homeowner vacancy rate | 0.8 | (X) |
| Rental vacancy rate | 3.2 | (X) |
| UNITS IN STRUCTURE | | |
| Total housing units | 269,883 | 269,883 |
| 1-unit, detached | 182,074 | 67.5% |
| 1-unit, attached | 22,151 | 8.2% |
| 2 units | 6,025 | 2.2% |
| 3 or 4 units | 9,173 | 3.4% |
| 5 to 9 units | 9,923 | 3.7% |
| 10 to 19 units | 10,885 | 4.0% |
| 20 or more units | 26,008 | 9.6% |
| Mobile home | 3,629 | 1.3% |
| Boat, RV, van, etc. | 15 | 0.0% |
| YEAR STRUCTURE BUILT | | |
| Total housing units | 269,883 | 269,883 |
| Built 2020 or later | 725 | 0.3% |
| Built 2010 to 2019 | 17,812 | 6.6% |
| Built 2000 to 2009 | 28,294 | 10.5% |
| Built 1990 to 1999 | 29,506 | 10.9% |
| Built 1980 to 1989 | 42,178 | 15.6% |
| Built 1970 to 1979 | 36,285 | 13.4% |
| Built 1960 to 1969 | 37,813 | 14.0% |
| Built 1950 to 1959 | 32,591 | 12.1% |
| Built 1940 to 1949 | 11,039 | 4.1% |
| Built 1939 or earlier | 33,640 | 12.5% |

*Source: 2021 American Community Survey*

### CONCLUSION

Monmouth County is a successful blend of commercial and residential development. It is among the fast-growing counties in New Jersey, due to its proximity to major metropolitan areas, accessibility to regional highway and transit systems, availability of developable land, and extensive environmental and cultural resources.

## REGIONAL MAP VIEW OF SUBJECT



## LOCAL DATA – TOWNSHIP OF FREEHOLD




Freehold Township is a township in Monmouth County, New Jersey. According to the United States Census Bureau, Freehold Township has a total area of 38.88 square miles including 38.65 square miles of land and 0.23 square miles of water (0.59%). The township completely surrounds the borough of Freehold, making it part of 21 pairs of "doughnut towns" in the state, where one municipality entirely surrounds another.[73] The township borders Colts Neck Township, Howell Township, Manalapan Township, Marlboro Township and Millstone Township in Monmouth County; and Jackson Township in Ocean County.The township has an approximate total of 200.13 miles of roadways, of which 158.62 miles were maintained by the municipality, 26.49 miles by Monmouth County, and 15.02 miles by the New Jersey Department of Transportation.

### POPULATION

During 2020 the population of the township decreased by 2.3%. The current population of Freehold Township is as follows:

| | POPULATION | CHANGE | PERCENT CHANGE |
|---|---|---|---|
| 1990 | 24,710 | - | - |
| 2000 | 31,537 | 6,827 | 27.6% |
| 2010 | 36,184 | 4,647 | 14.7% |
| 2020 | 35,369 | 815 | -2.3% |

*U.S. Census Bureau & 2020 American Community Survey*

The current population of 35,369 indicates a decrease of 2.3% from the 2010 census figures. The population has decreased over the past decade.

### HOUSEHOLDS & INCOME

The total households and income levels within the township are as follows:

| | |
|---|---|
| Total Households | 12,546 |
| Median Household Income | $115,210 |
| Per Capita Income | $51,790 |

*Source: 2020 American Community Survey*

The typical Freehold Township resident is 41.8 years of age with a per capita income of $51,790. The median household income in Freehold Township is $115,210 and the median family income is $151,442. As the chart on the following page shows the township has income levels that are above the State averages.

## LOCAL DATA – TOWNSHIP OF FREEHOLD

### LAND USES

According to the New Jersey Municipal Data Book, the real estate uses are divided as follows:

***Land Use within Freehold Township***

| CLASS | TOTAL PARCELS | % OF TOTAL |
|---|---|---|
| Vacant Land | 502 | 3.94% |
| Residential | 11,546 | 90.68% |
| Farm | 242 | 1.90% |
| Commercial | 408 | 3.20% |
| Industrial | 31 | 0.24% |
| Apartments | 3 | 0.02% |
| *Total* | *12,732* | |

*Source: NJACTB-October 2022*

As the above table shows, Freehold Township is comprised mainly of residential properties.

### EMPLOYMENT

An analysis of the labor force in Freehold Township is summarized as follows:

***Labor Force within Freehold Township***

| CATEGORY | NUMBER | % OF TOTAL |
|---|---|---|
| Managers & Professionals | 9,275 | 53.1% |
| Technicians, Sales & Administrative support | 3,852 | 22.1% |
| Service Occupations | 2,385 | 13.7% |
| Farming, Fishing & Forestry | 139 | 0.8% |
| Precision Production, Craft & Repair | 885 | 5.1% |
| Operators, Fabricators & Laborers | 1,068 | 6.1% |
| Self-employed persons | 817 | 4.7% |
| *Total* | | |

*Source: NJ Municipal Data Book*

The make-up of this labor force is typical of most communities within the township with a high percentage of managers and professionals.

## LOCAL DATA – TOWNSHIP OF FREEHOLD

### HOUSING, CONSTRUCTION & LOCAL DEVELOPMENT

The township has a mixture of various property types. There are a total 13,246 housing units within the township. Of these 12,446 are occupied units, 9,775 are owner occupied (78.5%) with the remaining being rental units.

| HOUSING OCCUPANCY | | |
|---|---|---|
| Total housing units | 13,407 | 13,407 |
| Occupied housing units | 12,546 | 93.6% |
| Vacant housing units | 861 | 6.4% |
| Homeowner vacancy rate | 0.8 | (X) |
| Rental vacancy rate | 6.0 | (X) |
| UNITS IN STRUCTURE | | |
| Total housing units | 13,407 | 13,407 |
| 1-unit, detached | 8,537 | 63.7% |
| 1-unit, attached | 1,616 | 12.1% |
| 2 units | 273 | 2.0% |
| 3 or 4 units | 394 | 2.9% |
| 5 to 9 units | 1,151 | 8.6% |
| 10 to 19 units | 497 | 3.7% |
| 20 or more units | 624 | 4.7% |
| Mobile home | 315 | 2.3% |
| Boat, RV, van, etc. | 0 | 0.0% |
| YEAR STRUCTURE BUILT | | |
| Total housing units | 13,407 | 13,407 |
| Built 2014 or later | 193 | 1.4% |
| Built 2010 to 2013 | 98 | 0.7% |
| Built 2000 to 2009 | 1,452 | 10.8% |
| Built 1990 to 1999 | 3,091 | 23.1% |
| Built 1980 to 1989 | 2,767 | 20.6% |
| Built 1970 to 1979 | 2,496 | 18.6% |
| Built 1960 to 1969 | 2,080 | 15.5% |
| Built 1950 to 1959 | 742 | 5.5% |
| Built 1940 to 1949 | 139 | 1.0% |
| Built 1939 or earlier | 349 | 2.6% |

*Source: 2020 American Community Survey*

### CONCLUSION

Freehold Township is a small community that is home to the historic site of the Battle of Monmouth, which was fought in 1778 and preserved as the Monmouth Battlefield State Park. The township is also home to several other attractions such as the 1,180-acre Turkey Swamp Park which offers excellent hiking and other outdoor recreational activities, the Freehold Raceway where annual horse races are held, and the Freehold Art Gallery which showcases works by talented local, regional, and international artists. As of now, NJ Transit provides bus service to the Port Authority Bus Terminal in New York City, to Newark Liberty International Airport, the City of Newark, and Philadelphia.

**LOCAL MAP VIEW OF SUBJECT**



## NEIGHBORHOOD MARKET

The subject site itself is situated on the highly traveled roadway known as US Highway 9 which a minor arterial that runs north/south through most of Monmouth County as well as several other counties throughout the entire State of New Jersey. The subject is located within a commercial corridor which consists of a variety of retail, restaurant, office improvements many of which are occupied by nationally known tenants. In addition, the site has great accessibility to other major roadways such as Route 18, Route 33, Route 34, Route 35, and the Garden State Parkway. There is minimal land available for development. Shown below and on the pages to follow are demographic and commercial real estate information regarding the subject's immediate and general neighborhood.

| Radius | 1 Mile | | 5 Mile | | 10 Mile | |
|---|---|---|---|---|---|---|
| **Population** | | | | | | |
| 2028 Projection | 5,063 | | 121,860 | | 345,809 | |
| 2023 Estimate | 4,966 | | 118,210 | | 332,089 | |
| 2010 Census | 5,224 | | 117,241 | | 310,820 | |
| Growth 2023 - 2028 | 1.95% | | 3.09% | | 4.13% | |
| Growth 2010 - 2023 | -4.94% | | 0.83% | | 6.84% | |
| **2023 Population by Age** | **4,966** | | **118,210** | | **332,089** | |
| Age 0 - 4 | 235 | 4.73% | 5,748 | 4.86% | 16,238 | 4.89% |
| Age 5 - 9 | 258 | 5.20% | 6,093 | 5.15% | 17,167 | 5.17% |
| Age 10 - 14 | 284 | 5.72% | 7,087 | 6.00% | 19,819 | 5.97% |
| Age 15 - 19 | 286 | 5.76% | 7,813 | 6.61% | 22,081 | 6.65% |
| Age 20 - 24 | 271 | 5.46% | 7,459 | 6.31% | 21,208 | 6.39% |
| Age 25 - 29 | 294 | 5.92% | 6,946 | 5.88% | 19,532 | 5.88% |
| Age 30 - 34 | 341 | 6.87% | 6,412 | 5.42% | 17,761 | 5.35% |
| Age 35 - 39 | 401 | 8.07% | 6,413 | 5.43% | 17,422 | 5.25% |
| Age 40 - 44 | 415 | 8.36% | 6,722 | 5.69% | 18,250 | 5.50% |
| Age 45 - 49 | 384 | 7.73% | 7,175 | 6.07% | 19,810 | 5.97% |
| Age 50 - 54 | 371 | 7.47% | 8,239 | 6.97% | 22,806 | 6.87% |
| Age 55 - 59 | 361 | 7.27% | 9,194 | 7.78% | 25,288 | 7.61% |
| Age 60 - 64 | 327 | 6.58% | 9,140 | 7.73% | 25,234 | 7.60% |
| Age 65 - 69 | 260 | 5.24% | 7,757 | 6.56% | 21,805 | 6.57% |
| Age 70 - 74 | 194 | 3.91% | 6,165 | 5.22% | 17,765 | 5.35% |
| Age 75 - 79 | 128 | 2.58% | 4,304 | 3.64% | 12,795 | 3.85% |
| Age 80 - 84 | 73 | 1.47% | 2,682 | 2.27% | 8,304 | 2.50% |
| Age 85+ | 81 | 1.63% | 2,861 | 2.42% | 8,806 | 2.65% |
| Age 65+ | 736 | 14.82% | 23,769 | 20.11% | 69,475 | 20.92% |
| **Median Age** | **41.30** | | **43.80** | | **44.10** | |
| **Average Age** | **40.40** | | **42.10** | | **42.30** | |

## NEIGHBORHOOD MARKET DATA

| | | | | | | |
|---|---|---|---|---|---|---|
| **2023 Average Household Size** | **3.00** | | **2.80** | | **2.80** | |
| **Households** | | | | | | |
| 2028 Projection | 1,522 | | 42,391 | | 120,352 | |
| 2023 Estimate | 1,489 | | 41,012 | | 115,482 | |
| 2010 Census | 1,553 | | 40,353 | | 108,115 | |
| Growth 2023 - 2028 | 2.22% | | 3.36% | | 4.22% | |
| Growth 2010 - 2023 | -4.12% | | 1.63% | | 6.81% | |
| **Radius** | **1 Mile** | | **5 Mile** | | **10 Mile** | |
| **2023 Households by HH Income** | **1,489** | | **41,013** | | **115,481** | |
| <$25,000 | 191 | 12.83% | 3,726 | 9.08% | 9,209 | 7.97% |
| $25,000 - $50,000 | 295 | 19.81% | 4,597 | 11.21% | 12,300 | 10.65% |
| $50,000 - $75,000 | 227 | 15.25% | 4,300 | 10.48% | 12,661 | 10.96% |
| $75,000 - $100,000 | 192 | 12.89% | 3,870 | 9.44% | 11,554 | 10.01% |
| $100,000 - $125,000 | 213 | 14.30% | 4,105 | 10.01% | 12,679 | 10.98% |
| $125,000 - $150,000 | 72 | 4.84% | 3,570 | 8.70% | 12,245 | 10.60% |
| $150,000 - $200,000 | 172 | 11.55% | 5,593 | 13.64% | 16,128 | 13.97% |
| $200,000+ | 127 | 8.53% | 11,252 | 27.44% | 28,705 | 24.86% |
| **2023 Avg Household Income** | **$98,631** | | **$152,339** | | **$149,154** | |
| **2023 Med Household Income** | **$79,101** | | **$124,442** | | **$123,693** | |
| **2023 Occupied Housing** | **1,490** | | **41,012** | | **115,483** | |
| Owner Occupied | 901 | 60.47% | 34,961 | 85.25% | 99,095 | 85.81% |
| Renter Occupied | 589 | 39.53% | 6,051 | 14.75% | 16,388 | 14.19% |
| **2010 Housing Units** | **1,686** | | **43,653** | | **122,003** | |
| 1 Unit | 1,177 | 69.81% | 35,093 | 80.39% | 101,811 | 83.45% |
| 2 - 4 Units | 194 | 11.51% | 1,973 | 4.52% | 5,900 | 4.84% |
| 5 - 19 Units | 78 | 4.63% | 4,720 | 10.81% | 9,454 | 7.75% |
| 20+ Units | 237 | 14.06% | 1,867 | 4.28% | 4,838 | 3.97% |
| **2023 Housing Value** | **900** | | **34,962** | | **99,094** | |
| <$100,000 | 42 | 4.67% | 485 | 1.39% | 1,372 | 1.38% |
| $100,000 - $200,000 | 62 | 6.89% | 1,848 | 5.29% | 4,433 | 4.47% |
| $200,000 - $300,000 | 228 | 25.33% | 3,829 | 10.95% | 11,695 | 11.80% |
| $300,000 - $400,000 | 241 | 26.78% | 5,921 | 16.94% | 22,763 | 22.97% |
| $400,000 - $500,000 | 118 | 13.11% | 7,122 | 20.37% | 18,900 | 19.07% |
| $500,000 - $1,000,000 | 209 | 23.22% | 14,683 | 42.00% | 36,439 | 36.77% |
| $1,000,000+ | 0 | 0.00% | 1,074 | 3.07% | 3,492 | 3.52% |
| **2023 Median Home Value** | **$348,962** | | **$475,793** | | **$449,121** | |
| **2023 Housing Units by Yr Built** | **1,688** | | **44,057** | | **123,657** | |
| Built 2010+ | 44 | 2.61% | 2,036 | 4.62% | 10,370 | 8.39% |
| Built 2000 - 2010 | 179 | 10.60% | 6,413 | 14.56% | 19,026 | 15.39% |
| Built 1990 - 1999 | 86 | 5.09% | 8,687 | 19.72% | 21,904 | 17.71% |
| Built 1980 - 1989 | 214 | 12.68% | 9,333 | 21.18% | 24,336 | 19.68% |
| Built 1970 - 1979 | 309 | 18.31% | 7,510 | 17.05% | 16,377 | 13.24% |
| Built 1960 - 1969 | 173 | 10.25% | 5,360 | 12.17% | 17,454 | 14.11% |
| Built 1950 - 1959 | 227 | 13.45% | 1,651 | 3.75% | 6,663 | 5.39% |
| Built <1949 | 456 | 27.01% | 3,067 | 6.96% | 7,527 | 6.09% |
| **2023 Median Year Built** | **1968** | | **1984** | | **1985** | |

## NEIGHBORHOOD MARKET DATA

| Radius | 1 Mile | | 5 Mile | | 10 Mile | |
|---|---|---|---|---|---|---|
| 2023 Population by Occupation | 5,105 | | 122,657 | | 340,161 | |
| Real Estate & Finance | 189 | 3.70% | 6,496 | 5.30% | 18,622 | 5.47% |
| Professional & Management | 1,299 | 25.45% | 40,446 | 32.97% | 110,402 | 32.46% |
| Public Administration | 63 | 1.23% | 2,039 | 1.66% | 6,790 | 2.00% |
| Education & Health | 499 | 9.77% | 14,925 | 12.17% | 40,880 | 12.02% |
| Services | 583 | 11.42% | 8,374 | 6.83% | 21,500 | 6.32% |
| Information | 60 | 1.18% | 2,324 | 1.89% | 5,799 | 1.70% |
| Sales | 532 | 10.42% | 14,879 | 12.13% | 40,913 | 12.03% |
| Transportation | 376 | 7.37% | 6,875 | 5.61% | 17,082 | 5.02% |
| Retail | 329 | 6.44% | 7,395 | 6.03% | 20,885 | 6.14% |
| Wholesale | 40 | 0.78% | 1,783 | 1.45% | 5,259 | 1.55% |
| Manufacturing | 169 | 3.31% | 3,949 | 3.22% | 11,197 | 3.29% |
| Production | 311 | 6.09% | 4,264 | 3.48% | 13,555 | 3.98% |
| Construction | 276 | 5.41% | 3,706 | 3.02% | 11,951 | 3.51% |
| Utilities | 223 | 4.37% | 2,566 | 2.09% | 8,049 | 2.37% |
| Agriculture & Mining | 12 | 0.24% | 114 | 0.09% | 406 | 0.12% |
| Farming, Fishing, Forestry | 0 | 0.00% | 78 | 0.06% | 149 | 0.04% |
| Other Services | 144 | 2.82% | 2,444 | 1.99% | 6,722 | 1.98% |




| | Street | Cross Street | Cross Str Dist | Count Year | Avg Daily Volume | Volume Type | Miles from Subject Prop |
|---|---|---|---|---|---|---|---|
| 1 | United States Highway 9 | Schibanoff Ln | 0.19 N | 2022 | 58,939 | MPSI | .10 |
| 2 | United States Highway 9 | Freehold-Englishtown Rd | 0.08 S | 2020 | 2,362 | MPSI | .14 |
| 3 | United States Highway 9 | Freehold-Englishtown Rd | 0.06 SW | 2020 | 2,271 | MPSI | .15 |
| 4 | United States Highway 9 | Freehold-Englishtown Rd | 0.07 S | 2020 | 2,359 | MPSI | .15 |
| 5 | United States Highway 9 | Freehold-Englishtown Rd | 0.04 S | 2020 | 2,606 | MPSI | .16 |
| 6 | Freehold-Englishtown Road | | 0.00 | 2022 | 9,823 | MPSI | .21 |
| 7 | Haley St | Freehold-Englishtown Rd | 0.14 NE | 2022 | 43,718 | MPSI | .36 |
| 8 | United States Highway 9 | Kingsley Way | 0.08 S | 2022 | 51,765 | MPSI | .50 |
| 9 | Rhea Street | Ave A | 0.00 S | 2022 | 7,139 | MPSI | .54 |
| 10 | Pond Road | Topanemus Lake Rd | 0.02 NW | 2022 | 1,729 | MPSI | .55 |

## SUBJECT SITE DESCRIPTION

### SITE DETAIL – BLOCK 6 LOT 31 (AS-IS) "BEFORE"

| | | |
|---|---|---|
| **Number of Parcels** | 1 | |
| **Land Area** | **Square Feet** | **Acres** |
| **Usable** | 82,643 | 1.8972 |
| **Wetlands** | 0 | 0.0000 |
| **Total** | 82,643 | 1.8972 |
| **Corner** | No | |
| **Floor Area Ratio (FAR)** | 0.12 | |
| **Site Topography** | Level to Sloping | |
| **Site Shape** | Rectangular | |
| **Site Quality** | Good | |
| **Site Access** | Average | |
| **Site Exposure** | Average | |
| **Site Utility** | Average | |
| **Utilities** | | |
| **Water** | Private Well (Public at Street) | |
| **Sewer** | Private Septic System | |
| **Gas** | New Jersey Natural Gas Co. | |
| **Electric** | Jersey Central Power & Light | |

### STREET & TRAFFIC DETAIL

| **Street Improvements** | **Type** | **Direction** | **Lanes** | **Lights** | **Curbs** | **Sidewalks** | **Signals** | **Median** | **Parking** | **Center Lane** | **Bike Lane** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| US Highway 9 | Arterial | Two-Way | 3 | X | X | | X | X | | | |

| | |
|---|---|
| **Frontage** | |
| US Highway 9 | 280 feet; One curb-cut |

## SUBJECT SITE DESCRIPTION

### SITE DETAIL – BLOCK 6 LOT 31 (AS-IS) "BEFORE"

| | |
|---|---|
| **Flood Zone** | Zone X (Unshaded). This is referenced by Panel Number 34025C0143F, dated September 25, 2009. Zone X (unshaded) is a moderate and minimal risk area. Areas of moderate or minimal hazard are studied based upon the principal source of flood in the area. However, buildings in these zones could be flooded by severe, concentrated rainfall coupled with inadequate local drainage systems. Local storm water drainage systems are not normally considered in a community's flood insurance study. The failure of a local drainage system can create areas of high flood risk within these zones. Flood insurance is available in participating communities, but is not required by regulation in these zones. Nearly 25% of all flood claims filed are for structures located within these zones. Minimal risk areas outside the 1% and 0.2% annual chance floodplains. No BFEs or base flood depths are shown within these zones. (Zone X (unshaded) is used on new and revised maps in place of Zone C.) |
| **Easements** | A preliminary title report was not available for review. During the property inspection, no adverse easements or encumbrances were noted. However, the appraiser was provided with a survey which indicates several easements on the property. Those identified by the appraiser are listed below.<br>- DRAINAGE SEWER EASEMENT – DB 531 PG. 294<br>- 20' WIDE SANITARY SEWER EASEMENT - DB 531 PG. 294<br>- ACCESS & USE EASEMENT VIA LOT 30 - DB 531 PG. 294<br>- 100' WIDE NJDOT CROSS ACCESS EASEMENT - DB 531 PG. 294<br>- 20' X 50' DOMINANT ESTATE (NJ DOT)<br>**The appraiser is not a title researcher and should not be construed as such. it is highly recommended that the client obtain a title report conducted by a qualified professional in order to unequivocally determine any and all easements, encumbrances, etc located on the subject property. Therefore, the value estimate expressed herein is based on the assumption that any easements or encroachments do not have a negative impact on the subject property.** |
| **Soils / Hazardous Waste** | A detailed soils analysis was not available for review. Based on the development of the subject, it appears the soils are stable and suitable for the existing improvements. We have not conducted an independent investigation to determine the presence or absence of toxins on the subject property. If questions arise, the reader is strongly cautioned to seek qualified professional assistance in this matter. Please see the Assumptions and Limiting Conditions for a full disclaimer. |

## SUBJECT SITE DESCRIPTION

The description of the parcel below is "after" hypothetical sub-lot 31A has been separated or subdivided from the site.

### SITE DETAIL – BLOCK 6 LOT 31 "AFTER"

| | | |
|---|---|---|
| **Number of Parcels** | 1 | |
| **Land Area** | **Square Feet** | **Acres** |
| **Usable** | 60,852 | 1.3970 |
| **Unusable** | 0 | 0.0000 |
| **Surplus** | 0 | 0.0000 |
| **Excess** | 0 | 0.0000 |
| **Total** | 60,852 | 1.3970 |
| **Corner** | No | |
| **Site Topography** | Level to Sloping | |
| **Site Shape** | Rectangular | |
| **Site Quality** | Good | |
| **Site Access** | Average | |
| **Site Exposure** | Average | |
| **Site Utility** | Average | |
| **Utilities** | | |
| **Water** | Private Well (Public at Street) | |
| **Sewer** | Private Septic System | |
| **Gas** | New Jersey Natural Gas Co. | |
| **Electric** | Jersey Central Power & Light | |

### STREET & TRAFFIC DETAIL

| **Street Improvements** | **Type** | **Direction** | **Lanes** | **Lights** | **Curbs** | **Sidewalks** | **Signals** | **Median** | **Parking** | **Center Lane** | **Bike Lane** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| US Highway 9 | Arterial | Two-Way | 3 | X | X | | X | X | | | |

**Frontage**

| | |
|---|---|
| US Highway 9 | 280 feet; One curb-cut |

## SITE DETAIL – BLOCK 6 LOT 31 "AFTER"

**Flood Zone**

Zone X (Unshaded). This is referenced by Panel Number 34025C0143F, dated September 25, 2009. Zone X (unshaded) is a moderate and minimal risk area. Areas of moderate or minimal hazard are studied based upon the principal source of flood in the area. However, buildings in these zones could be flooded by severe, concentrated rainfall coupled with inadequate local drainage systems. Local storm water drainage systems are not normally considered in a community's flood insurance study. The failure of a local drainage system can create areas of high flood risk within these zones. Flood insurance is available in participating communities, but is not required by regulation in these zones. Nearly 25% of all flood claims filed are for structures located within these zones. Minimal risk areas outside the 1% and 0.2% annual chance floodplains. No BFEs or base flood depths are shown within these zones. (Zone X (unshaded) is used on new and revised maps in place of Zone C.)

**Easements**

A preliminary title report was not available for review. During the property inspection, no adverse easements or encumbrances were noted. However, the appraiser was provided with a survey which indicates several easements on the property. Those identified by the appraiser are listed below.

- PROPOSED SEWER EASEMENT TO THE EXISTING PUMP STATION / A GENERATOR MAY NEED TO BE ADDED FOR PUMP STATION IF IT DOESN'T ALREADY EXIST
- PROP. SEWER EASEMENT TO CONNECT SEWER EASEMENT TO PUMP STATION / CONNECTING TO THE EX. 20 FT EASEMENT
- 20' WIDE SANITARY SEWER EASEMENT - DB 531 PG. 294
- 100' WIDE NJDOT CROSS ACCESS EASEMENT - DB 531 PG. 294
- 20' X 50' DOMINANT ESTATE (NJ DOT)

***Per the provided subdivision sketch, if the hypothetical sub-lot were to be created, the cross access & use easement between Lot 30 & Lot 31 would be removed.**

**The appraiser is not a title researcher and should not be construed as such. it is highly recommended that the client obtain a title report conducted by a qualified professional in order to unequivocally determine any and all easements, encumbrances, etc located on the subject property. Therefore, the value estimate expressed herein is based on the assumption that any easements or encroachments do not have a negative impact on the subject property.**

**Soils / Hazardous Waste**

A detailed soils analysis was not available for review. Based on the development of the subject, it appears the soils are stable and suitable for the existing improvements. We have not conducted an independent investigation to determine the presence or absence of toxins on the subject property. If questions arise, the reader is strongly cautioned to seek qualified professional assistance in this matter. Please see the Assumptions and Limiting Conditions for a full disclaimer.

## SUBJECT SITE DESCRIPTION

The description of the parcel below is “after” hypothetical sub-lot 31A has been separated or subdivided from the site.

### SITE DETAIL – HYPOTHETICAL SUB-LOT 31A

| | | |
|---|---|---|
| **Number of Parcels** | 1 | |
| **Land Area** | **Square Feet** | **Acres** |
| **Usable** | 21,791 | 0.5003 |
| **Wetlands** | 0 | 0.0000 |
| **Total** | 21,791 | 0.5003 |
| **Corner** | No | |
| **Site Topography** | Level to Sloping | |
| **Site Shape** | Rectangular | |
| **Site Quality** | Below Average | |
| **Site Access** | None | |
| **Site Exposure** | None | |
| **Site Utility** | Minimal | |
| **Utilities** | | |
| **Water** | Private Well (Public at Street) | |
| **Sewer** | Private Septic System | |
| **Gas** | New Jersey Natural Gas Co. | |
| **Electric** | Jersey Central Power & Light | |

### STREET & TRAFFIC DETAIL

| **Street Improvements** | **Type** | **Direction** | **Lanes** | **Lights** | **Curbs** | **Sidewalks** | **Signals** | **Median** | **Parking** | **Center Lane** | **Bike Lane** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| US Highway 9 | Arterial | Two-Way | 3 | X | X | | X | X | | | |
| **Frontage** | | | | | | | | | | | |
| US Highway 9 | None | | | | | | | | | | |

## SUBJECT SITE DESCRIPTION

### SITE DETAIL – BLOCK 6 LOT 30 (AS-IS) "BEFORE"

| | | |
|---|---|---|
| **Number of Parcels** | 1 | |
| **Land Area** | **Square Feet** | **Acres** |
| **Usable** | 376,106 | 8.6341 |
| **Wetlands** | 85,378 | 1.9600 |
| **Total** | 461,480 | 10.5941 |
| **Corner** | No | |
| **Site Topography** | Level to Sloping | |
| **Site Shape** | Irregular | |
| **Site Quality** | Good | |
| **Site Access** | Average | |
| **Site Exposure** | Average | |
| **Site Utility** | Average | |
| **Utilities** | | |
| **Water** | None | |
| **Sewer** | None (Easement) | |
| **Gas** | None | |
| **Electric** | None | |

### STREET & TRAFFIC DETAIL

| **Street Improvements** | **Type** | **Direction** | **Lanes** | **Lights** | **Curbs** | **Sidewalks** | **Signals** | **Median** | **Parking** | **Center Lane** | **Bike Lane** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| US Highway 9 | Arterial | Two-Way | 3 | X | X | | X | X | | | |

**Frontage**

| | |
|---|---|
| US Highway 9 | 682.33 feet |
| Route 9 "On-Ramp" | 176.17 feet |

## SUBJECT SITE DESCRIPTION

### SITE DETAIL – BLOCK 6 LOT 31 (AS-IS) "BEFORE"

| | |
|---|---|
| **Flood Zone** | Zone X (Unshaded). This is referenced by Panel Number 34025C0143F, dated September 25, 2009. Zone X (unshaded) is a moderate and minimal risk area. Areas of moderate or minimal hazard are studied based upon the principal source of flood in the area. However, buildings in these zones could be flooded by severe, concentrated rainfall coupled with inadequate local drainage systems. Local storm water drainage systems are not normally considered in a community's flood insurance study. The failure of a local drainage system can create areas of high flood risk within these zones. Flood insurance is available in participating communities, but is not required by regulation in these zones. Nearly 25% of all flood claims filed are for structures located within these zones. Minimal risk areas outside the 1% and 0.2% annual chance floodplains. No BFEs or base flood depths are shown within these zones. (Zone X (unshaded) is used on new and revised maps in place of Zone C.) |
| **Easements** | A preliminary title report was not available for review. During the property inspection, no adverse easements or encumbrances were noted. However, the appraiser was provided with a survey which indicates several easements on the property. Those identified by the appraiser are listed below.<br><br>- DRAINAGE SEWER EASEMENT – DB 531 PG. 294<br>- 20' WIDE SANITARY SEWER EASEMENT - DB 531 PG. 294<br>- ACCESS & USE EASEMENT VIA LOT 30 - DB 531 PG. 294<br>- 100' WIDE NJDOT CROSS ACCESS EASEMENT - DB 531 PG. 294<br>- 20' X 50' DOMINANT ESTATE (NJ DOT)<br><br>**The appraiser is not a title researcher and should not be construed as such. it is highly recommended that the client obtain a title report conducted by a qualified professional in order to unequivocally determine any and all easements, encumbrances, etc located on the subject property. Therefore, the value estimate expressed herein is based on the assumption that any easements or encroachments do not have a negative impact on the subject property.** |
| **Soils / Hazardous Waste** | A detailed soils analysis was not available for review. Based on the development of the subject, it appears the soils are stable and suitable for the existing improvements. We have not conducted an independent investigation to determine the presence or absence of toxins on the subject property. If questions arise, the reader is strongly cautioned to seek qualified professional assistance in this matter. Please see the Assumptions and Limiting Conditions for a full disclaimer. |

## SUBJECT SITE DESCRIPTION

The description of the parcel below is “after” hypothetical sub-lot 30A has been separated or subdivided from the site.

### SITE DETAIL – BLOCK 6 LOT 30 “AFTER”

| | | |
|---|---|---|
| **Number of Parcels** | 1 | |
| **Land Area** | **Square Feet** | **Acres** |
| **Usable** | 346,550 | 7.9557 |
| **Wetlands** | 85,378 | 1.9600 |
| **Total** | 431,928 | 9.9157 |
| **Corner** | No | |
| **Site Topography** | Level to Sloping | |
| **Site Shape** | Rectangular | |
| **Site Quality** | Good | |
| **Site Access** | Average | |
| **Site Exposure** | Average | |
| **Site Utility** | Average | |
| **Utilities** | | |
| **Water** | None | |
| **Sewer** | None (Easement) | |
| **Gas** | None | |
| **Electric** | None | |

### STREET & TRAFFIC DETAIL

| **Street Improvements** | **Type** | **Direction** | **Lanes** | **Lights** | **Curbs** | **Sidewalks** | **Signals** | **Median** | **Parking** | **Center Lane** | **Bike Lane** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| US Highway 9 | Arterial | Two-Way | 3 | X | X | | X | X | | | |

**Frontage**

| | |
|---|---|
| US Highway 9 | 603.55 feet |
| Route 9 “On-Ramp” | 95.15 feet |

## SITE DETAIL – BLOCK 6 LOT 30 "AFTER"

| | |
|---|---|
| **Flood Zone** | Zone X (Unshaded). This is referenced by Panel Number 34025C0143F, dated September 25, 2009. Zone X (unshaded) is a moderate and minimal risk area. Areas of moderate or minimal hazard are studied based upon the principal source of flood in the area. However, buildings in these zones could be flooded by severe, concentrated rainfall coupled with inadequate local drainage systems. Local storm water drainage systems are not normally considered in a community's flood insurance study. The failure of a local drainage system can create areas of high flood risk within these zones. Flood insurance is available in participating communities, but is not required by regulation in these zones. Nearly 25% of all flood claims filed are for structures located within these zones. Minimal risk areas outside the 1% and 0.2% annual chance floodplains. No BFEs or base flood depths are shown within these zones. (Zone X (unshaded) is used on new and revised maps in place of Zone C.) |
| **Easements** | A preliminary title report was not available for review. During the property inspection, no adverse easements or encumbrances were noted. However, the appraiser was provided with a survey which indicates several easements on the property. Those identified by the appraiser are listed below.<br><br>- PROPOSED SEWER EASEMENT TO THE EXISTING PUMP STATION / A GENERATOR MAY NEED TO BE ADDED FOR PUMP STATION IF IT DOESN'T ALREADY EXIST<br>- PROP. SEWER EASEMENT TO CONNECT SEWER EASEMENT TO PUMP STATION / CONNECTING TO THE EX. 20 FT EASEMENT<br>- 20' WIDE SANITARY SEWER EASEMENT - DB 531 PG. 294<br>- 100' WIDE NJDOT CROSS ACCESS EASEMENT - DB 531 PG. 294<br>- 20' X 50' DOMINANT ESTATE (NJ DOT)<br><br>***Per the provided subdivision sketch, if the hypothetical sub-lot were to be created, the cross access & use easement between Lot 30 & Lot 31 would be removed.**<br><br>**The appraiser is not a title researcher and should not be construed as such. it is highly recommended that the client obtain a title report conducted by a qualified professional in order to unequivocally determine any and all easements, encumbrances, etc located on the subject property. Therefore, the value estimate expressed herein is based on the assumption that any easements or encroachments do not have a negative impact on the subject property.** |
| **Soils / Hazardous Waste** | A detailed soils analysis was not available for review. Based on the development of the subject, it appears the soils are stable and suitable for the existing improvements. We have not conducted an independent investigation to determine the presence or absence of toxins on the subject property. If questions arise, the reader is strongly cautioned to seek qualified professional assistance in this matter. Please see the Assumptions and Limiting Conditions for a full disclaimer. |

## SUBJECT SITE DESCRIPTION

The description of the parcel below is "after" hypothetical sub-lot 30A has been separated or subdivided from the site.

### SITE DETAIL – HYPOTHETICAL SUB-LOT 30A

| | | |
|---|---|---|
| **Number of Parcels** | 1 | |
| **Land Area** | **Square Feet** | **Acres** |
| **Usable** | 29,552 | 0.6784 |
| **Wetlands** | 0 | 0.0000 |
| **Total** | 29,552 | 0.6784 |
| **Corner** | No | |
| **Site Topography** | Level to Sloping | |
| **Site Shape** | Rectangular | |
| **Site Quality** | Average | |
| **Site Access** | Average | |
| **Site Exposure** | Below Average | |
| **Site Utility** | Below Average | |
| **Utilities** | | |
| **Water** | None | |
| **Sewer** | None (Easement) | |
| **Gas** | None | |
| **Electric** | None | |

### STREET & TRAFFIC DETAIL

| **Street Improvements** | **Type** | **Direction** | **Lanes** | **Lights** | **Curbs** | **Sidewalks** | **Signals** | **Median** | **Parking** | **Center Lane** | **Bike Lane** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| US Highway 9 | Arterial | Two-Way | 3 | X | X | | X | X | | | |

**Frontage**

| | |
|---|---|
| US Highway 9 | 78.78 feet |
| Route 9 "On-Ramp" | 81.02 feet |

## PROVIDED SUBDIVISION SKETCH



## EXCERPT FROM PROVIDED SUBDIVISION SKETCH




***PLEASE NOTE THAT IT IS BEYOND THE SCOPE OF THIS APPRAISAL TO VALUE ANY PROPOSED EASEMENTS. THE VALUES HEREIN DO NOT CONSIDER ANY SUCH EASEMENTS.***

## DESCRIPTION OF THE SUBJECTS IMPROVEMENTS (BLOCK 6 LOT 31)

As of the effective date, Block 6 Lot 31 was improved with a restaurant improvement. However, given the purposes of this appraisal, only the underlying land and some site improvements have been considered in this valuation. The site improvements considered in the valuation are the lined parking lot (62 spaces), two wells, and the sanitary pump station.

Per Marshall & Swift Cost Estimator, the cost of a parking lot ranges from $1,590 to $2,925 per space. This price per space includes engineering, grading, drainage, paving, electrical, landscaping, and other miscellaneous costs. The appraiser was not provided specifics regarding the subject wells nor sanitary pump stations. Public data indicates the cost per well is between $1,500 and $12,000 and the cost of a sanitary pump station/system can range from $150,000 to $1,500,000. Our concluded costs are shown below.

| | | |
|---|---|---|
| Parking Lot (62 Spaces x $2,500 per space) | = | $155,000 |
| 2 Wells ($10,000 per well) | = | $20,000 |
| Sanitary Pump Station (Estimated) | = | $200,000 |
| Total Replacement Cost | = | $375,000 |
| *Less Estimated Depreciation (25%)* | = | *$93,750* |
| ***Estimated Depreciated Cost of Site Improvements*** | = | ***$281,250*** |

## DESCRIPTION OF THE SUBJECTS IMPROVEMENTS (BLOCK 6 LOT 30)

In order to determine an applicable “as-is” “before” land value of Block 6 Lot 30, we must consider the relevant site improvements contributing value to the land. The items we will consider are the parking lot with 49 lined spaces. Per Marshall & Swift Cost Estimator, the cost of a parking lot ranges from $1,590 to $2,925 per space. Our concluded costs are shown below.

| | | |
|---|---|---|
| Parking Lot (49 Spaces x $2,500 per space) | = | $122,500 |
| Total Replacement Cost | = | $122,500 |
| *Less Estimated Depreciation (25%)* | = | *$30,625* |
| ***Estimated Depreciated Cost of Site Improvements*** | = | ***$91,875*** |

## HIGHEST AND BEST USE

Highest and Best Use is defined as:

The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. (*Source*: *The Dictionary of Real Estate Appraisal, Seventh Edition, Appraisal Institute, 2022*)

**As Vacant -** Highest and best use of land or a site as though vacant assumes that a parcel of land is vacant or can be made vacant by demolishing the current improvements. This assumption allows the appraisers to identify all the possible uses that create value. In addition; an accurate estimate of site value can be estimated either by direct comparison to similar sites or by an extraction method from improved sales. This reasoning also dictates that the appraised value of the improvements is based on their actual contribution to the site.

The value of land is generally estimated as though vacant. When land is already vacant, the reasoning is clear; the appraiser values the land as is. When land is not vacant, however, land value depends on how the land can be developed. The highest and best use of land as though vacant is considered in relation to its existing use and all potential uses. In addition; land as though vacant is a fundamental concept of valuation theory, and the foundation for the cost approach.

**As Improved -** There are two reasons to analyze the highest and best use of a property as improved. The first is to identify the appropriate property use that can be expected to produce the highest overall return in relation to the capital invested. This is also the underlying premise for the principal of substitution.

The second reason to analyze the highest and best use of property as improved is to decide which of the following options should be perused:
· Maintain the improvements as is.
· Cure items of deferred maintenance and retain the improvements.
· Modify the improvements (e.g., renovate modernize, or convert).
· Demolish the improvements.

In some situations, a property may be subject to restrictions (e.g., historic preservation) that prevent the improvements from being demolished and the property from being developed to its highest and best use.

The highest and best use conclusion should specify the optimal use (or uses), when the property will be put to this use or achieve stabilized occupancy, and who would be the most likely purchaser or user of the property (e.g., an owner-operator of the property or an equity or debt investor). (*Source*: *The Dictionary of Real Estate Appraisal, Seventh Edition, Appraisal Institute, 2022*)

## OPINION OF HIGHEST AND BEST USE

To arrive at a determination of Highest and Best Use the property must be analyzed As Though Vacant and As Improved. In both examples all four criteria are applied as follows:

### HIGHEST AND BEST USE – AS VACANT

### HYPOTHETICAL SUB-LOT 31A

The total site area of "hypothetical sub-lot 31A" is estimated to be 21, 791 square feet or 0.5003 acres. This hypothetical lot is landlocked with no frontage.

**Legally Permissible**- The permitted legal uses for the site are outlined in the zoning section of the report, to reiterate the subject lies within Corporate Multi-Use - 3 Acres (CMX-3A) District. The hypothetical site falls short of the minimum lot area requirement as well as several other bulk requirements. The hypothetical parcel would have no utility as a stand-alone parcel and therefore does not meet the test of legal permissibility. The highest and best use of the hypothetical parcel would be assembling with a neighboring parcel.

### HIGHEST AND BEST USE – AS VACANT

### HYPOTHETICAL SUB-LOT 30A

The total site area of "hypothetical sub-lot 310" is estimated to be 29,552 square feet or 0.6784 acres. This hypothetical lot has 78.78 feet of frontage along Route 9 and 81.02 feet along the Route 9 "on-ramp".

**Legally Permissible**- The permitted legal uses for the site are outlined in the zoning section of the report, to reiterate the subject lies within Corporate Multi-Use - 3 Acres (CMX-3A) District. The hypothetical site falls short of the minimum lot area requirement as well as several other bulk requirements. The hypothetical parcel would have no utility as a stand-alone parcel outside of its continued parking use and therefore does not meet the test of legal permissibility. The highest and best use of the hypothetical parcel would be assembling with a neighboring parcel and continued use as an ancillary parking lot.

## APPROACH TO VALUE - THE VALUATION PROCESS

There are three basic approaches that may be used in order to derive an estimation of Market Value. These three approaches provide data from the market from three different sources when all are available, the Cost Approach, Sales Comparison Approach and the Income Approach.

The **Cost Approach** is a set of procedures through which a value indication is derived for the fee simple estate by estimating the cost new as of the effective date of the appraisal to construct a reproduction of (or replacement for) the existing structure, including an entrepreneurial incentive; deducting depreciation from the total cost; and adding the estimated land value. The contributory value of any site improvements that have not already been considered in the total cost can be added on a depreciated-cost basis. Adjustments may then be made to the indicated value of the fee simple estate in the subject property to reflect the value of the property rights being appraised. *(Source: The Dictionary of Real Estate Appraisal, Seventh Edition, Appraisal Institute, 2022)*

The Cost Approach consists of an analysis of the physical value of the property. The Principle of Substitution forms the underlying rationale of this approach. It holds that no prudent person will pay more for a property than the amount a site could be purchased with equal amenities and a contractor hired to build improvements equal to those of the subject property, without undue delay.

The Cost Approach has as its premise the valuation of the site by comparison with other sites in the area that have sold in recent past, making adjustments for differences to indicate a site value estimate. To the site value is added the estimated cost to reproduce or replace the improvements, less any loss of value (depreciation) which might have transpired or taken place.

The **Sales Comparison Approach** is the process of deriving a value indication for the subject property by comparing sales of similar properties to the property being appraised, identifying appropriate units of comparison, and making adjustments to the sale prices (or unit prices, as appropriate) of the comparable properties based on relevant, market-derived elements of comparison. The sales comparison approach may be used to value improved properties, vacant land, or land being considered as though vacant when an adequate supply of comparable sales is available. (*Source*: *The Dictionary of Real Estate Appraisal, Seventh Edition, Appraisal Institute, 2022*)

Based on the Principle of Substitution and considers that a prudent investor would pay no more for a property than the cost to acquire another property of equal desirability or utility. When sufficient data is available, the Sales Comparison Approach provides a reliable indication of value and insight into the actions of buyers and sellers.

By analyzing sales that qualify as arm's length transactions between willing, knowledgeable buyers and sellers, the appraiser can identify market value and price trends. Comparability in physical, locational and economic characteristics is an important criterion when comparing the sales to the subject property.

## APPROACH TO VALUE - THE APPRAISAL PROCESS (continued)

The **Income Approach** is defined as follows: A set of procedures through which an appraiser derives a value indication for an income producing property by converting its anticipated benefits (cash flows and reversion) into property value. This conversion can be accomplished in two ways. (1) One year's income expectancy can be capitalized at a market derived capitalization rate or at a capitalization rate that reflects a specified income pattern, return on investment, and change in the value of the investment. (2) Alternatively, the annual cash flows for the holding period and the reversion can be discounted at a specified yield rate. (*Source*: *The Dictionary of Real Estate Appraisal, Seventh Edition, Appraisal Institute, 2022*)

This approach to value is based on the assumption that value in real property is created by anticipated benefits derived in the future. Therefore, the value of income producing properties is the present value of future income expected during the life or over a specified holding period of the property. The Income Approach is used for investment properties and uses investment criteria to derive a value estimate. This is accomplished by either capitalizing the net income of the property or by compiling the present values of the potential income streams and the reversion at the end of the anticipated holding period.

The Sales Comparison Approach will be incorporated to conclude an estimated market value of both parcels "before" and "after".

As the pieces of land being valued herein are not individual parcels, in order to determine an opinion of value, the appraiser will consider each subject portion of land to be a "hypothetical sub-lot" and utilize a valuation technique that is similar to that known as a "diminution in value". As such, the values of the "hypothetical sub-lots" will be the difference in value between the "before" and "after" land values. See below.

| "Before" Value | - | "After" Value | = | Value of "Hypothetical Sub-Lot" |
|---|---|---|---|---|
| "As-is" Land Value of Block 6 Lot 31<br><br>(82,643 SF or 1.8972 AC) | - | Land Value of Block 6 Lot 31 MINUS area of "hypothetical sub-lot"<br><br>(60,852 SF or 1.3970 AC) | = | Value of "Hypothetical Sub-Lot" Identified herein as "Lot 31A"<br><br>(21,791 SF or 0.5003 AC) |

| "Before" Value | - | "After" Value | = | Value of "Hypothetical Sub-Lot" |
|---|---|---|---|---|
| "As-is" Land Value of Block 6 Lot 30<br><br>(461,480 SF or 10.5941 AC) | - | Land Value of Block 6 Lot 30 MINUS area of "hypothetical sub-lot"<br><br>(431,928 SF or 9.9157 AC) | = | Value of "Hypothetical Sub-Lot" Identified herein as "Lot 30A"<br><br>(29,552 SF or 0.6784 AC) |

## SALES COMPARISON APPROACH – BLOCK 6 LOT 31 "BEFORE" LAND VALUE

On the pages to follow we will determine a "before" value for the underlying land associated with Block 6 Lot 31. This is an "as-is" value of the land area of this parcel, as of the effective date of this appraisal, which per a provided survey is 82,643 square feet or 1.8972 acres.




***The area above highlighted in yellow represents the approximate land area considered in the valuation to follow.***

# 2488 Route 9

Comparable 1



## Sale Information

| | | |
|---|---|---|
| Buyer | K-Land No.74, LLC | |
| Seller | Advantage Properties, LLC | |
| Sale Date | 7/11/2023 | |
| Transaction Status | Recorded | |
| Sale Price | $1,050,000 | $401,591 /AC |
| Recording Number | 9653-1521 | |
| Rights Transferred | Fee Simple | |
| Financing | Cash to Seller | |

## Property

| | |
|---|---|
| Land Area | 2.6146 Acres (113,894 SF) |
| Number of Parcels | 1 |
| Zoning | HD |
| Shape | Irregular |
| Topography | Level |
| Corner | Yes; Signalized |
| Proposed Land Use | Self-Storage |
| Utilities | At Street |
| Easements | None known |
| Environmental | None known |
| Frontage | 691' Route 9 / On Ramp / Sunnyside Rd |
| Flood Zones | Zone X (Unshaded) |

2488 Route 9
Howell, NJ 07731

County
Monmouth

Submarket
Monmouth West

APN
21-00132-0000-00001/3, 4 & 5




## Remarks

This is the sale of four contiguous parcels known as Block 132 Lots 1, 3, 4 & 5 situated within the HD-1 zone of Howell Township. The tract is situated at the corner of US Highway 9 and Sunnyside Road. According to the data available, none of the properties are encumbered by wetlands. Township planning documents reveal that the property had approvals and variance relief for the development of a 3-story, 79,089 square foot self-storage facility at the time of sale.

42 E MAIN STREET, SUITE 202, FREEHOLD NJ 07728 PHONE: 732-409-6080 APPRAISALS@STUARTAPPRAISALCO.COM WWW.STUARTAPPRAISALCO.COM

Stuart Appraisal COMPANY

# 1440 Route 9

Comparable 2




## Sale Information

| | |
|---|---|
| Buyer | Howell 1440, LLC |
| Seller | Florenze, Crystal L, Executrix |
| Sale Date | 8/12/2021 |
| Transaction Status | Recorded |
| Sale Price | $675,000 $92,466 /AC |
| Recording Number | 9535-95 |
| Rights Transferred | Fee Simple |
| Financing | Cash to Seller |

## Property

| | |
|---|---|
| Land Area | 7.3 Acres (317,988 SF) |
| Number of Parcels | 2 |
| Zoning | HD-1 (80k SF Lot Min) |
| Shape | Irregular |
| Topography | Level to Sloping |
| Corner | No |
| Utilities | Public Available |
| Environmental | 1.89 Acres of Wetlands |
| Frontage | 282' US Highway 9 |
| Flood Zones | Zone X (Unshaded) |

1440 Route 9
Howell, NJ 07731

County
Monmouth

Submarket
Howell Township

APN
21-00137-0000-00020, 21-00137-0000-00019




## Remarks

1.89 Acres of Wetlands

This is the sale of two contiguous, wooded parcels situated within the HD-1 zone of Howell Township. The parcels individually do not meet minimum requirements as they fall short of frontage requirements however as assembled are conforming. There is approximately 1.89 acres of wetlands. As such, the total combined uplands area is roughly 5.41 acres. The sale is noted as an estate sale however was exposed to the open market for a significant period of time and is considered to have sold at market.

Stuart Appraisal COMPANY

# 1008 Route 33

Comparable 3

## Sale Information

| | |
|---|---|
| Buyer | Ardena LCP, LLC |
| Seller | James R Ientile |
| Sale Date | 4/22/2021 |
| Transaction Status | Recorded |
| Sale Price | $800,000 $267,442 /AC |
| Recording Number | 9504-141 |
| Rights Transferred | Fee Simple |
| Financing | Cash to Seller |
| Conditions of Sale | Sold w/ approvals |

## Property

| | |
|---|---|
| Land Area | 2.9913 Acres (130,301 SF) |
| Number of Parcels | 1 |
| Zoning | HD-2 |
| Shape | Irregular |
| Topography | Level |
| Corner | No |
| Proposed Land Use | Warehouse/Office |
| Utilities | Septic/Well Needed |
| Easements | None |
| Environmental | 9% Wetlands |
| Frontage | 224' State Route 33 |
| Flood Zones | Zone X (Unshaded) |



1008 Route 33
Freehold, NJ 07728

County
Monmouth

Submarket
Monmouth West




APN
21-00177-0000-00028- 01

## Remarks

9% Wetlands

Usable Land Area - 2.7221 Acres

This is the sale of a 2.9913 acres parcel situated within the HD-2 Zone of Howell Township. The parcel is generally level and was primarily cleared at the time of sale. There are some wetlands near the rear of the parcel however they do impact the development potential of the site. Per property and municipal records, the site had final approvals for the development of a multi-unit, 34,390 square foot warehouse/office improvement at the time of sale.

42 E MAIN STREET, SUITE 202, FREEHOLD NJ 07728 PHONE: 732-409-6080 APPRAISALS@STUARTAPPRAISALCO.COM WWW.STUARTAPPRAISALCO.COM

# 3413-3415 Route 9

Comparable 4



## Sale Information

| | |
|---|---|
| Buyer | TOMJ Realty LLC |
| Seller | Petrou LLC & Omega Realty |
| Sale Date | 10/15/2018 |
| Transaction Status | Recorded |
| Sale Price | $1,125,000 $264,085 /AC |
| Recording Number | 9317-8531 |
| Rights Transferred | Fee Simple |
| Financing | Cash to Seller |

## Property

| | |
|---|---|
| Land Area | 4.26 Acres (185,566 SF) |
| Number of Parcels | 2 |
| Zoning | CMX-3 |
| Shape | Irregular |
| Topography | Level |
| Corner | No |
| Utilities | At Street |
| Easements | None known |
| Environmental | 0.80 Ac of DEP Wetlands |
| Frontage | 553' Route 9 |
| Flood Zones | Zone X (Unshaded) |

3413-3415 Route 9
Freehold, NJ 07728




County
Monmouth

Submarket
Monmouth West

APN
17-00080-0000-00006, 17-00080-0000-00007

## Remarks

This is the sale of two contiguous, wooded, parcels within the CMX-3 zone of Freehold Township. Per CoStar, the properties were exposed to the open market for approximately 210 days prior to going under contract. According to the information provided & available, this was a cash deal whereby the seller had held the property for a long period of time with no development plans and the buyer purchases the property to hold it as an investment. D.E.P wetlands data indicates that there is approximately 0.80 acres of wetlands that traverses the center of Lot 7 with a small portion on Lot 6. As a whole, the tract appears to conform with the minimum requirements of the CMX-3 zone.

42 E MAIN STREET, SUITE 202, FREEHOLD NJ 07728 PHONE: 732-409-6080 APPRAISALS@STUARTAPPRAISALCO.COM WWW.STUARTAPPRAISALCO.COM

Stuart Appraisal COMPANY

# Route 33 (Block 63 Lots 1-3)

Comparable 5



## Sale Information

| | |
|---|---|
| Seller | Jersey Freeze Property Management LLC |
| Transaction Status | Listing |
| Sale Price | $500,000 $500,000 /AC |
| Rights Transferred | Fee Simple |

## Property

| | |
|---|---|
| Land Area | 1 Acres (43,560 SF) |
| Number of Parcels | 1 |
| Zoning | CMX-3 |
| Shape | Irregular |
| Topography | Sloping |
| Corner | No |
| Utilities | At Street |
| Easements | None known |
| Environmental | None known |
| Frontage | 204' Route 33 |
| Flood Zones | Zone X (Unshaded) |

Route 33 (Block 63 Lots 1-3)
Freehold, NJ 07728




County
Monmouth

Submarket
Monmouth West

APN
17-00063-0000-00001

## Remarks

This is the active listing of two parcels that combine to create an approximately 1-acre tract within Freehold Township. It is situated within the CMX-3 zone of Freehold Township and falls short of the minimum lot requirement of 3-acres. Per the information available, there does not appear to be any approvals or plans in place. The site has a significant slope towards Route 33 also known as Park Avenue.

# Route 9 (B 79 L 60)

Comparable 6




## Sale Information

| | |
|---|---|
| Seller | Szymczak, Ewa |
| Transaction Status | Listing |
| Sale Price | $540,000 $303,371 /AC |
| Rights Transferred | Fee Simple |

## Property

| | |
|---|---|
| Land Area | 1.78 Acres (77,537 SF) |
| Number of Parcels | 1 |
| Zoning | HD-1 |
| Shape | Generally Rectangular |
| Topography | Level |
| Corner | No |
| Utilities | Public Water & Sewer |
| Easements | None known |
| Environmental | 0.44 AC of DEP Wetlands |
| Frontage | 240' Route 9 |
| Flood Zones | Zone X (Unshaded) |

Route 9 (B 79 L 60)
Howell, NJ 07731




County
Monmouth

Submarket
Monmouth West

APN
21-00079-0000-00060

## Remarks

This is the active listing of a 1.78 acre interior parcel situated on the southbound side of US Highway 9 within Howell Township. Per DEP wetlands mapping, the rear of the site is encumbered by approximately 0.44 acres of wetlands. Per the listing agent, the site previously had approvals for an office structure however such approvals have likely expired. The site has public sewer & water installed on the property. The property has been on the market for over 500 days.

**COMPARABLE SALES MAP**



# SALES COMPARISON APPROACH – BLOCK 6 LOT 31 "BEFORE" LAND VALUE

| LAND SALES COMPARISON TABLE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SUBJECT | COMP 1 | | COMP 2 | | COMP 3 | | COMP 4 | | COMP 5 | | COMP 6 | |
| Address | 4135 Route 9 | 2488 Route 9 | | 1440 Route 9 | | 1008 Route 33 | | 3413-3415 Route 9 | | Route 33 (B 63 L 1-3) | | Route 9 (B 79 L 60) | |
| City | Freehold | Howell | | Howell | | Freehold | | Freehold | | Freehold | | Howell | |
| State | NJ | NJ | | NJ | | NJ | | NJ | | NJ | | NJ | |
| Zip | 07728 | 07731 | | 07731 | | 07728 | | 07728 | | 07728 | | 07731 | |
| County | Monmouth | Monmouth | | Monmouth | | Monmouth | | Monmouth | | Monmouth | | Monmouth | |
| Land AC | 1.8972 | 2.6146 | | 7.3000 | | 2.9913 | | 4.2600 | | 1.0000 | | 1.7800 | |
| Wetlands (AC) | 0 | 0 | | 1.8900 | | 0.2692 | | 0.8000 | | 0.0000 | | 0.4400 | |
| Uplands (AC) | 1.8972 | 2.6146 | | 5.4100 | | 2.7221 | | 3.4600 | | 1.0000 | | 1.3400 | |
| **SALE INFORMATION** | | | | | | | | | | | | | |
| Transaction Price | | $1,050,000 | | $675,000 | | $800,000 | | $1,125,000 | | $500,000 | | $540,000 | |
| Transaction Price $/Acres | | $401,591 | | $92,466 | | $267,442 | | $264,085 | | $500,000 | | $303,371 | |
| Property Rights [1] | | Fee Simple | | Fee Simple | | Fee Simple | | Fee Simple | | Fee Simple | | Fee Simple | |
| Financing [2] | | Cash to Seller | | Cash to Seller | | Cash to Seller | | Cash to Seller | | - | | - | |
| Sale Conditions [3] | | - | | - | | - | | - | | List to Sale Ratio | (10%) | List to Sale Ratio | (10%) |
| Market Conditions [5] | | 7/11/2023 | | 8/12/2021 | | 4/22/2021 | | 10/15/2018 | | - | | - | |
| Sale Status | | Recorded | | Recorded | | Recorded | | Recorded | | Listing | | Listing | |
| Recording Number | | 9653-1521 | | 9535-95 | | 9504-141 | | 9317-8531 | | - | | - | |
| Total Transactional Adjustments | | $0 | 0% | $0 | 0% | $0 | 0% | $0 | 0% | $0 | 0% | $0 | 0% |
| **Adjusted $/Acres** | | **$401,591** | | **$92,466** | | **$267,442** | | **$264,085** | | **$500,000** | | **$303,371** | |
| **PHYSICAL INFORMATION** | | | | | | | | | | | | | |
| Location | Good | Good | | Good | | Above Average | 10% | Good | | Above Average | 10% | Good | |
| Acres | 1.8972 | 2.6146 | 5% | 7.3000 | 20% | 2.9913 | 10% | 4.2600 | 10% | 1.0000 | (10%) | 1.7800 | |
| Wetlands (Acres) | 0 | 0 | | 1.8900 | | 0.2692 | | 0.8000 | | 0 | | 0.4400 | |
| % of Wetlands | 0% | 0% | | 26% | 10% | 9% | | 19% | 10% | 0% | | 25% | 10% |
| Zoning | CMX-3A | HD-1 | | HD-1 | | HD-2 | | CMX-3 | | CMX-3 | | HD-1 | |
| Frontage | 280 | 690.9 | (10%) | 282 | | 224 | | 552.8 | (10%) | 203.9 | | 240 | |
| Access | Above Average | Above Average | | Average | 5% | Average | 5% | Average | 5% | Average | 5% | Average | 5% |
| Demo/Clearing | Assumed Cleared | Wooded | 10% | Wooded | 10% | Cleared | | Wooded | 10% | Cleared | | Wooded | 10% |
| Approvals | None | Final (Self-Storage) | (20%) | None | | Final (Warehouse) | (20%) | None | | None | | None | |
| Total Physical Adjustments | | ($60,239) | (15%) | $41,610 | 45% | $13,372 | 5% | $66,021 | 25% | $25,000 | 5% | $75,843 | 25% |
| **Adjusted $ / Acre** | | **$341,352** | | **$134,076** | | **$280,814** | | **$330,106** | | **$525,000** | | **$379,214** | |

## SALES COMPARISON APPROACH – BLOCK 6 LOT 31 "BEFORE" LAND VALUE

The appraisers conducted research of similar sales within the subject's market area. Due to the lack of recent comparable sales within Freehold Township, it was necessary to expand search parameters to neighboring areas as well as into previous years. The grid on the preceding page analyzes those sales that are considered most applicable for direct comparison to the subject property.

Property Rights: All of the sales are either fee simple or leased fee at market therefore no adjustment was necessary.

Financing: All of the sales used had market rate or conventional financing and required no adjustment for favorable financing.

Conditions of Sale: Each comparable utilized is considered to have been an arm's length transaction. Listings were adjusted for a list to sale price ratio.

Market Conditions: The outbreak has led to considerable uncertainty in commercial real estate. The effects of the pandemic will likely continue having a profound impact on demand, rent growth, and investment trends. All sales with exception to Sale 4 occurred within a similar time period therefore no adjustments were necessary. Sale 4 occurred in October 2018. However, due to the lack of recent comparable land sales within Freehold Township, there was insufficient data to support any adjustment for differences in market conditions.

Location: The subject parcel is situated on the northbound side of Route 9. All sales with the exception of Sale 3 and Listing 5 are also situated on Route 9. Sale 3 & Listing 5 are located on busy roadways however they experience less daily traffic than that of the subject thus the adjustments.

Land Area: For this portion of the valuation, Block 6 Lot 31 has a gross land area of approximately 1.8972 acres. Typically, the adjustment land area is predicated on economies of scale, whereby, a parcel with a greater land area will transfer for a lower unit rate and vice versa, whereby a parcel with a lower land area will sell for a higher unit rate. Each sale was adjusted accordingly.

Wetlands: The subject does not contain any wetlands. Sales were adjusted where necessary based upon their individual percentage of wetlands.

Zoning: The subject is situated within the CMX-3 zone of Freehold Township. All sales are located within reasonably similar zones therefore no adjustments were necessary.

Frontage: Block 6 Lot 31 has 280 feet of frontage on the northbound side of Route 9. Sales were adjusted where necessary based upon their individual frontage.

## SALES COMPARISON APPROACH – BLOCK 6 LOT 31 "BEFORE" LAND VALUE

Access: The subject parcel has above average access with two points of ingress / egress. One along Route 9 and the other via an access easement with Lot 30 allowing access from the Englishtown Road / Route 9 "on-ramp". Sales were adjusted where necessary.

Demo/Clearing: For the purposes of this appraisal, Block 6 Lot 31 is considered to be raw, cleared land. Sales were adjusted where necessary based upon the demo/clearing needed post sale.

Approvals: Sales 1 & 3 sold with final approvals thus the significant adjustment to account for such.

**LAND SALE COMPARISON APPROACH (ACRES)**

| | TRANSACTION PRICE | ADJUSTMENT TRANSACTIONAL[1] | ADJUSTED | PROPERTY[2] | FINAL | NET ADJ |
|---|---|---|---|---|---|---|
| 1 | $401,591 | 0% | $401,591 | (15%) | $341,352 | (15%) |
| 2 | $92,466 | 0% | $92,466 | 45% | $134,076 | 45% |
| 3 | $267,442 | 0% | $267,442 | 5% | $280,814 | 5% |
| 4 | $264,085 | 0% | $264,085 | 25% | $330,106 | 25% |
| 5 | $500,000 | 0% | $500,000 | 5% | $525,000 | 5% |
| 6 | $303,371 | 0% | $303,371 | 25% | $379,214 | 25% |
| *HIGH* | *$500,000* | *0%* | *$500,000* | *45%* | *$525,000* | *45%* |
| *AVG* | *$304,826* | *0%* | *$304,826* | *15%* | *$331,760* | *15%* |
| *MED* | *$285,407* | *0%* | *$285,407* | *15%* | *$335,729* | *15%* |
| *LOW* | *$92,466* | *0%* | *$92,466* | *(15%)* | *$134,076* | *(15%)* |

After adjustments, the comparables reflect a range in value from $134,076 to $525,000 per acre. The adjusted mean is $331,760 and the adjusted median is $335,729 per acre. The appraisers have considered all closed sales however have only utilized Listings 5 & 6 to show current market activity. Furthermore, minimal weight is given to Sale 2 as it is significantly larger and appears to be an outlier. The appraisers have concluded that $315,000 per acre is most appropriate and between the range of value. The value via the sales comparison approach is concluded on the next page.

## SALES COMPARISON APPROACH – BLOCK 6 LOT 31 "BEFORE" LAND VALUE

| BLOCK 6 LOT 31 "BEFORE" ACRES | | CONCLUDED $/AC | | VALUE |
|---|---|---|---|---|
| 1.8972 | x | $315,000 | = | $597,618 |

In order to determine an applicable "as-is" "before" land value of Block 6 Lot 31, we must consider the relevant site improvements contributing value to the land. The items we will consider are the parking lot with 62 lined spaced, two wells, and a sanitary pump station. Per Marshall & Swift Cost Estimator, the cost of a parking lot ranges from $1,590 to $2,925 per space. This price per space includes engineering, grading, drainage, paving, electrical, landscaping, and other miscellaneous costs. The appraiser was not provided specifics regarding the subject wells nor sanitary pump stations. Public data indicates the cost per well is between $1,500 and $12,000 and the cost of a sanitary pump station/system can range from $150,000 to $1,500,000. Our concluded costs are shown below.

| | | |
|---|---|---|
| Parking Lot (62 Spaces x $2,500 per space) | = | $155,000 |
| 2 Wells ($10,000 per well) | = | $20,000 |
| Sanitary Pump Station (Estimated) | = | $200,000 |
| | | |
| Total Replacement Cost | = | $375,000 |
| *Less Estimated Depreciation (25%)* | = | *$93,750* |
| | | |
| ***Estimated Depreciated Cost of Site Improvements*** | **=** | ***$281,250*** |

| BLOCK 6 LOT 31 "BEFORE" LAND VALUE | + | BLOCK 6 LOT 31 DEPRECIATED SITE IMPROVEMENT COSTS | | CONCLUDED VALUE |
|---|---|---|---|---|
| $597,618 | + | $281,250 | = | $878,868 |
| | | **ROUNDED** | = | $880,000 |

***CONCLUDED "BEFORE" LAND VALUE OF BLOCK 6 LOT 31 VIA SALES COMPARISON APPROACH***

**EIGHT HUNDRED EIGHTY THOUSAND DOLLARS**

**$880,000**

## SALES COMPARISON APPROACH – BLOCK 6 LOT 31 "AFTER" LAND VALUE

On the pages to follow we will determine an "after" value for the underlying land associated with Block 6 Lot 31. This hypothetical value considers Block 6 Lot 31 without the land area associated with "Hypothetical Sub-Lot 31A". The land area valued in this scenario is 60,852 square feet or 1.3970 acres.




***The area above highlighted in yellow represents the approximate land area considered in the valuation to follow.**

# SALES COMPARISON APPROACH – BLOCK 6 LOT 31 "AFTER" LAND VALUE

| LAND SALES COMPARISON TABLE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SUBJECT | COMP 1 | | COMP 2 | | COMP 3 | | COMP 4 | | COMP 5 | | COMP 6 | |
| Address | 4135 Route 9 | 2488 Route 9 | | 1440 Route 9 | | 1008 Route 33 | | 3413-3415 Route 9 | | Route 33 (B 63 L 1-3) | | Route 9 (B 79 L 60) | |
| City | Freehold | Howell | | Howell | | Freehold | | Freehold | | Freehold | | Howell | |
| State | NJ | NJ | | NJ | | NJ | | NJ | | NJ | | NJ | |
| Zip | 07728 | 07731 | | 07731 | | 07728 | | 07728 | | 07728 | | 07731 | |
| County | Monmouth | Monmouth | | Monmouth | | Monmouth | | Monmouth | | Monmouth | | Monmouth | |
| Land AC | 1.8972 | 2.6146 | | 7.3000 | | 2.9913 | | 4.2600 | | 1.0000 | | 1.7800 | |
| Wetlands (AC) | 0 | 0 | | 1.8900 | | 0.2692 | | 0.8000 | | 0.0000 | | 0.4400 | |
| Uplands (AC) | 1.8972 | 2.6146 | | 5.4100 | | 2.7221 | | 3.4600 | | 1.0000 | | 1.3400 | |
| SALE INFORMATION | | | | | | | | | | | | | |
| Transaction Price | | $1,050,000 | | $675,000 | | $800,000 | | $1,125,000 | | $500,000 | | $540,000 | |
| Transaction Price $/Acres | | $401,591 | | $92,466 | | $267,442 | | $264,085 | | $500,000 | | $303,371 | |
| Property Rights [1] | | Fee Simple | | Fee Simple | | Fee Simple | | Fee Simple | | Fee Simple | | Fee Simple | |
| Financing [2] | | Cash to Seller | | Cash to Seller | | Cash to Seller | | Cash to Seller | | - | | - | |
| Sale Conditions [3] | | - | | - | | - | | - | | List to Sale Ratio | (10%) | List to Sale Ratio | (10%) |
| Market Conditions [5] | | 7/11/2023 | | 8/12/2021 | | 4/22/2021 | | 10/15/2018 | | - | | - | |
| Sale Status | | Recorded | | Recorded | | Recorded | | Recorded | | Listing | | Listing | |
| Recording Number | | 9653-1521 | | 9535-95 | | 9504-141 | | 9317-8531 | | - | | - | |
| Total Transactional Adjustments | | $0 | 0% | $0 | 0% | $0 | 0% | $0 | 0% | $0 | 0% | $0 | 0% |
| **Adjusted $/Acres** | | **$401,591** | | **$92,466** | | **$267,442** | | **$264,085** | | **$500,000** | | **$303,371** | |
| PHYSICAL INFORMATION | | | | | | | | | | | | | |
| Location | Good | Good | | Good | | Above Average | 10% | Good | | Above Average | 10% | Good | |
| Acres | 1.3970 | 2.6146 | 10% | 7.3000 | 25% | 2.9913 | 10% | 4.2600 | 15% | 1.0000 | (5%) | 1.7800 | 5% |
| Wetlands (Acres) | 0 | 0 | | 1.8900 | | 0.2692 | | 0.8000 | | 0 | | 0.4400 | |
| % of Wetlands | 0% | 0% | | 26% | 10% | 9% | 5% | 19% | 10% | 0% | | 25% | 10% |
| Zoning | CMX-3A | HD-1 | | HD-1 | | HD-2 | | CMX-3 | | CMX-3 | | HD-1 | |
| Frontage | 280 | 690.9 | (10%) | 282 | | 224 | | 552.8 | (10%) | 203.9 | | 240 | |
| Access | Above Average | Above Average | | Average | 5% | Average | 5% | Average | 5% | Average | 5% | Average | 5% |
| Demo/Clearing | Assumed Cleared | Wooded | 10% | Wooded | 10% | Cleared | | Wooded | 10% | Cleared | | Wooded | 10% |
| Approvals | None | Final (Self-Storage) | (20%) | None | | Final (Warehouse) | (20%) | None | | None | | None | |
| Total Physical Adjustments | | ($40,159) | (10%) | $46,233 | 50% | $26,744 | 10% | $79,226 | 30% | $50,000 | 10% | $91,011 | 30% |
| **Adjusted $ / Acre** | | **$361,432** | | **$138,699** | | **$294,186** | | **$343,311** | | **$550,000** | | **$394,382** | |

## SALES COMPARISON APPROACH – BLOCK 6 LOT 31 "AFTER" LAND VALUE

The appraisers conducted research of similar sales within the subject's market area. Due to the lack of recent comparable sales within Freehold Township, it was necessary to expand search parameters to neighboring areas as well as into previous years. The grid on the preceding page analyzes those sales that are considered most applicable for direct comparison to the subject property.

Property Rights: All of the sales are either fee simple or leased fee at market therefore no adjustment was necessary.

Financing: All of the sales used had market rate or conventional financing and required no adjustment for favorable financing.

Conditions of Sale: Each comparable utilized is considered to have been an arm's length transaction. Listings were adjusted for a list to sale price ratio.

Market Conditions: The outbreak has led to considerable uncertainty in commercial real estate. The effects of the pandemic will likely continue having a profound impact on demand, rent growth, and investment trends. All sales with exception to Sale 4 occurred within a similar time period therefore no adjustments were necessary. Sale 4 occurred in October 2018. However, due to the lack of recent comparable land sales within Freehold Township, there was insufficient data to support any adjustment for differences in market conditions.

Location: The subject parcel is situated on the northbound side of Route 9. All sales with the exception of Sale 3 and Listing 5 are also situated on Route 9. Sale 3 & Listing 5 are located on busy roadways however they experience less daily traffic than that of the subject thus the adjustments.

Land Area: For this portion of the valuation, Block 6 Lot 31 has a gross land area of approximately 1.3970 acres. Typically, the adjustment land area is predicated on economies of scale, whereby, a parcel with a greater land area will transfer for a lower unit rate and vice versa, whereby a parcel with a lower land area will sell for a higher unit rate. Each sale was adjusted accordingly.

Wetlands: The subject does not contain any wetlands. Sales were adjusted where necessary based upon their individual percentage of wetlands.

Zoning: The subject is situated within the CMX-3 zone of Freehold Township. All sales are located within reasonably similar zones therefore no adjustments were necessary.

Frontage: Block 6 Lot 31 has 280 feet of frontage on the northbound side of Route 9. Sales were adjusted where necessary based upon their individual frontage.

## SALES COMPARISON APPROACH – BLOCK 6 LOT 31 "AFTER" LAND VALUE

Access: The subject parcel has above average access with two points of ingress / egress. One along Route 9 and the other via an access easement with Lot 30 allowing access from the Englishtown Road / Route 9 "on-ramp". Sales were adjusted where necessary.

Demo/Clearing: For the purposes of this appraisal, Block 6 Lot 31 is considered to be raw, cleared land. Sales were adjusted where necessary based upon the demo/clearing needed post sale.

Approvals: Sales 1 & 3 sold with final approvals thus the significant adjustment to account for such.

**LAND SALE COMPARISON APPROACH (ACRES)**

| | TRANSACTION PRICE | ADJUSTMENT | | | | NET ADJ |
|---|---|---|---|---|---|---|
| | | TRANSACTIONAL[1] | ADJUSTED | PROPERTY[2] | FINAL | |
| 1 | $401,591 | 0% | $401,591 | (10%) | $361,432 | (10%) |
| 2 | $92,466 | 0% | $92,466 | 50% | $138,699 | 50% |
| 3 | $267,442 | 0% | $267,442 | 10% | $294,186 | 10% |
| 4 | $264,085 | 0% | $264,085 | 30% | $343,311 | 30% |
| 5 | $500,000 | 0% | $500,000 | 10% | $550,000 | 10% |
| 6 | $303,371 | 0% | $303,371 | 30% | $394,382 | 30% |
| *HIGH* | *$500,000* | *0%* | *$500,000* | *50%* | *$550,000* | *50%* |
| *AVG* | *$304,826* | *0%* | *$304,826* | *20%* | *$347,002* | *20%* |
| *MED* | *$285,407* | *0%* | *$285,407* | *20%* | *$352,372* | *20%* |
| *LOW* | *$92,466* | *0%* | *$92,466* | *(10%)* | *$138,699* | *(10%)* |

After adjustments, the comparables reflect a range in value from $138,699 to $550,000 per acre. The adjusted mean is $347,002 and the adjusted median is $352,372 per acre. The appraisers have considered all closed sales however have only utilized Listings 5 & 6 to show current market activity. Furthermore, minimal weight is given to Sale 2 as it is significantly larger and appears to be an outlier. The appraisers have concluded that $335,000 per acre is most appropriate and between the range of value. The value via the sales comparison approach is concluded on the next page.

## SALES COMPARISON APPROACH – BLOCK 6 LOT 31 "AFTER" LAND VALUE

| BLOCK 6 LOT 31 "AFTER" ACRES | | CONCLUDED $/AC | | VALUE |
|---|---|---|---|---|
| 1.3970 | x | $335,000 | = | $467,995 |

In order to determine an applicable "as-is" "before" land value of Block 6 Lot 31, we must consider the relevant site improvements contributing value to the land. The items we will consider are the parking lot with 62 lined spaced, two wells, and a sanitary pump station. Per Marshall & Swift Cost Estimator, the cost of a parking lot ranges from $1,590 to $2,925 per space. This price per space includes engineering, grading, drainage, paving, electrical, landscaping, and other miscellaneous costs. The appraiser was not provided specifics regarding the subject wells nor sanitary pump stations. Public data indicates the cost per well is between $1,500 and $12,000 and the cost of a sanitary pump station/system can range from $150,000 to $1,500,000. Our concluded costs are shown below.

| | | |
|---|---|---|
| Parking Lot (62 Spaces x $2,500 per space) | = | $155,000 |
| 2 Wells ($10,000 per well) | = | $20,000 |
| Sanitary Pump Station (Estimated) | = | $200,000 |
| | | |
| Total Replacement Cost | = | $375,000 |
| *Less Estimated Depreciation (25%)* | = | *$93,750* |
| | | |
| ***Estimated Depreciated Cost of Site Improvements*** | = | ***$281,250*** |

| BLOCK 6 LOT 31 "AFTER" LAND VALUE | + | BLOCK 6 LOT 31 DEPRECIATED SITE IMPROVEMENT COSTS | | CONCLUDED VALUE |
|---|---|---|---|---|
| $467,995 | + | $281,250 | = | $749,245 |
| | | **ROUNDED** | = | $750,000 |

***CONCLUDED "AFTER" LAND VALUE OF BLOCK 6 LOT 31***
***VIA SALES COMPARISON APPROACH***

**SEVEN HUNDRED FIFTY THOUSAND DOLLARS**

**$750,000**

## HYPOTHETICAL SUB-LOT 31A VALUE CONCLUSION

We will determine an applicable value of "Hypothetical Sub-Lot 31A". We will utilize a valuation technique that is similar to that known as a "diminution in value". Whereby the value of the "hypothetical sub-lot" will be the difference in value between the "before" and "after" land values.




***The area above highlighted in yellow represents the approximate land area considered in the valuation to follow.***

## HYPOTHETICAL SUB-LOT 31A VALUE CONCLUSION

We will determine an applicable value of "Hypothetical Sub-Lot 31A". We will utilize a valuation technique that is similar to that known as a "diminution in value". Whereby the value of the "hypothetical sub-lot" will be the difference in value between the "before" and "after" land values.

| **"Before" Value** | **-** | **"After" Value** | **=** | **Value of "Hypothetical Sub-Lot"** |
|---|---|---|---|---|
| "As-is" Land Value of Block 6 Lot 31<br><br>(82,643 SF or 1.8972 AC) | - | Land Value of Block 6 Lot 31 MINUS area of "hypothetical sub-lot"<br><br>(60,852 SF or 1.3970 AC) | = | Value of "Hypothetical Sub-Lot" Identified herein as "Lot 31A"<br><br>(21,791 SF or 0.5003 AC) |

As such, we have concluded the following:

| **"Before" Value Block 6 Lot 31** | **-** | **"After" Value Block 6 Lot 31** | **=** | **Value of "Hypothetical Sub-Lot 31A"** |
|---|---|---|---|---|
| $880,000 | - | $750,000 | = | $130,000 |

***CONCLUDED VALUE***
***OF "HYPOTHETICAL SUB-LOT 31A"***

**ONE HUNDRED THIRTY THOUSAND DOLLARS**

**$130,000**

## SALES COMPARISON APPROACH – BLOCK 6 LOT 30 "BEFORE" LAND VALUE

On the pages to follow we will determine a "before" value for the underlying land associated with Block 6 Lot 30. This is an "as-is" value of the land area of this parcel, as of the effective date of this appraisal, which per a provided survey is 461,480 square feet or 10.5941 acres.




***The area above highlighted in yellow represents the approximate land area considered in the valuation to follow.***

Stuart Appraisal COMPANY

# 2488 Route 9

Comparable 1



## Sale Information

| | |
|---|---|
| Buyer | K-Land No.74, LLC |
| Seller | Advantage Properties, LLC |
| Sale Date | 7/11/2023 |
| Transaction Status | Recorded |
| Sale Price | $1,050,000 $401,591 /AC |
| Recording Number | 9653-1521 |
| Rights Transferred | Fee Simple |
| Financing | Cash to Seller |

## Property

| | |
|---|---|
| Land Area | 2.6146 Acres (113,894 SF) |
| Number of Parcels | 1 |
| Zoning | HD |
| Shape | Irregular |
| Topography | Level |
| Corner | Yes; Signalized |
| Proposed Land Use | Self-Storage |
| Utilities | At Street |
| Easements | None known |
| Environmental | None known |
| Frontage | 691' Route 9 / On Ramp / Sunnyside Rd |
| Flood Zones | Zone X (Unshaded) |

2488 Route 9
Howell, NJ 07731




County
Monmouth

Submarket
Monmouth West

APN
21-00132-0000-00001/3, 4 & 5

## Remarks

This is the sale of four contiguous parcels known as Block 132 Lots 1, 3, 4 & 5 situated within the HD-1 zone of Howell Township. The tract is situated at the corner of US Highway 9 and Sunnyside Road. According to the data available, none of the properties are encumbered by wetlands. Township planning documents reveal that the property had approvals and variance relief for the development of a 3-story, 79,089 square foot self-storage facility at the time of sale.

Stuart Appraisal COMPANY

# Route 9 (B 143 L 23.01)

Comparable 2




## Sale Information

| | |
|---|---|
| Buyer | Howell Medical Investors, LLC |
| Seller | Savino Savo |
| Sale Date | 9/6/2022 |
| Transaction Status | Recorded |
| Sale Price | $3,600,000 $283,912 /AC |
| Recording Number | 9616-7456 |
| Rights Transferred | Fee Simple |
| Financing | Cash to Seller |

## Property

| | |
|---|---|
| Land Area | 12.68 Acres (552,341 SF) |
| Number of Parcels | 1 |
| Zoning | HD-1 |
| Shape | Irregular |
| Topography | Level |
| Corner | No |
| Utilities | At Street |
| Environmental | 3.98 AC of DEP Wetlands |
| Frontage | 843' Route 9 |
| Flood Zones | Zone AE, Zone X (Unshaded) |

Route 9 (B 143 L 23.01)
Freehold, NJ 07728

County
Monmouth

Submarket
Monmouth West

APN
21-00143-0000-00023-01




## Remarks

This is the sale of a 12.68 acre parcel situated on the northbound side of US Highway 9 within the HD-1 zone of Howell Township. Per Planning Documents, the parcel received preliminary approval for a shopping center and two restaurant pads in 2018/2019. At this time clearing of the parcel began however was never developed. In it unclear if final approvals were obtained however according to property records, the parcel sold with an NU code #24 which indicates zoning influence prior to the sale. Per DEP wetlands data, the site is encumbered by approximately 3.98 acres of wetlands.

42 E MAIN STREET, SUITE 202, FREEHOLD NJ 07728 PHONE: 732-409-6080 APPRAISALS@STUARTAPPRAISALCO.COM WWW.STUARTAPPRAISALCO.COM

Stuart Appraisal COMPANY

# Route 9 (B 13264.11 L 61.11)

Comparable 3




## Sale Information

| | |
|---|---|
| Buyer | N5 Old Bridge LLC |
| Seller | Cindy Lane II LLC |
| Sale Date | 5/12/2022 |
| Transaction Status | Recorded |
| Sale Price | $1,350,000 $116,079 /AC |
| Recording Number | 18934-170 |
| Rights Transferred | Fee Simple |
| Financing | Cash to Seller |

## Property

| | |
|---|---|
| Land Area | 11.63 Acres (506,603 SF) |
| Number of Parcels | 1 |
| Zoning | OG1 |
| Shape | Irregular |
| Topography | Level to Sloping |
| Corner | No |
| Proposed Land Use | Self-Storage |
| Utilities | At Street |
| Easements | Sewer Easements |
| Environmental | 4.76 AC of DEP Wetlands |
| Frontage | 1,142' Route 9 |
| Flood Zones | Zone X (Unshaded) |

Route 9 (B13264.11 L 61.11)
Old Bridge, NJ 08857




County
Middlesex

Submarket
Middlesex

APN
15-13264-11-00061-11

## Remarks

This is the sale of a large parcel situated on the northbound side of US Highway 9, zoned OG-1, within Old Bridge Township. According to Old Bridge Township Planning Documents, the purchasers applied for variance relief and approvals to develop a self-storage facility in 2020 however we denied. Although the appraiser was unable to identify a resolution approving the self-storage facility prior to this sale, the property was purchased by the same group and, according to property records, it appears that zoning influence impacted the sale price. The site is encumbered by 4.76 acres of wetlands which limits the developmental envelope of the site.

Stuart Appraisal COMPANY

# 1302-1400 Route 9

Comparable 4




## Sale Information

| | |
|---|---|
| Buyer | Howell 360 LLC |
| Seller | 1400 ROute 9 South, LLC |
| Sale Date | 8/19/2021 |
| Transaction Status | Recorded |
| Sale Price | $7,300,000 $364,685 /AC |
| Recording Number | 9537-9583 |
| Rights Transferred | Fee Simple |
| Financing | Cash to Seller |

## Property

| | |
|---|---|
| Land Area | 20.0173 Acres (871,953 SF) |
| Number of Parcels | 1 |
| Zoning | HD-1 |
| Shape | Irregular |
| Topography | Level |
| Corner | No |
| Utilities | At street |
| Easements | None known |
| Environmental | None known |
| Frontage | 797' Route 9 |
| Flood Zones | Zone AE, Zone X (Unshaded) |

1302-1400 Route 9
Howell, NJ 07731

County
Monmouth

Submarket
Monmouth West

APN
21-00137-0000-00022,23,24,25,26




## Remarks

This is the sale of five contiguous parcels situated on the southbound side of US Highway 9 within Howell Township. Per an available survey, the parcels combine to create a total land area of approximately 20.02 acres. D.E.P wetlands data indicates that the sites are encumbered by approximately 2.42 acres of wetlands, all of which are located in the rear of the parcels and do not appear to affect development potential. Per Howell Township & Monmouth County planning documents, plans were submitted for development of a 360 residential apartment complex subsequent to the purchase of the property, however, in 2019 the parcels were rezoned to permit 252 market rate housing units and 112 family rental affordable housing units.

42 E MAIN STREET, SUITE 202, FREEHOLD NJ 07728 PHONE: 732-409-6080 APPRAISALS@STUARTAPPRAISALCO.COM WWW.STUARTAPPRAISALCO.COM

# 1440 Route 9

Comparable 5

## Sale Information

| | |
|---|---|
| Buyer | Howell 1440, LLC |
| Seller | Florenze, Crystal L, Executrix |
| Sale Date | 8/12/2021 |
| Transaction Status | Recorded |
| Sale Price | $675,000 $92,466 /AC |
| Recording Number | 9535-95 |
| Rights Transferred | Fee Simple |
| Financing | Cash to Seller |

## Property

| | |
|---|---|
| Land Area | 7.3 Acres (317,988 SF) |
| Number of Parcels | 2 |
| Zoning | HD-1 (80k SF Lot Min) |
| Shape | Irregular |
| Topography | Level to Sloping |
| Corner | No |
| Utilities | Public Available |
| Environmental | 1.89 Acres of Wetlands |
| Frontage | 282' US Highway 9 |
| Flood Zones | Zone X (Unshaded) |




1440 Route 9
Howell, NJ 07731

County
Monmouth

Submarket
Howell Township

APN
21-00137-0000-00020, 21-00137-0000-00019




## Remarks

1.89 Acres of Wetlands

This is the sale of two contiguous, wooded parcels situated within the HD-1 zone of Howell Township. The parcels individually do not meet minimum requirements as they fall short of frontage requirements however as assembled are conforming. There is approximately 1.89 acres of wetlands. As such, the total combined uplands area is roughly 5.41 acres. The sale is noted as an estate sale however was exposed to the open market for a significant period of time and is considered to have sold at market.

42 E MAIN STREET, SUITE 202, FREEHOLD NJ 07728 PHONE: 732-409-6080 APPRAISALS@STUARTAPPRAISALCO.COM WWW.STUARTAPPRAISALCO.COM

Stuart Appraisal COMPANY

# 3413-3415 Route 9

Comparable 6



## Sale Information

| | |
|---|---|
| Buyer | TOMJ Realty LLC |
| Seller | Petrou LLC & Omega Realty |
| Sale Date | 10/15/2018 |
| Transaction Status | Recorded |
| Sale Price | $1,125,000 $264,085 /AC |
| Recording Number | 9317-8531 |
| Rights Transferred | Fee Simple |
| Financing | Cash to Seller |

## Property

| | |
|---|---|
| Land Area | 4.26 Acres (185,566 SF) |
| Number of Parcels | 2 |
| Zoning | CMX-3 |
| Shape | Irregular |
| Topography | Level |
| Corner | No |
| Utilities | At Street |
| Easements | None known |
| Environmental | 0.80 Ac of DEP Wetlands |
| Frontage | 553' Route 9 |
| Flood Zones | Zone X (Unshaded) |

3413-3415 Route 9
Freehold, NJ 07728

County
Monmouth

Submarket
Monmouth West

APN
17-00080-0000-00006, 17-00080-0000-00007




## Remarks

This is the sale of two contiguous, wooded, parcels within the CMX-3 zone of Freehold Township. Per CoStar, the properties were exposed to the open market for approximately 210 days prior to going under contract. According to the information provided & available, this was a cash deal whereby the seller had held the property for a long period of time with no development plans and the buyer purchases the property to hold it as an investment. D.E.P wetlands data indicates that there is approximately 0.80 acres of wetlands that traverses the center of Lot 7 with a small portion on Lot 6. As a whole, the tract appears to conform with the minimum requirements of the CMX-3 zone.

42 E MAIN STREET, SUITE 202, FREEHOLD NJ 07728 PHONE: 732-409-6080 APPRAISALS@STUARTAPPRAISALCO.COM WWW.STUARTAPPRAISALCO.COM

**COMPARABLE SALES MAP**



# SALES COMPARISON APPROACH – BLOCK 6 LOT 30 "BEFORE" LAND VALUE

| LAND SALES COMPARISON TABLE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SUBJECT | COMP 1 | | COMP 2 | | COMP 3 | | COMP 4 | | COMP 5 | | COMP 6 | |
| Address | 4151 Route 9 | 2488 Route 9 | | Route 9 (B 143 L 23.01) | | Route 9 (B13264.11 L 61.11) | | 1302-1400 Route 9 | | Route 33 (B 63 L 1-3) | | 3413-3415 Route 9 | |
| City | Freehold | Howell | | Freehold | | Old Bridge | | Howell | | Howell | | Freehold | |
| State | NJ | NJ | | NJ | | NJ | | NJ | | NJ | | NJ | |
| Zip | 07728 | 07731 | | 07728 | | 08857 | | 07731 | | 07731 | | 07728 | |
| County | Monmouth | Monmouth | | Monmouth | | Middlesex | | Monmouth | | Monmouth | | Monmouth | |
| Land AC | 10.5941 | 2.6146 | | 12.6800 | | 11.6300 | | 20.0173 | | 7.3000 | | 4.2600 | |
| Wetlands (AC) | 1.9600 | 0 | | 3.9800 | | 4.7600 | | 2.4200 | | 1.8900 | | 0.4400 | |
| Uplands (AC) | 8.6341 | 2.6146 | | 8.7000 | | 6.8700 | | 17.5973 | | 5.4100 | | 3.8200 | |
| SALE INFORMATION | | | | | | | | | | | | | |
| Transaction Price | | $1,050,000 | | $3,600,000 | | $1,350,000 | | $7,300,000 | | $675,000 | | $1,125,000 | |
| Transaction Price $/Acres | | $401,591 | | $283,912 | | $116,079 | | $364,685 | | $92,466 | | $264,085 | |
| Property Rights [1] | | Fee Simple | | Fee Simple | | Fee Simple | | Fee Simple | | Fee Simple | | Fee Simple | |
| Financing [2] | | Cash to Seller | | Cash to Seller | | Cash to Seller | | Cash to Seller | | Cash to Seller | | Cash to Seller | |
| Sale Conditions [3] | | - | | - | | - | | - | | - | | - | |
| Market Conditions [5] | | 7/11/2023 | | 9/6/2022 | | 5/12/2022 | | 8/19/2021 | | 8/12/2021 | | 10/15/2018 | |
| Sale Status | | Recorded | | Recorded | | Recorded | | Recorded | | Recorded | | Recorded | |
| Recording Number | | 9653-1521 | | 9616-7456 | | 18934-170 | | 9537-9583 | | 9535-95 | | 9317-8531 | |
| Total Transactional Adjustments | | $0 | 0% | $0.00 | 0% | $0.00 | 0% | $0.00 | 0% | $0.00 | 0% | $0.00 | 0% |
| **Adjusted $/Acres** | | **$401,591** | | **$283,912** | | **$116,079** | | **$364,685** | | **$92,466** | | **$264,085** | |
| PHYSICAL INFORMATION | | | | | | | | | | | | | |
| Location | Good | Good | | Good | | Good | | Good | | Good | | Good | |
| Acres | 10.5941 | 2.6146 | (20%) | 12.6800 | 5% | 11.6300 | 5% | 20.0173 | 10% | 7.3000 | (5%) | 4.2600 | (15%) |
| Wetlands (Acres) | 1.9600 | 0 | | 3.9800 | | 4.7600 | | 2.4200 | | 1.8900 | | 0.4400 | |
| % of Wetlands | 19% | 0% | (10%) | 31% | 5% | 41% | 10% | 12% | (5%) | 26% | | 10% | 5% |
| Zoning | CMX-3A | HD-1 | | HD-1 | | OG1 | 10% | HD-1 | | HD-1 | | CMX-3 | |
| Frontage | 858.5 | 690.9 | 5% | 843.3 | | 1142 | (5%) | 797 | | 282 | 15% | 552.8 | 5% |
| Access | Above Average | Above Average | | Average | 5% | Above Average | | Average | 5% | Average | 5% | Average | 5% |
| Demo/Clearing | Wooded | Wooded | | Cleared | (10%) | Wooded | | Wooded | | Wooded | | Wooded | |
| Approvals | None | Final (Self-Storage) | (20%) | Final (Shopping Center) | (20%) | Assumed Preliminary | (10%) | Affordable Housing | (20%) | None | | None | |
| Total Physical Adjustments | | ($180,716) | (45%) | ($42,587) | (15%) | $11,608 | 10% | ($36,468) | (10%) | $13,870 | 15% | $0 | 0% |
| **Adjusted $ / Acre** | | **$220,875** | | **$241,325** | | **$127,687** | | **$328,217** | | **$106,336** | | **$264,085** | |

## SALES COMPARISON APPROACH – BLOCK 6 LOT 30 "BEFORE" LAND VALUE

The appraisers conducted research of similar sales within the subject's market area. Due to the lack of recent comparable sales within Freehold Township, it was necessary to expand search parameters to neighboring areas as well as into previous years. The grid on the preceding page analyzes those sales that are considered most applicable for direct comparison to the subject property.

Property Rights: All of the sales are either fee simple or leased fee at market therefore no adjustment was necessary.

Financing: All of the sales used had market rate or conventional financing and required no adjustment for favorable financing.

Conditions of Sale: Each comparable utilized is considered to have been an arm's length transaction. Listings were adjusted for a list to sale price ratio.

Market Conditions: The outbreak has led to considerable uncertainty in commercial real estate. The effects of the pandemic will likely continue having a profound impact on demand, rent growth, and investment trends. All sales with exception to Sale 4 occurred within a similar time period therefore no adjustments were necessary. Sale 6 occurred in October 2018. However, due to the lack of recent comparable land sales within Freehold Township, there was insufficient data to support any adjustment for differences in market conditions.

Location: The subject parcel is situated on the northbound side of Route 9. All sales 5 are also situated on Route 9.

Land Area: For this portion of the valuation, Block 6 Lot 30 has a gross land area of approximately 10.5941 acres. Typically, the adjustment land area is predicated on economies of scale, whereby, a parcel with a greater land area will transfer for a lower unit rate and vice versa, whereby a parcel with a lower land area will sell for a higher unit rate. Each sale was adjusted accordingly.

Wetlands: Block 6 Lot 30 contains 1.96 acres of wetlands per DEP data. Sales were adjusted where necessary based upon their individual percentage of wetlands.

Zoning: The subject is situated within the CMX-3 zone of Freehold Township. All sales are located within reasonably similar zones therefore no adjustments were necessary.

Frontage: For this portion of the valuation, Block 6 Lot 30 has 858.5 feet of frontage on the northbound side of Route 9 / the Route 9 – Englishtown Road "on-ramp". Sales were adjusted where necessary based upon their individual frontage.

## SALES COMPARISON APPROACH – BLOCK 6 LOT 30 "BEFORE" LAND VALUE

Access: The subject parcel has above average access with two points of ingress / egress. One along Route 9 and the other via the Englishtown Road / Route 9 "on-ramp". Sales were adjusted where necessary.

Demo/Clearing: Lot 30 is mostly wooded. Sales were adjusted where necessary based upon the demo/clearing needed post sale.

Approvals: Sales 1, 2 & 4 sold with final approvals thus the adjustments. The appraiser was unable to identify the resolution giving final approvals to Sale 3 however property records indicate that zoning influence impacted the sale price thus the minor adjustment.

**LAND SALE COMPARISON APPROACH (ACRES)**

| | TRANSACTION PRICE | ADJUSTMENT TRANSACTIONAL[1] | ADJUSTED | PROPERTY[2] | FINAL | NET ADJ |
|---|---|---|---|---|---|---|
| 1 | $401,591 | 0% | $401,591 | (45%) | $220,875 | (45%) |
| 2 | $283,912 | 0% | $283,912 | (15%) | $241,325 | (15%) |
| 3 | $116,079 | 0% | $116,079 | 10% | $127,687 | 10% |
| 4 | $364,685 | 0% | $364,685 | (10%) | $328,217 | (10%) |
| 5 | $92,466 | 0% | $92,466 | 15% | $106,336 | 15% |
| 6 | $264,085 | 0% | $264,085 | 0% | $264,085 | 0% |
| *HIGH* | *$401,591* | *0%* | *$401,591* | *15%* | *$328,217* | *15%* |
| *AVG* | *$253,803* | *0%* | *$253,803* | *(8%)* | *$214,754* | *(7%)* |
| *MED* | *$273,999* | *0%* | *$273,999* | *(5%)* | *$231,100* | *(5%)* |
| *LOW* | *$92,466* | *0%* | *$92,466* | *(45%)* | *$106,336* | *(45%)* |

After adjustments, the comparables reflect a range in value from $106,336 to $328,217 per acre. The adjusted mean is $214,754 and the adjusted median is $231,100 per acre. The appraisers have considered all closed sales however have given minimal weight to Sales 4 & 5 as they appear to be outliers. The appraisers have concluded that $215,000 per acre is most appropriate and between the range of value. The value via the sales comparison approach is concluded on the next page.

## COMPARABLE SALES ANALYSIS

| BLOCK 6 LOT 30 "BEFORE" ACRES | | CONCLUDED $/ AC | | VALUE |
|---|---|---|---|---|
| 10.5941 | x | $215,000 | = | $2,277,732 |

In order to determine an applicable "as-is" "before" land value of Block 6 Lot 30, we must consider the relevant site improvements contributing value to the land. The items we will consider are the parking lot with 49 lined spaces. Per Marshall & Swift Cost Estimator, the cost of a parking lot ranges from $1,590 to $2,925 per space. Our concluded costs are shown below.

Parking Lot (49 Spaces x $2,500 per space) = $122,500

Total Replacement Cost = $122,500
*Less Estimated Depreciation (25%) = $30,625*

***Estimated Depreciated Cost of Site Improvements = $91,875***

| BLOCK 6 LOT 30 "BEFORE" LAND VALUE | + | BLOCK 6 LOT 30 DEPRECIATED SITE IMPROVEMENT COSTS | | CONCLUDED VALUE |
|---|---|---|---|---|
| $2,277,732 | + | $91,875 | = | $2,369,607 |
| | | **ROUNDED** | = | $2,370,000 |

***CONCLUDED "BEFORE" LAND VALUE OF BLOCK 6 LOT 30***
***VIA SALES COMPARISON APPROACH***

**TWO MILLION THREE HUNDRED SEVENTY THOUSAND DOLLARS**

**$2,370,000**

## SALES COMPARISON APPROACH – BLOCK 6 LOT 30 "AFTER" LAND VALUE

On the pages to follow we will determine an "after" value for the underlying land associated with Block 6 Lot 30. This hypothetical value considers Block 6 Lot 30 without the land area associated with "Hypothetical Sub-Lot 31A". The land area valued in this scenario is 431,928 square feet or 9.9157 acres.




***The area above highlighted in yellow represents the approximate land area considered in the valuation to follow.***

# SALES COMPARISON APPROACH – BLOCK 6 LOT 31 "AFTER" LAND VALUE

| LAND SALES COMPARISON TABLE | | | | | | | |
|---|---|---|---|---|---|---|---|
| | SUBJECT | COMP 1 | COMP 2 | COMP 3 | COMP 4 | COMP 5 | COMP 6 |
| Address | 4151 Route 9 | 2488 Route 9 | Route 9 (B 143 L 23.01) | Route 9 (B13264.11 L 61.11) | 1302-1400 Route 9 | Route 33 (B 63 L 1-3) | 3413-3415 Route 9 |
| City | Freehold | Howell | Freehold | Old Bridge | Howell | Howell | Freehold |
| State | NJ | NJ | NJ | NJ | NJ | NJ | NJ |
| Zip | 07728 | 07731 | 07728 | 08857 | 07731 | 07731 | 07728 |
| County | Monmouth | Monmouth | Monmouth | Middlesex | Monmouth | Monmouth | Monmouth |
| Land AC | 9.9157 | 2.6146 | 12.6800 | 11.6300 | 20.0173 | 7.3000 | 4.2600 |
| Wetlands (AC) | 1.9600 | 0 | 3.9800 | 4.7600 | 2.4200 | 1.8900 | 0.4400 |
| Uplands (AC) | 7.9557 | 2.6146 | 8.7000 | 6.8700 | 17.5973 | 5.4100 | 3.8200 |
| SALE INFORMATION | | | | | | | |
| Transaction Price | | $1,050,000 | $3,600,000 | $1,350,000 | $7,300,000 | $675,000 | $1,125,000 |
| Transaction Price $/Acres | | $401,591 | $283,912 | $116,079 | $364,685 | $92,466 | $264,085 |
| Property Rights [1] | | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Financing [2] | | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller |
| Sale Conditions [3] | | - | - | - | - | - | - |
| Market Conditions [5] | | 7/11/2023 | 9/6/2022 | 5/12/2022 | 8/19/2021 | 8/12/2021 | 10/15/2018 |
| Sale Status | | Recorded | Recorded | Recorded | Recorded | Recorded | Recorded |
| Recording Number | | 9653-1521 | 9616-7456 | 18934-170 | 9537-9583 | 9535-95 | 9317-8531 |
| Total Transactional Adjustments | | $0 0% | $0.00 0% | $0.00 0% | $0.00 0% | $0.00 0% | $0.00 0% |
| **Adjusted $/Acres** | | **$401,591** | **$283,912** | **$116,079** | **$364,685** | **$92,466** | **$264,085** |
| PHYSICAL INFORMATION | | | | | | | |
| Location | Good | Good | Good | Good | Good | Good | Good |
| Acres | 9.9157 | 2.6146 (20%) | 12.6800 5% | 11.6300 | 20.0173 10% | 7.3000 (5%) | 4.2600 (15%) |
| Wetlands (Acres) | 1.9600 | 0 | 3.9800 | 4.7600 | 2.4200 | 1.8900 | 0.4400 |
| % of Wetlands | 20% | 0% (5%) | 31% | 41% 5% | 12% | 26% | 10% |
| Zoning | CMX-3A | HD-1 | HD-1 | OG1 10% | HD-1 | HD-1 | CMX-3 |
| Frontage | 698.7 | 690.9 | 843.3 (5%) | 1142 (10%) | 797 | 282 10% | 552.8 |
| Access | Average | Above Average (5%) | Average | Above Average (5%) | Average | Average | Average |
| Demo/Clearing | Wooded | Wooded | Cleared (10%) | Wooded | Wooded | Wooded | Wooded |
| Approvals | None | Final (Self-Storage) (20%) | Final (Shopping Center) (20%) | Assumed Preliminary (10%) | Affordable Housing (20%) | None | None |
| Total Physical Adjustments | | ($200,795) (50%) | ($85,174) (30%) | ($11,608) (10%) | ($36,468) (10%) | $4,623 5% | ($39,613) (15%) |
| **Adjusted $ / Acre** | | **$200,796** | **$198,738** | **$104,471** | **$328,217** | **$97,089** | **$224,472** |

## SALES COMPARISON APPROACH – BLOCK 6 LOT 31 "AFTER" LAND VALUE

The appraisers conducted research of similar sales within the subject's market area. Due to the lack of recent comparable sales within Freehold Township, it was necessary to expand search parameters to neighboring areas as well as into previous years. The grid on the preceding page analyzes those sales that are considered most applicable for direct comparison to the subject property.

Property Rights: All of the sales are either fee simple or leased fee at market therefore no adjustment was necessary.

Financing: All of the sales used had market rate or conventional financing and required no adjustment for favorable financing.

Conditions of Sale: Each comparable utilized is considered to have been an arm's length transaction. Listings were adjusted for a list to sale price ratio.

Market Conditions: The outbreak has led to considerable uncertainty in commercial real estate. The effects of the pandemic will likely continue having a profound impact on demand, rent growth, and investment trends. All sales with exception to Sale 4 occurred within a similar time period therefore no adjustments were necessary. Sale 6 occurred in October 2018. However, due to the lack of recent comparable land sales within Freehold Township, there was insufficient data to support any adjustment for differences in market conditions.

Location: The subject parcel is situated on the northbound side of Route 9. All sales 5 are also situated on Route 9.

Land Area: For this portion of the valuation, Block 6 Lot 30 has a gross land area of approximately 9.9157 acres. Typically, the adjustment land area is predicated on economies of scale, whereby, a parcel with a greater land area will transfer for a lower unit rate and vice versa, whereby a parcel with a lower land area will sell for a higher unit rate. Each sale was adjusted accordingly.

Wetlands: Block 6 Lot 30 contains 1.96 acres of wetlands per DEP data. Sales were adjusted where necessary based upon their individual percentage of wetlands.

Zoning: The subject is situated within the CMX-3 zone of Freehold Township. All sales are located within reasonably similar zones therefore no adjustments were necessary.

Frontage: For this portion of the valuation, Block 6 Lot 30 has 698.7 feet of frontage on the northbound side of Route 9 / the Route 9 – Englishtown Road "on-ramp". Sales were adjusted where necessary based upon their individual frontage.

## SALES COMPARISON APPROACH – BLOCK 6 LOT 31 "AFTER" LAND VALUE

Access: For this portion of the valuation, Block 6 Lot 30 would only have access via the northbound side of Route 9. Per the provided subdivision sketch, following the subdivision of the site, the access easement will be relinquished. Sales were adjusted where necessary based on their access.

Demo/Clearing: Lot 30 is mostly wooded. Sales were adjusted where necessary based upon the demo/clearing needed post sale.

Approvals: Sales 1, 2 & 4 sold with final approvals thus the adjustments. The appraiser was unable to identify the resolution giving final approvals to Sale 3 however property records indicate that zoning influence impacted the sale price thus the minor adjustment.

### LAND SALE COMPARISON APPROACH (ACRES)

| | TRANSACTION PRICE | ADJUSTMENT TRANSACTIONAL[1] | ADJUSTED | PROPERTY[2] | FINAL | NET ADJ |
|---|---|---|---|---|---|---|
| 1 | $401,591 | 0% | $401,591 | (50%) | $200,796 | (50%) |
| 2 | $283,912 | 0% | $283,912 | (30%) | $198,738 | (30%) |
| 3 | $116,079 | 0% | $116,079 | (10%) | $104,471 | (10%) |
| 4 | $364,685 | 0% | $364,685 | (15%) | $309,982 | (15%) |
| 5 | $92,466 | 0% | $92,466 | 5% | $97,089 | 5% |
| 6 | $264,085 | 0% | $264,085 | (15%) | $224,472 | (15%) |
| *HIGH* | *$401,591* | *0%* | *$401,591* | *5%* | *$309,982* | *5%* |
| *AVG* | *$253,803* | *0%* | *$253,803* | *(19%)* | *$189,258* | *(19%)* |
| *MED* | *$273,999* | *0%* | *$273,999* | *(15%)* | *$199,767* | *(15%)* |
| *LOW* | *$92,466* | *0%* | *$92,466* | *(50%)* | *$97,089* | *(50%)* |

After adjustments, the comparables reflect a range in value from $97,089 to $309,982 per acre. The adjusted mean is $189,258 and the adjusted median is $199,767 per acre. The appraisers have considered all closed sales however have given minimal weight to Sales 4 & 5 as they appear to be outliers. The appraisers have concluded that $200,000 per acre is most appropriate and between the range of value. The value via the sales comparison approach is concluded on the next page

## SALES COMPARISON APPROACH – BLOCK 6 LOT 31 "AFTER" LAND VALUE

| BLOCK 6 LOT 30 "AFTER" ACRES | | CONCLUDED $/ AC | | VALUE |
|---|---|---|---|---|
| 9.9157 | x | $200,000 | = | $1,983,140 |
| | | **ROUNDED** | = | $1,985,000 |

***CONCLUDED "AFTER" LAND VALUE OF BLOCK 6 LOT 30***
***VIA SALES COMPARISON APPROACH***

**ONE MILLION NINE HUNDRED EIGHTY-FIVE THOUSAND DOLLARS**

**$1,985,000**

## HYPOTHETICAL SUB-LOT 30A VALUE CONCLUSION

We will determine an applicable value of "Hypothetical Sub-Lot 310". We will utilize a valuation technique that is similar to that known as a "diminution in value". Whereby the value of the "hypothetical sub-lot" will be the difference in value between the "before" and "after" land values.




***The area above highlighted in yellow represents the approximate land area considered in the valuation to follow.***

## HYPOTHETICAL SUB-LOT 30A VALUE CONCLUSION

We will determine an applicable value of “Hypothetical Sub-Lot 30A”. We will utilize a valuation technique that is similar to that known as a “diminution in value”. Whereby the value of the “hypothetical sub-lot” will be the difference in value between the “before” and “after” land values.

| “Before” Value | - | “After” Value | = | Value of “Hypothetical Sub-Lot” |
|---|---|---|---|---|
| “As-is” Land Value of Block 6 Lot 30<br><br>(461,480 SF or 10.5941 AC) | - | Land Value of Block 6 Lot 30 MINUS area of “hypothetical sub-lot”<br><br>(431,928 SF or 9.9157 AC) | = | Value of “Hypothetical Sub-Lot” Identified herein as “Lot 30A”<br><br>(29,552 SF or 0.6784 AC) |

As such, we have concluded the following:

| “Before” Value Block 6 Lot 30 | - | “After” Value Block 6 Lot 30 | = | Value of “Hypothetical Sub-Lot 31A” |
|---|---|---|---|---|
| $2,370,000 | - | $1,985,000 | = | $385,000 |

***CONCLUDED VALUE***
***OF “HYPOTHETICAL SUB-LOT 30A”***

**THREE HUNDRED EIGHTY-FIVE THOUSAND DOLLARS**

**$385,000**

## RECONCILIATION AND FINAL VALUE ESTIMATE

The Sales Comparison Approach was used to value the subject parcels. We have utilized each approach in a way similar to how a potential purchaser would look at the property, and consider what price should be paid. Each approach applied provided the following value conclusions of the subject's leased fee interest as of July 5, 2023:

| SALES COMPARISON APPROACH (BLOCK 6 LOT 31) | |
|---|---|
| **BLOCK 6 LOT 31 – "AS-IS" / "BEFORE" LAND VALUE** | **$880,000** |
| **BLOCK 6 LOT 31 – HYPOTHETICAL "AFTER" LAND VALUE** | **$750,000** |
| **INDICATED VALUE OF HYPOTHETICAL SUB-LOT 31A** | **$130,000** |

| SALES COMPARISON APPROACH (BLOCK 6 LOT 30) | |
|---|---|
| **BLOCK 6 LOT 30 – "AS-IS" / "BEFORE" LAND VALUE** | **$2,370,000** |
| **BLOCK 6 LOT 30 – HYPOTHETICAL "AFTER" LAND VALUE** | **$1,985,000** |
| **INDICATED VALUE OF HYPOTHETICAL SUB-LOT 30A** | **$385,000** |

**SALES COMPARISON APPROACH** - The Sales Comparison Approach was concluded by means of a comparison of similar sales within the subject's general area. In the subject property's case, the data gathered consisted of six comparables from which to draw a conclusion. An analysis of each sale was conducted, comparing each one to the subject property. Each sale was adjusted for noted differences and an adjusted unit price per square foot was concluded. It is worth noting that the appraiser would typically make adjustments to the comparables within the Sales Comparison Approach given the below market terms of the current tenant's lease however the appraiser was not privy to the lease terms of the comparables as such information is not publicly available. Market participants for this property type consider valuation by comparison a useful method. In the case of the subject, the Sales Comparison Approach is considered to be the only reliable indictor of value.

Based on our analysis contained in this report, we are of the following opinions:

| VALUE CONCLUSION(S) | | | | |
|---|---|---|---|---|
| **"Before" Land Value Block 6 Lot 31** | - | **"After" Land Value Block 6 Lot 31** | = | **Value of "Hypothetical Sub-Lot 31A"** |
| $880,000 | - | $750,000 | = | **$130,000** |

| VALUE CONCLUSION(S) | | | | |
|---|---|---|---|---|
| **"Before" Land Value Block 6 Lot 30** | - | **"After" Land Value Block 6 Lot 30** | = | **Value of "Hypothetical Sub-Lot 30A"** |
| $2,370,000 | - | $1,985,000 | = | **$385,000** |

## ESTIMATED EXPOSURE TIME

The requirements and guidelines, of the Uniform Standards of Professional Appraisal Practice (USPAP), Federal National Mortgage Association (Fannie Mae), Federal Deposit Insurance Corporation (FDIC), Veterans Administration (VA) and the Farm Home Administration (FHA) require the appraiser to estimate a reasonable exposure period for the subject property.

Exposure Time (or Exposure Period) is defined as follows:

"An opinion, based on supporting market data, of the length of time that property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal."

Comment: Exposure time is a retrospective opinion based on an analysis of past events assuming a competitive and open market.

*Source: USPAP 2020/2021 Edition @ The Appraisal Foundation*

The appraisers have not estimated exposure time as parcels similar to the hypothetical sub-lots are not exposed to the open market.

## ESTIMATED MARKETING PERIOD

The requirements and guidelines, of the Uniform Standards of Professional Appraisal Practice (USPAP), Federal National Mortgage Association (Fannie Mae), Federal Deposit Insurance Corporation (FDIC), Veterans Administration (VA) and the Farm Home Administration (FHA) require the appraiser to estimate a reasonable marketing period for the subject property.
Marketing Time (or Marketing Period) is defined as follows:

1. The time it takes an interest in real property to sell on the open market subsequent to the date of an appraisal.

2. Reasonable marketing time is an estimate of the amount of time it might take to sell an interest in real property at its estimated market value during the period immediately after the effective date of the appraisal; the anticipated time required to expose the property to a pool of prospective purchasers and to allow appropriate time for negotiation, the exercise of due diligence, and the consummation of a sale at a price supportable by current market conditions.

Marketing time differs from exposure time, which is always presumed to precede the effective date of the appraisal. (Advisory Opinion G-7 of the Appraisal Standards Board of the Appraisal Foundation and Statement on Appraisal Standards No. 6, "Reasonable Exposure Time in Market Value Estimates" address the determination of reasonable exposure and marketing time.)

Market value estimates imply that an adequate marketing effort and reasonable time for exposure occurred prior to the effective date of the appraisal. In the case of disposition value, the time frame allowed for marketing the property rights is somewhat limited, but the marketing effort is orderly and adequate. With liquidation value, the time frame for marketing the property rights is so severely limited that an adequate marketing program cannot be implemented. (*Source*: *The Dictionary of Real Estate Appraisal, Seventh Edition, Appraisal Institute, 2022*)

The appraisers have not estimated marketing time as parcels similar to the hypothetical sub-lots are not exposed to the open market.

## EXTRAORDINARY ASSUMPTIONS & HYPOTHETICAL CONDITIONS

**Extraordinary Assumptions:**

An extraordinary assumption is defined by the USPAP (2020/2021 Edition, The Appraisal Foundation) "an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions"

Comment: Uncertain information might include physical, legal, or economic characteristics of the subject property; or conditions external to the property, such as market conditions or trends; or the integrity of data used in an analysis

**This appraisal employs the following extraordinary assumptions (s):**

| EXTRAORDINARY ASSUMPTIONS | |
|---|---|
| **Extraordinary Assumption 1** | *As shown within the sale history & tax assessment sections of this appraisal, Block 6 Lot 31 sold in October 2021 for $350,000. The parcel was never exposed to the open market prior to the sale. The sale price was significantly below the 2021 assessed value however the current assessment has been lowered to be in-line with the sale price. The appraiser was not able to communicate with any parties involved with the sale nor the Freehold Township Tax Assessor. The appraiser was only able to utilize information that is publicly available or provided regarding this parcel. Information available to the appraiser does not indicate there are any significant limitations or issues with the parcel that would dramatically impact value or development potential of the site. As such, this appraisal is premised on the extraordinary assumption that Block 6 Lot 30 is not impacted by any significant limitations or detrimental environmental issues that could impact the parcel's value or marketability. If future information proves to the contrary, this could significantly impact the opinions and conclusions herein whereby the appraiser reserves the right to alter this appraisal if deemed appropriate and necessary. The appraiser highly recommends that the client and/or the client's legal representatives interview the owner of Block 6 Lot 30 and/or the Freehold Township Tax Assessor to determine if any such issues exists.* |

## EXTRAORDINARY ASSUMPTIONS & HYPOTHETICAL CONDITIONS

### Hypothetical Conditions:

A hypothetical condition is defined by the USPAP (2020/2021 Edition, The Appraisal Foundation) "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results but is used for the purpose of analysis."

Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis.

**This appraisal employs the following hypothetical condition(s):**

| HYPOTHETICAL CONDITIONS | |
|---|---|
| **Hypothetical Condition 1** | *As noted throughout this appraisal report, the appraiser has been requested to value partial interests of Block 6 Lot 30 & Block 6 Lot 31. These partial interests / portions of the parcels were identified by a hand drawn "Subdivision Sketch" prepared by James E. Henry of Dynamic Engineering Consultants PC on August 1, 2023. The legal description identifying the exact dimensions of the "hypothetical sub-lots" are unknown as the appraiser was only provided a conceptual sketch. The values of such hypothetical sub-lots are premised on the hypothetical condition that "hypothetical sub-lot 31A" is the 21,791 square foot piece of land as identified in "red" within the provided "subdivision sketch" and that "hypothetical sub-lot 30A" is the 29,552 square feet piece of land as identified in "purple" within the provided "subdivision sketch". The appraiser has only utilized the information indicated within the "Subdivision Sketch" and any deviation from such is not intended and should not be implied.* |
| **Hypothetical Condition 2** | *In order to determine an "after" value of both Block 6 Lot 31 and Block 6 Lot 30 whereby the parcels are valued following the hypothetical subdivision of the hypothetical sub-lots, we must rely on the information within the provided "Subdivision Sketch". Considering such, the "after" values of both Lot 30 & 31 are premised on the hypothetical condition that Block 6 Lot 31 has been subdivided and the site area of this lot following the subdivision is 60,852 square feet or 1.3970 acres and the site area of Block 6 Lot 30 following the hypothetical subdivision is 431,928 square feet or 9.9157 acres. The appraiser has only utilized the information indicated within the "Subdivision Sketch" and any deviation from such is not intended and should not be implied.* |

*Source: USPAP 2020-2021 Edition @ The Appraisal Foundation*

## CERTIFICATION

Michael R. Pallitto, SCGREA certify to the best of their knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial and unbiased professional analyses, opinions, and conclusions.

3. We have no present or prospective interest in or bias with respect to the property that is the subject of this report, and I (we) have no personal interest in or bias with respect to the parties involved with this assignment.

4. I/We have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within a three year period immediately preceding acceptance of this assignment.

5. Our engagement in this assignment was not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the use of this appraisal.

6. Our compensation for the preparation of this report is not in any way contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, or minimum valuation, the attainment of a stipulated result, the approval of a loan, or the occurrence of a subsequent event.

7. Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice of The Appraisal Foundation and the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

8. Michael R. Pallitto, SCGREA has made a personal inspection of the property that is the subject of this report.

9. Michael Cefalu, Associate, provided significant professional assistance to the undersigned in the preparation of the analyses, conclusions and opinions concerning real estate that are set forth in this appraisal report.

10. We comply with the Competency Provision in USPAP as adopted in FIRREA 1989 and have sufficient education and experience to perform the appraisal of the subject property.

11. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

**CERTIFICATION (continued)**

12. As of the date of this report, Michael R. Pallitto, SCGREA has completed the requirements of continuing education, and is currently state Certified General Real Estate Appraisers in the state in which the subject of this report is located.

Michael R. Pallitto, SCGREA
*NJ Certified General Real Estate Appraiser*
*Certification No.* 42RG00253700

## ASSUMPTIONS & DISCLOSURES

An assumption is that which is taken to be true and these are generally basic in nature. This appraisal has the following assumptions and disclosures.

 Details of the site including yet not limited to dimensions, shape, nearby uses, etc. are reported based on personal observation and/or measurement and/or reliance on tax maps or surveys. All are assumed reasonably correct.

 Details of the improvements thereon (if applicable) including yet not limited to floor plans, construction materials, dimensions, etc. are reported based on personal observation and/or measurement and/or reliance upon provided plans, dimensions or sizes provided. All are assumed reasonably correct.

 Our inspection of the subject property was limited to what was readily observable. Unseen spaces are assumed to have physical condition similar to that in observed spaces. It is further assumed the subject has no hidden defects. No probes or attempts to remove materials to discover unapparent defects were made by the appraiser(s).

 Real estate tax information for the subject was obtained from a source deemed reliable. Any historical income and expense information (if applicable) provided and contained in this report was provided by sources deemed reliable and is assumed reasonably correct. All information from any credible source is assumed reasonably correct. Moreover, this information is assumed the most recent that is expeditiously available to the public.

 If a public water system and public sewer main are connected to the subject structure, or available near the subject's lot lines, this appraisal assumes these systems possess sufficient capacity to adequately serve the intended use of the subject improvements, if any. This appraisal also assumes such water is potable and non-contaminated. If these systems are inadequate to properly serve the subject's intended use, then the subject's value and marketability would be adversely affected.

 This report assumes the subject property has clear title. If a value-impairment is identified or suggested in a title policy, another professional report, or some other document, this appraisal does not address issues that are significantly atypical for a valuation of this type property unless specifically identified in the Scope of Work or any other section of this report.
These assumptions are integral premises upon which the conclusion(s) in this report are based. If any of these assumptions are later found to be materially inaccurate, then this report's conclusion(s) may or may not be credible.

## CONTINGENT & LIMITING CONDITIONS

1. By this notice, all persons and firms using or relying on this report in any manner bind themselves to accept these contingent and limiting conditions, and all other contingent and limiting conditions contained elsewhere in this report. **Do not use any portion of this report unless you fully accept all contingent and limiting conditions contained throughout this document**.

2. Throughout this report, the singular term "Appraiser" also refers to the plural term "Appraisers”. The terms "Appraiser" and “Appraisers” refer collectively to "Stuart Appraisal Company", its officers, employees, contractors, and associate appraisers. The masculine terms "he" or "his" also refer to the feminine term "she" or "her”.

3. These conditions are an integral part of this appraisal report, and are a preface to any certification, definition, description, fact, or analysis. Moreover, these conditions are intended to establish as a matter of record that the intended use of this report is to provide one or more value opinions for the subject property. All value opinions are prepared solely for the explicitly identified client and explicitly identified, other intended users.

4. Any value opinion herein is based a gathering of market information, and an analysis of the gathered information for the effective value date. The effective value date is the only point in time that the value applies. Information about the subject property, neighborhood, comparables, or other topics discussed in this report was obtained from sensible sources. In accordance with the extent of research disclosed in the Scope of Work section, all information cited herein was examined for accuracy, is believed to be reliable, and is assumed reasonably accurate. However, no guaranties or warranties are made for this information. No liability or responsibility is assumed for any inaccuracy which is outside the control of the Appraiser, beyond the scope of work, or outside reasonable due diligence of the Appraiser.

5. Real estate values are affected by many changing factors. Therefore, any value opinion herein is considered credible only on the effective value date. Every day that passes thereafter, the degree of credibility wanes as the subject changes physically, the economy changes, or market conditions change. The Appraisers reserve the right to amend these analyses and/or the value conclusion(s) contained within this appraisal report if erroneous, or more factual-information is subsequently discovered wherein an additional charge would be applied for review of any new facts. No guarantee is made for the accuracy of estimates or opinions furnished by others and replied upon in this report.

6. This appraisal is not an engineering, construction, legal, or architectural study. It is not an examination or survey of any kind. Expertise in these areas is not implied. The Appraisers are in no way responsible for any costs incurred to discover, or correct any deficiency in the property. In the case of limited partnerships, syndication offerings, or stock offerings in the real estate, the client agrees that in case of lawsuit (brought by the lender, partner, or part owner in any form of ownership, tenant, or any other party), the client will hold Stuart Appraisal Company, its officers, contractors, employees and associate appraisers completely harmless. Acceptance of, and/or use of this report by the client, or any third party is prima facie evidence that the user understands, and agrees to all these conditions.

**Contingent and Limiting Conditions**

7. Unless specifically stated herein, the appraisers are unaware of any engineering study made to determine the bearing capacity of the subject land, or nearby lands. Improvements in the vicinity, if any, appear to be structurally sound. It is assumed soil and subsoil conditions are stable and free from features, which would cause supernormal costs to arise. It is also assumed existing soil conditions of the subject land have proper load bearing qualities to support the existing improvements, or proposed improvements appropriate for the site. No investigations for potential seismic hazards were made. This appraisal assumes there are no conditions of the site, subsoil, or structures, whether latent, patent, or concealed that would render the subject property less valuable. Unless specifically stated otherwise in this document, no earthquake compliance report, engineering report, flood zone analysis, hazardous waste, or asbestos analysis was made, or ordered in conjunction with this appraisal report. The client is strongly urged to retain experts in these fields, if so desired.

8. For appraisals of multifamily property, only a portion of all dwellings was observed. A typical ratio of observed dwellings roughly approximates a minimum of 10% of the total number of units, and this ratio declines as the number of dwellings grows. It is assumed, in reaching a value opinion, that the functionality, condition, and finish of the remaining units are similar to the functionality, condition, and finish of the observed units. If unobserved dwellings significantly differ from those that were viewed in functionality, condition, or finish, the Appraisers reserve the right to amend theses analysis and/or value opinion(s).

9. This valuation may or may not include an observation of the property appraised by one or more signatories to this report. The extent of any observation is disclosed in the Scope of Work section of this report. Any observation by a signatory is not, and should not be misconstrued as a professional property inspection. Comments or descriptions about physical condition of the improvements, if any, are based solely on a superficial visual observation. Electric, heating, cooling, plumbing, water supply, sewer or septic, mechanical equipment, and other systems were not tested. No determinations were made regarding the operability, capacity, or remaining physical life of any component in, on, or under the real estate appraised. All building components are assumed adequate and in good working order unless stated otherwise. Private water wells and private septic systems are assumed sufficient to comply with federal, state, or local health safety standards. No liability is assumed for the soundness of structural members since structural elements were not tested or studied to determine their structural integrity. The roof cover for all structures is assumed water tight unless otherwise noted. Comments regarding physical condition are included to familiarize the reader with the property. This document is not an engineering or architectural report. If the client has any concern regarding structural, mechanical or protective components of the improvements, or the adequacy or quality of sewer, water or other utilities, it is suggested experts in these disciplines be retained before relying upon this report. No representations are made herein as to these matters unless explicitly stated otherwise in this report.

**Contingent and Limiting Conditions**

10. No liability is assumed for matters of legal nature that affect the value of the subject property. Unless a clear statement to the contrary is made in this report, value opinion(s) herein are predicated upon the following assumptions. (A) The real property is appraised as though, and assumed free from all value impairments including yet not limited to judgements defects, liens, encumbrances, title claims, boundary discrepancies, encroachments, adverse easements, environmental hazards, pest infestation, leases, and atypical physical deficiencies. (B) All real estate taxes and assessments, of any type, are assumed fully paid. (C) The property being appraised is assumed to be owned under responsible and lawful ownership. (D) It is assumed the subject property is operated under competent and informed management. (E) The subject property was appraised as though, and assumed free of indebtedness. (F) The subject real estate is assumed fully compliant with all applicable federal, state, and local environmental regulations and laws. (G) The subject is assumed fully compliant with all applicable zoning ordinances, building codes, use regulations, and restrictions of all types. (H) All licenses, consents, permits, or other documentation required by any relevant legislative or governmental authority, private entity, or organization have been obtained, or can be easily renewed for a nominal fee.

11. If this appraisal values an interest that is less than the whole leased fee interest, then the following disclosure applies. The value for the fractional interest appraised plus the value of all other complementary fractional interests may or may not equal the value of the entire leased fee interest.

12. An appraised property that is a physical portion of a larger parcel or tract is subject to the following limitations. The value opinion for the property appraised pertains only to that portion defined as the subject. This value opinion should not be construed as applying with equal validity to other complementary portions of the same parcel or tract. The value opinion for the physical portion appraised plus the value of all other complementary physical portions may or may not equal the value of the whole parcel or tract.

13. The allocation of value between the subject's land and improvements, if any, represents our judgment only under the existing use of the property. A re-evaluation should be made if the improvements are removed, substantially altered, or the land is utilized for another purpose.

14. The Appraisers assume a prospective purchaser (if applicable) of the subject is aware of the following. (A) This appraisal of the subject property does not serve as a warranty on the condition of the property. (B) It is the responsibility of the purchaser to carefully examine the property, and to take all necessary precautions before signing a purchase contract. (C) Any estimate for repairs is a non-warranted opinion of the appraiser.

15. If this appraisal values the subject as though construction, repairs, alterations, remodeling, renovation, or rehabilitation will be completed in the future, it is assumed such work will be completed in a timely fashion, using non-defective materials, and proper workmanship. All previously completed work is assumed to substantially conform to plans, specifications, descriptions, or attachments made or referred to herein. It is also assumed all planned, in-progress, or recently completed construction complies with the zoning ordinance, and all applicable building codes. In a prospective valuation, it is understood and agreed the Appraiser is not responsible for the impact on value, caused by unforeseeable events, before completion of the project.

**Contingent and Limiting Conditions**

16. Any exhibits in the report are intended to assist the reader in visualizing the subject property and its surroundings. The drawings are not surveys unless specifically identified as such. No responsibility is assumed for cartographic accuracy. Drawings are not intended to be exact in size, scale, or detail.

17. Value opinions involve only real estate, and inconsequential personal property. Value conclusions do not include personal property, unaffixed equipment, trade fixtures, business good will, chattel, or franchise items of material worth unless explicitly stated otherwise.

18. Conversion of the subject's income into a market value opinion is based upon typical financing terms that were readily available from a disinterested, third party lender on this report's effective date. Atypical financing terms and conditions do not influence market value, but may affect investment value.

19. All information and comments concerning the location, neighborhood, trends, construction quality, construction costs, value loss, physical condition, rents or other data for the subject represent estimates and opinions of the Appraisers. Expenses shown in the Income Approach, if used, are estimates only. They are based on past operating history, if available, and are stabilized as generally typical over a reasonable period.

20. Stuart Appraisal Company and the appraisers have no expertise in the field of insect, termite, or pest infestation. We are **not** qualified to detect the presence of these or any other unfavorable infestation. The appraisers have no knowledge of the existence of any infestation on, under, above, or within the subject real estate. No overt evidence of infestation is apparent to the untrained eye. However, we have not specifically inspected or tested the subject property to determine the presence of any infestation. No effort was made to dismantle or probe the structure. No effort was exerted to observe enclosed, encased, or otherwise concealed evidence of infestation. The presence of any infestation would likely diminish the property's value. All value opinions in this communication assume there is no infestation of any type affecting the subject real estate. No responsibility is assumed by the appraisers or Stuart Appraisal Company for any infestation or for any expertise required to discover any infestation. Our client is urged to retain an expert in this field, if desired.

21. Effective January 26, 1992, the Americans with Disabilities Act (ADA) - a national law, affects all nonresidential real estate or the portion of any property, which is non-residential. The appraisers have not observed the subject property to determine whether the subject conforms to the requirements of the ADA. It is possible a compliance survey, together with a detailed analysis of ADA requirements, could reveal the subject is not fully compliant. If such a determination was made, the subject's value may or may not be adversely affected. Since the appraisers have no direct evidence, or knowledge pertaining to the subject's compliance or lack of compliance, this appraisal does **not** consider possible noncompliance or its effect on the subject's value.

**Contingent and Limiting Conditions**

22. The appraiser is not required to give testimony or appear in court because of having prepared this report unless arrangements have been previously made. If the appraiser is subpoenaed pursuant to court order, the client agrees to compensate the Appraisers for their court appearance time, court preparation time, and travel time at their regular hourly rate, then in effect, plus expenses. In the event the real property appraised is, or becomes the subject of litigation, a condemnation, or other legal proceeding, it is assumed the Appraisers will be given reasonable advanced notice, and reasonable additional time for court preparation.

23. All opinions are those of the signatory appraisers based on the information in this report. We assume no responsibility for changes in market conditions, or for the inability of the client, or any other party to achieve their desired results based upon the appraised value. Some of the assumptions or projections made herein can vary depending upon evolving events. We realize some assumptions may never occur and unexpected events or circumstances may occur. Therefore, actual results achieved during the projection period may vary from those set forth in this report. Compensation for appraisal services is dependent solely on the delivery of this report, and no other event or occurrence.

24. If at the Client's request, we have provided an insurable value estimate. The estimate is based on figures derived from a national cost estimating service i.e. Marshall and Swift and is developed consistent with industry practices. However, actual local and regional construction costs may vary significantly from our estimate and individual insurance policies and underwriters have varied specifications, exclusions, and non-insurable items. As such, we strongly recommend that the Client obtain estimates from professionals experienced in establishing insurance coverage for replacing any structure. This analysis should not be relied upon to determine insurance coverage. Furthermore, we make no warranties regarding the accuracy of this estimate.

25. By use of this Appraisal Report, each party that uses this Appraisal Report agrees to be bound by all of the Contingent and Limiting Conditions, Hypothetical Conditions and Extraordinary Assumptions stated herein.

26. This appraisal is made with the understanding that the subject can obtain a negative declaration from the Department of Environmental Protection following the regulations and requirements of the Environmental Cleanup Responsibility Act of 1983 (ECRA), as amended. This act requires as a pre-condition of any cessation of operation or the transfer of real property, which used or stored regulated hazardous substances, the testing, cleanup and disposal of any such material. The appraisers are not qualified to determine the existence of any such hazardous material and therefore, have expressed a value of the subject property as if free and clear of any such substances.

27. In conjunction with the preceding paragraph, the appraisers have not been apprised of, nor are they qualified to ascertain, the existence of Radon, a radioactive gas which occurs naturally in the soil of certain identified areas. This gas, in concentrated form has been shown detrimental and its existence would create a negative impact on value. As in the above instance, the value estimate assumes the subject is free and clear of Radon gas.

**Contingent and Limiting Conditions**

28. It is assumed that the property conforms to all applicable zoning and use regulations and restrictions unless nonconformity has been identified, described and considered in the appraisal report.

29. The value found herein is subject to these and to any other assumptions, contingencies or conditions set forth in the body of this report but which may have been omitted from these Contingent and Limiting Conditions.

30. This is an appraisal report which is intended to comply with the reporting requirements set forth under Standards Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice. The appraisal conforms to the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA). FIRREA requires that real estate appraisals used in conjunction with federally-related transactions be performed in accordance with USPAP. The depth of discussion contained in this report is specific to the needs of the client and for the intended use stated. The appraiser is not responsible for unauthorized use of this report.

31. No part of this report shall be published or disseminated to the public by the use of advertising media, public relations media, news media, sales media, electronic devices, or other media without the prior written consent of Stuart Appraisal Company. This restriction applies particularly as to analyses, opinions, and conclusions; the identity of the Appraisers; and any reference to the Appraisal Institute or its MAI, SRPA, or SRA designations. Furthermore, no part of this report may be reproduced or incorporated into any information retrieval system without written permission from Stuart Appraisal Company, the copyright holder.

# ADDENDA

Stuart Appraisal COMPANY

**Client:** Mr. George Sarris c/o
Sarris Family, LLC
47 Rachael Drive
Morganville, NJ 07751

**Re:** 4135 Route 9
Freehold, NJ 07728
Monmouth County
Block 6 Lot 31 &
Hypothetical Sublots

Dear Mr. Sarris,

Enclosed you will find our Appraisal Services Agreement, Addenda and attached Terms and Conditions collectively referred to herein as the "Agreement". Specific information about the property to be valued is identified below and on subsequent pages. Acceptance of this "Agreement" by the Client and Stuart Appraisal Company indicates understanding and approval of the terms set forth herein.

If you have questions, please don't hesitate to contact our office.

Thank you for allowing Stuart Appraisal Company the opportunity to be of service to you.

Sincerely,

**Michael R. Pallitto, SCGREA** | **President & Chief Appraiser**
**Stuart Appraisal Company LLC**
*42 E. Main Street, Suite 202, Freehold NJ 07728*
*(P) 732-409-6080 | (F) 732-409-0538*
*(E) appraisals@stuartappraisalco.com*
*(W) www.stuartappraisalco.com*

*Agreement Sent To:* george.k.sarris@gmail.com

GKS

Stuart Appraisal Company

### Appraisal Services Agreement

**Re:** 4135 Route 9
Freehold, NJ 07728
Monmouth County
Block 6 Lot 31 &
Hypothetical Sublots

## 1. Appraisal Specifications

| | |
|---|---|
| **Subject Property:** | 4135 Route 9, Freehold (Block 6 Lot 31)<br>Hypothetical Rear Portion of Lot 31 - 23,258 sf of land<br>Hypothetical Side Portion of Block 6 Lot 30 - 43,438 sf of land |
| **Interest to be Valued:** | Fee Simple or Leased Fee |
| **Type of Value:** | "As-Is" Market Value |
| **Date of Value:** | Current (Effective Date is Date of Site Visit) |
| **Report Format:** | Narrative |
| **Anticipated Delivery Date:** | Four (4) weeks from date of appraisal inspection |
| **Delivery of Reports:** | One (1) Electronic PDF copy will be sent via email.<br>Up to two (2) hard copies can be provided upon request only. |
| **Appraisal Fee:** | Four Thousand Five Hundred Dollars ($4,500) |
| **Payment Terms:** | At Appraisal Site Visit or Upon Acceptance of this Agreement |

**Please be aware that Stuart Appraisal Company will not release the contents, conclusions and/or report itself until payment has been received in full or as otherwise agreed upon and stated herein.**

GKS
GKS

42 E MAIN STREET, SUITE 202, FREEHOLD NJ 07728 PHONE: 732-409-6080 APPRAISALS@STUARTAPPRAISALCO.COM WWW. STUARTAPPRAISALCO.COM

Stuart Appraisal COMPANY

## APPRAISAL SERVICES AGREEMENT

**Re:** 4135 Route 9
Freehold, NJ 07728
Monmouth County
Block 6 Lot 31 &
Hypothetical Sublots

### 2. SCOPE OF WORK SPECIFICATIONS

**A. Extent of Appraiser Site Visit:** Interior & Exterior

**B. Intended Use(s):** Assist with Internal Business Decision Regarding Possible Land Swap / Purchase

**This appraisal is not intended for nor should be utilized for any purposes other than the intended use(s) described herein. The client's acceptance of this Agreement indemnifies the appraiser(s) and firm from any legal or civil disputes that may arise due to the unauthorized use or user of the appraisal report. Please be advised that no changes can be made to the Intended Use(s) above subsequent to the Acceptance of this Agreement.**

**C. Intended User(s):** Mr. George Sarris c/o Sarris Family, LLC

**This appraisal is not authorized or intended to be nor should be utilized by anyone other than the intended user(s) identified herein. The client's acceptance of this Agreement indemnifies the appraiser(s) and firm from any legal or civil disputes that may arise due to the unauthorized use or user of the appraisal report. Please be advised that no changes can be made to the Intended Use(s) above subsequent to the Acceptance of this Agreement.**

**D. Valuation Approach:** Appraiser will provide the Appraisal in accordance with Uniform Standards of Professional Appraisal (USPAP), The Code of Professional Ethics of the Appraisal Institute, Standards of Professional Appraisal Practice of the Appraisal Institute, and State Licensing Laws. Appraiser will research relevant market data and perform analysis to the extent necessary to produce credible appraisal results. Potential approaches to value include the Cost Approach, Sales Comparison Approach and/or the Income Approach. Appraiser(s) shall use the approaches necessary to develop a credible opinion of value. Approach applicability and utilization or lack thereof is determined solely by the appraiser(s). A detailed scope of work will be included in the Appraisal. A copy of the Assumptions and Limiting Conditions, which appear in the Appraisal, is available upon request.

**E. Prior Services Disclosure (USPAP Requirement):** I/ Stuart Appraisal Company has NOT performed services as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three year period immediately preceding acceptance of this assignment.

GKS
GKS

42 E MAIN STREET, SUITE 202, FREEHOLD NJ 07728 PHONE: 732-409-6080 APPRAISALS@STUARTAPPRAISALCO.COM WWW. STUARTAPPRAISALCO.COM

Stuart Appraisal Company

## Appraisal Services Agreement

**Re:** 4135 Route 9
Freehold, NJ 07728
Monmouth County
Block 6 Lot 31 &
Hypothetical Sublots

### 3. Additional Provisions

F. **Testimony in Court or Other Proceedings:** Unless otherwise stated in this Agreement, Client agrees that Appraiser's engagement pursuant to this Agreement does not include Appraiser's participation in or preparation for, whether voluntarily or pursuant to subpoena, any oral or written discovery; sworn testimony in a judicial, arbitration or administrative proceeding; or attendance at any judicial, arbitration or administrative proceeding relating to this assignment.

G. **Withdrawal of Appraiser prior to Completion of Assignment**: Appraiser may withdraw without penalty or liability from the assignment(s) contemplated under this Agreement before completion or reporting of the appraisal in the event that Appraiser determines, at Appraiser's sole discretion, that incomplete information was provided to Appraiser prior to the engagement, that Client or other parties have not or cannot provide Appraiser with documentation or information necessary to Appraiser's analysis or reporting, that conditions of the subject property render the original scope of work inappropriate, that Appraiser becomes aware that he or she lacks the competency needed for the assignment within the meaning of applicable professional standards, that a conflict of interest has arisen, or that Client has not complied with its payment obligations under this Agreement.

H. **Cancellation of Assignment by Client**: Client may cancel this Agreement at any time without charge prior to Appraiser's site visit. Client may cancel this Agreement subsequent to the Appraiser's site visit however Client agrees to pay $150 Site Visit Fee as well as compensate the Appraiser for any work that may have been completed on the assignment prior to Appraiser's receipt of written cancellation notice, unless otherwise agreed upon by Appraiser and Client in writing.

I. **When Appraiser's Obligations Are Complete**: Appraiser's obligations under this Agreement are complete when the appraisal report specified above has been delivered to Client. Appraiser agrees to be reasonably responsive to Client's legitimate inquiries regarding the contents of the report after delivery.

J. **Expiration:** This Appraisal Service Agreement becomes null and void if it has not been signed by both the Firm (*Stuart Appraisal Company*) and the Client within the **Fourteen (14) Days** following the date shown on the first page. Acceptance subsequent to the period noted above will require a new Appraisal Services Agreement or written authorization by Stuart Appraisal Company agreeing to honor the terms of the original Agreement.

K. **Property Documentation and Information:** Client agrees to provide Appraiser with the documentation required and requested by the Appraiser to complete the appraisal. Shown within this Agreement as "Addendum A" is a list information / documentation that may be necessary for an accurate and compliant valuation. Delays in Appraiser's receipt of documentation may result in Appraiser being unable to deliver the appraisal report on the delivery date stated herein.

GKS
GKS

42 E MAIN STREET, SUITE 202, FREEHOLD NJ 07728 PHONE: 732-409-6080 APPRAISALS@STUARTAPPRAISALCO.COM WWW. STUARTAPPRAISALCO.COM

Stuart Appraisal COMPANY

## APPRAISAL SERVICES AGREEMENT

**Re:** 4135 Route 9
Freehold, NJ 07728
Monmouth County
Block 6 Lot 31 &
Hypothetical Sublots

If the terms of this Agreement are agreeable to you, please sign below to show your authorization to proceed.

Thank you for the opportunity to assist you, we look forward to being of service to you. Please do not hesitate to contact our office with any questions or concerns.

**Sincerely,**

George Sarris
**Client or Authorized Person(s) Printed Name**

**For the Firm**
**Michael R. Pallitto, SCGREA**
**President & Chief Appraiser**

George Sarris
George Sarris (Jun 28, 2023 14:34 EDT)
Jun 28, 2023
**Client or Authorized Person(s) Signature** **Date**

**Preferred Method of Payment:**

- [x] Cash/Check (Via Mail)
- [ ] Cash/Check (At Appraiser Site Visit)
- [ ] Credit/Debit (Online via Quickbooks)

***Please refer to Page 2 for "Payment Terms"**
***Checks should be made payable to: Stuart Appraisal Company LLC**

GKS
GKS

42 E MAIN STREET, SUITE 202, FREEHOLD NJ 07728 PHONE: 732-409-6080 APPRAISALS@STUARTAPPRAISALCO.COM WWW. STUARTAPPRAISALCO.COM

Stuart Appraisal COMPANY

## ADDENDUM A

**Re:** 4135 Route 9
Freehold, NJ 07728
Monmouth County
Block 6 Lot 31 &
Hypothetical Sublots

### PROPERTY DOCUMENTATION AND INFORMATION

As described on the previous page, Client agrees to provide Appraiser with the documentation required and requested by the Appraiser to complete the appraisal. Delays in Appraiser's receipt of documentation particular those items that are considered required, may result in Appraiser being unable to deliver the appraisal report on the delivery date stated herein.

- Items labeled as "Required" must be provided prior to the commencement of the appraiser's work on this assignment as they are fundamental necessities for an accurate and compliant valuation.
- Items labeled as "Essential" are vital to an accurate valuation. A valuation can generally still be performed, however typically will result in the appraisal being premised on one or more extraordinary assumptions and/or hypothetical conditions in order to be considered compliant.
- Items labeled as "If Available" are helpful to the appraiser(s). They generally allow for a more precise appraisal however an accurate and compliant valuation can be still be performed without the appraiser being afforded access to these items.

| Item | Required Item | Essential Item | If Available | Not Applicable |
|---|---|---|---|---|
| Property Survey | ☐ | ☐ | ☑ | ☐ |
| Floor/Site/Building Plans | ☐ | ☐ | ☑ | ☐ |
| Copy of All Leases | ☐ | ☑ | ☐ | ☐ |
| Rent Roll | ☐ | ☐ | ☑ | ☐ |
| Historical Operating Expenses (Last 3 Years) | ☐ | ☑ | ☐ | ☐ |
| Detailed Construction Plans & Costs | ☐ | ☐ | ☑ | ☐ |
| List of Recent Renovation/Additions & Costs | ☐ | ☐ | ☑ | ☐ |
| Environmental Reports | ☐ | ☐ | ☑ | ☐ |
| Other: . | ☐ | ☐ | ☐ | ☑ |
| Other: | ☐ | ☐ | ☐ | ☑ |

GKS
GKS

42 E MAIN STREET, SUITE 202, FREEHOLD NJ 07728 PHONE: 732-409-6080 APPRAISALS@STUARTAPPRAISALCO.COM WWW. STUARTAPPRAISALCO.COM

## TERMS & CONDITIONS

**CONFIDENTIALITY-** Appraiser shall not provide a copy of the written Appraisal Report to, or disclose the results of the appraisal prepared in accordance with this Agreement to, any party other than Client, unless Client authorizes, except as stipulated in the Confidentiality Section of the Ethics Rule of the Uniform Standards of Professional Appraisal Practice (USPAP).

**USE OF EMPLOYEES OR INDEPENDENT CONTRACTORS -** Appraiser may use employees or independent contractors at Appraiser's discretion to complete the assignment, unless otherwise agreed by the parties. Notwithstanding, Appraiser shall sign the written Appraisal Report and take full responsibility for the services provided as a result of this Agreement.

**SERVICES NOT PROVIDED -** The fees set forth in this Agreement apply to the appraisal services rendered by Appraiser as set forth in this Agreement. Unless otherwise specified herein, Appraiser's services for which the fees in this Agreement apply shall not include meetings with persons other than Client or Client's agents or professional advisors; Appraiser's deposition(s) or testimony before judicial, arbitration or administrative tribunals; or any preparation associated with such depositions or testimony. Any additional services performed by Appraiser not set forth in this Agreement will be performed on terms and conditions set forth in an amendment to this Agreement, or in a separate agreement.

**CHANGES TO AGREEMENT -** Any changes to the assignment as outlined in this Agreement shall necessitate a new Agreement. The identity of the Client, intended users, or intended use; the date of value; type of value; or property appraised cannot be changed without a new Agreement.

**GOVERNING LAW AND JURISDICTION -** This Agreement shall be governed by the law of the state in which Appraiser's office as specified in this Agreement is located, exclusive of that state's choice of law rules. The parties agree that any legal proceeding brought by either party to interpret or enforce this Agreement, or to enforce an arbitration award entered pursuant to this Agreement, shall be brought in a state or federal court having jurisdiction over the location of Appraiser's office as specified in this Agreement, and the parties hereby waive any objections to the personal jurisdiction of said court.

**APPRAISER INDEPENDENCE -** Appraiser cannot agree to provide a value opinion that is contingent on a predetermined amount. Appraiser cannot guarantee the outcome of the assignment in advance. Appraiser cannot ensure that the opinion of value developed as a result of this Assignment will serve to facilitate any specific objective of Client or others or advance any particular cause. Appraiser's opinion of value will be developed competently and with independence, impartiality and objectivity.

**NO THIRD-PARTY BENEFICIARIES -** Nothing in this Agreement shall create a contractual relationship between Appraiser or Client and any third party, or any cause of action in favor of any third party. This Agreement shall not be construed to render any person or entity a third party beneficiary of this Agreement, including, but not limited to, any third parties identified herein.

**SPECIAL OR CONSEQUENTIAL DAMAGES -** Neither party shall under any circumstances be liable to the other party for special, exemplary, punitive or consequential damages, including, without limitation, loss of profits or damages proximately caused by loss of use of any property, whether arising from either party's negligence, breach of the Agreement or otherwise, whether or not a party was advised, or knew, of the possibility of such damages, or such possibility was foreseeable by that party. In no event shall Appraiser be liable to Client for any amounts that exceed the fees and costs paid by Client to Appraiser pursuant to this Agreement.

**MEDIATION & ARBITRATION -** In the event of a dispute concerning the subject matter of this Agreement, the parties shall in good faith attempt to resolve such dispute by negotiation between the parties' principals, or, if such negotiation is unsuccessful, by mediation conducted by a third-party mediator. If such mediation results in an impasse, the parties shall submit their dispute to binding arbitration. Such mediation or, if necessary, binding arbitration shall be conducted pursuant to the mediation procedures or the commercial arbitration rules of the American Arbitration Association. Any arbitration shall be conducted in the city in which Appraiser's office as specified herein is located. The parties shall share equally the costs of any mediation. In the event of binding arbitration, the arbitrators shall, in addition to any relief appropriate to be awarded to the prevailing party, enter an award in favor of the prevailing party for that party's costs of the arbitration, including the party's reasonable attorneys' fees and arbitration expenses incurred in prosecuting or defending the arbitration proceeding. Subject to the right of the prevailing party to recover its share of the costs of the arbitration services pursuant to the arbitrator's award, the costs of the arbitration services shall be borne equally by the parties. If the prevailing party seeks judicial confirmation of any arbitration award entered pursuant to this Agreement, the court shall, in addition to any other appropriate relief, enter an award to the prevailing party in such confirmation proceeding for its reasonable attorneys' fees and litigation expenses incurred in confirming or successfully opposing the confirmation of such an award.

**CLIENT'S DUTY TO INDEMNIFY APPRAISER -** Client agrees to defend, indemnify and hold harmless Appraiser from any damages, losses or expenses, including attorneys' fees and litigation expenses at trial or on appeal, arising from allegations asserted against Appraiser by any third party that if proven to be true would constitute a breach by Client of any of Client's obligations, representations or warranties made in this Agreement, or any violation by Client of any federal, state or local law, ordinance or regulation, or common law (a "Claim"). In the event of a Claim, Appraiser shall promptly notify Client of such Claim, and shall cooperate with Client in the defense or settlement of any Claim. Client shall have the right to select legal counsel to defend any Claim, provided that Appraiser shall have the right to engage independent counsel at Appraiser's expense to monitor the defense or settlement of any Claim. Client shall have the right to settle any Claim, provided that Appraiser shall have the right to approve any settlement that results in any modification of Appraiser's rights under this Agreement, which approval will not be unreasonably withheld, delayed or conditioned.

**ASSIGNMENT-** Neither party may assign this Agreement to a third party without the express written consent of the other party, which the non-assigning party may withhold in its sole discretion. In the event this Agreement is assigned by mutual consent of the parties, it shall become binding on the assigning party's permitted assigns.

**SEVERABILITY -** In the event any provision of this Agreement shall be determined to be void or unenforceable by any court of competent jurisdiction, then such determination shall not affect any other provision of this Agreement and all such other provisions shall remain in full force and effect. Template for Agreement for Professional Valuation Services

**EXTENT OF AGREEMENT-** This Agreement represents the entire and integrated agreement between the Client and Appraiser and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by a written instrument signed by both Client and Appraiser. This Agreement includes all prior pages & the following Appendices, which are incorporated into, and made a part of this Agreement:

GKS
GKS

## ADDITIONAL ADDENDUMS OR AMENDMENTS

.

Per a conversation with the client, the appraisal report will include an opinion of market value of the following parcel and hypothetical parcel(s):

- 4135 Route 9, Block 6 Lot 31

- Hypothetical Subdivided Portion of Block 6 Lot 31. This hypothetical area is located directly to the rear of the improvement situated on Block 6 Lot 31. Per provided documents, the land area of this portion is 23,258 square feet.

- Hypothetical Subdivided Portion of Block 6 Lot 30. This hypothetical area is the parking lot adjacent to Lot 31. Per provided documents, the land area of this portion is 43,438 square feet.

The "as-is" market value of 4135 Route 9 and will incorporate any leases that may be in place as of the effective date.

The values of the hypothetical lots will be the market value of each using a hypothetical condition that each lot was subdivided and considered an individual taxable parcel as of the effective date. In doing such, the appraiser will consider the zoning of each parcel as of the effective date.

Please note that the appraisers are not experts in the interpretation of zoning code and are not qualified to make unequivocable determinations of zoning compliance or lack thereof as such should only be done by a qualified legal professional. Any interpretation of zoning code made by the appraiser in the report will be consistent with that expected of a certified real estate appraiser and should not be relied upon without the review and confirmation of a qualified legal professional.

GKS
GKS

# 2023 - Agreement of Services- 4135 Route 9, Freehold

Final Audit Report 2023-06-28

| | |
|---|---|
| Created: | 2023-06-20 |
| By: | Stuart Appraisal Company (appraisals@stuartappraisalco.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAmWDXI-VoXMtcNhIx8Lp5Y24-2IO87lyl |

## "2023 - Agreement of Services- 4135 Route 9, Freehold" History

- Document created by Stuart Appraisal Company (appraisals@stuartappraisalco.com)
  2023-06-20 - 4:16:46 PM GMT
- Document emailed to george.k.sarris@gmail.com for signature
  2023-06-20 - 5:35:33 PM GMT
- Email viewed by george.k.sarris@gmail.com
  2023-06-20 - 5:58:47 PM GMT
- New document URL requested by george.k.sarris@gmail.com
  2023-06-28 - 6:31:20 PM GMT
- Email viewed by george.k.sarris@gmail.com
  2023-06-28 - 6:31:35 PM GMT
- Signer george.k.sarris@gmail.com entered name at signing as George Sarris
  2023-06-28 - 6:34:17 PM GMT
- Document e-signed by George Sarris (george.k.sarris@gmail.com)
  Signature Date: 2023-06-28 - 6:34:19 PM GMT - Time Source: server
- Agreement completed.
  2023-06-28 - 6:34:19 PM GMT

Adobe Acrobat Sign

All Seasons

THIS LEASE AGREEMENT, made the 15th day of June, 1999, between

GEORGE SARRIS, residing or located at 19 Willowbrook Road, in the Township of Freehold, County of Monmouth and State of New Jersey 07728, herein designated as the Lessor.

AND

ADELPHIA & ELIAS L.L.C., located at 7 Highland Drive, in the Township of Jackson, County of Ocean and State of New Jersey 08527, herein designated as the Lessee;

WITNESSETH that, the Lessor does hereby lease to the Lessee and the Lessee does hereby rent from the Lessor, the following described premises:

Certain real property located at Route 9 North, Freehold, New Jersey, known as Block 6 Lot 31 Freehold Township, Monmouth County, New Jersey, including a fifty (50') foot easement from D.C.H. for a future double driveway for ingress and access. The term of this lease is thirty (30) years, commencing on June 15, 1999 and ending on June 14, 2029. A diner is presently operating on the property. Said diner is being sold to the Tenant simultaneous with the signing of this lease. The property being leased shall only be used by the Tenant to continue the diner/restaurant business being sold while any monies for the sale of the business remain outstanding. The property shall not be used for any other purpose.

Upon the following Conditions and Covenants:

1st. The Tenant covenants and agrees to pay to the Landlord, as rent for and during the term hereof, the sum of $ 2,880,000.00 in the following manner:

$5,500.00 per month for the first five years;
$6,500.00 per month for sixth through tenth year;
$7,500.00 per month for eleventh through fifteen year;
$8,500.00 per month for the sixteenth through twentieth year;
$9,500.00 per month for the twenty-first through twenty-fifth year;
$10,500.00 per month for the twenty-sixth through thirtieth year.

Due and payable on the fifteenth (15th) day of each month, payable in advance. The Tenant shall pay, as additional rent, a late charge of five (5%) percent of any payment not

1

received by the landlord by the fifteenth (15th) day of any month. Said payment to be made with the monthly rent. The Tenant has the option to extend the lease for two (2) five-year periods at the conclusion of the thirty (30) year term. The rent for the first option period shall be $720,000.00, payable at the rate of $12,000.00 per month. The rent for the second option period shall be $840,000.00, payable at the rate of $14,000.00 per month. All other terms of this lease shall apply to each option period exercised by the Tenant.

1.1 This lease is contingent upon the purchase of the business by the Tenant.

1.2 A breach of this lease, if material, shall be a default in the Note, and a default in the Note shall be a breach of this lease.

2nd. The Tenant has examined the premises and has entered into this lease without any representation on the part of the Landlord as to the condition thereof, except as set forth herein. The Tenant shall take good care of the premises and shall at the Tenant's own cost and expense, make all repairs, and shall maintain the premises in good condition and state of repair, and at the end or other expiration of the term hereof, shall deliver up the rented premises in good order and condition. The Tenant shall neither encumber nor obstruct the sidewalks, driveways, yards, or entrances of the premises and shall maintain the same in a clean condition, free from debris, trash, refuse, snow and ice. The Tenant's right of possession is subject to all easements and right of ways of record, along with all facts revealed by an accurate survey or inspection of the property. The Tenant's right of possession is further subject to any exceptions contained in all policies of title insurance insuring the subject property.

2.1 Once the indebtedness to Landlord/Seller is paid off, Tenant/Purchaser's obligation shall run to maintain the parking area and landscaping; however, the Tenant/Purchaser shall at all times be responsible to abate at its expense any violations for which it receives notice from any governmental entity on the building or grounds. This provision shall survive closing.

2.2. Landlord/Seller represents that to the best of his knowledge he knows of no environmental violations or hazardous or toxic waste on the property prior to his ownership and that during this ownership from 1976 to date he has been in possession and has no knowledge of any environmental violations.

2.3 Landlord/Seller shall be responsible to make the following repairs: None

2.4 Landlord/Seller represents that except for the repairs noted in 2.3 above, Seller knows of no structural defects in the premises.

2.5 Landlord/Seller represents that there are no underground oil tanks on the property and that the septic system has been properly decommissioned. The Landlord/Seller shall hold the Tenant/Purchaser harmless for any requirement to remove the septic.

3rd. In case of the destruction of or damage of any kind whatsoever to the premises, caused by the carelessness, negligence or improper conduct on the part of the Tenant or the Tenant's agents, employees, guests, licensees, invitees, subtenants, assignees or successors, the Tenant shall repair the said damage or replace or restore any destroyed parts of the premises, as speedily as possible, at the Tenant's own cost and expense.

4th. No alterations, additions, improvements, containers, storage tanks, television or radio antennas, heavy equipment, apparatus or fixtures, shall be installed, attached or placed upon or under the leased premises, unless it meets all legal requirements. At the termination of this lease the Tenant shall at his own expense remove any such item from the premises and restore the premises to its original condition. Any property not removed shall become the property of the Landlord.

5th. The Tenant shall have the right to expand the diner and install any signs he believes are necessary for the improvement of his business. Before any expansion or installation of signs the Tenant shall give notice to the Landlord. Any expansion or signs installed by the Tenant shall at all times conform with all municipal ordinances or other laws and regulations applicable thereto.

6th. The Tenant shall pay when due all property taxes, fire insurance premiums, and the rents or charges for water or other utilities used by the Tenant, which are, or may be, assessed or imposed upon the leased premises or which are, or may be, charged to the Landlord by the suppliers thereof during the term hereof. If not paid, such rents or charges shall be added to and become payable as additional rent with the installment of rent next due or within 30 days of demand therefor, whichever occurs sooner.

6.1 If Tenant fails to pay property taxes for any quarter, then and in that event, Landlord shall have the right to have the Tenant pay with each note payment 1/12th of the property taxes and provide for an escrow for 3 months in advance.

6.2 If Landlord receives notice of cancellation of any required insurances for any reason, Landlord shall have the right to demand that 1/12th of the insurance premium be paid to it monthly including sufficient escrow to pay for the policy 1 year in advance.

7th. The Tenant shall promptly comply with all laws, ordinances, rules, regulations, requirements and directives of all Federal, State and Municipal Governments and all Public Authorities and all of their departments, bureaus and subdivisions, applicable to and affecting the said premises, their use and occupancy, for the corrections, prevention and abatement of nuisances, violations or other grievances in, upon or connected with the said premises during the term hereof; and shall promptly comply with all orders, regulations, requirements and directives of the Board of Fire Underwriters or similar authority and of any insurance companies which have issued or are about to issue policies of insurance covering the said premises and its contents, for the prevention of fire or other casualty damage or injury, at the Tenant's own cost and expense.

7.1 If Tenant receives any notice of violations, Tenant must remedy or abate same. If summonses are issued, Tenant will be responsible to pay fines and/or reasonable attorney's fees or risk being in breach of this lease.

7.2 The Tenant intends to use the Premises as a Diner/Restaurant. The Landlord states that this use does not violate any applicable zoning ordinance, building code or other law. The Tenant will obtain and pay for all inspections required by law and provide copies of same to Landlord. Tenant agrees to correct any violations of law at the Tenant's own expense.

8th. The Tenant, at Tenant's own cost and expense, shall obtain or provide and keep in full force for the benefit of the Landlord, during the term hereof, general public liability insurance insuring the Landlord against any all liability or claims of liability arising out of, occasioned by or resulting from any accident or otherwise in or about the leased premises, for injuries to any person or persons, for limits of not less than $2,000,000.00 for injuries to one person and $2,000,000.00 for injuries to more than one person, in any one accident or occurrence, and for loss or damage to the property of any person or persons, for not less than $2,000,000.00. The policy or policies of insurance shall be of a company or companies authorized to do business in this State and shall be delivered to the Landlord, together with evidence of the payment of the premiums therefor not less than fifteen days prior to the commencement of the term hereof or the date when the Tenant shall either into possession, whichever occurs sooner. At least fifteen days prior to the expiration or termination date of any policy, the Tenant shall deliver a renewal or replacement policy with proof of the payment of the premium therefor. The Tenant also agrees to and shall save, hold and keep harmless and indemnify the Landlord

from and for any and all payments expenses costs, attorney fees and from and for any and all claims and liability for losses or damage to property or injuries to persons occasioned wholly or in part by or resulting from any acts or omissions by the damage to property or injuries to person occasioned wholly or in part by or resulting from any acts or omissions by the Tenant or the Tenant's agents, employees, guests, licensees, invitees, subTenants, assignees or successors, or for any cause or reason whatsoever arising out of or by reason of the occupancy by the Tenant and the conduct of the Tenant's business.

8.2 landlord shall be noted as additional insured on all policies. If Landlord receives notice of cancellation for any reason, Seller shall have the right to demand that 1/12th of the insurance premium be paid to it monthly including sufficient escrow to pay for the policy 1 year in advance.

9th. The Tenant may assign, mortgage or hypothecate this lease, or sublet or sublease the premises or any part thereof, provided that Tenant remains liable thereon.

10th. The Tenant shall not occupy or use the leased premises or any part thereof, nor permit or suffer the same to be occupied or used, for any purposes other than as herein limited, nor for any purpose deemed unlawful, disreputable, or extra hazardous, on account of fire or other casualty.

11th. This lease shall not be a lien against the premises in respect to any mortgages that may hereafter be placed upon said premises. The recording of such mortgage or mortgages shall have preference and precedence and be superior and prior in lien to this lease, irrespective of the date of recording, and the Tenant agrees to execute any instruments, without cost, which may be deemed necessary or desirable, to further effect the subordination of this lease to any such mortgage or mortgages. A refusal by the Tenant to execute such instruments shall entitle the Landlord to the option of canceling this lease, and the term hereof is hereby expressly limited accordingly.

12th. If the land and premises leased herein, or of which the leased premises are a part, or any portion thereof, shall be taken under eminent domain or condemnation proceedings, or if suit or other action shall be instituted for the taking or condemnation thereof, or if in lieu of any formal condemnation proceedings or actions, the Landlord shall grant an option to purchase and/or shall sell and convey the said premises, or any portion thereof, to the governmental or other public authority, agency, body or public utility, seeking to take said land and premises or any portion thereof, then this lease shall continue in effect and the parties

shall be entitled to such claim or claims which may be awarded as damages as the result of such condemnation to which that party is entitled by law.

The parties shall notify each other in the event of any condemnation contact by any entity and each shall keep the other fully informed of the proceedings. There shall be no consent to sale without both parties agreement and both will participate in commissioner hearings and legal proceedings at their own cost and expense.

13th. In case of fire or other casualty, the Tenant shall give immediate notice to the Landlord.

14th. If the Tenant shall fail or refuse to comply with and perform any conditions and covenants of the within lease, the Landlord may, if the Landlord so elects, carry out and perform such conditions and covenants, at the cost and expense of the Tenant, and the said cost and expense shall be payable on demand, or at the option of the Landlord shall be added to the installment of rent due immediately thereafter but in no case later than one month after such demand, whichever occurs sooner, and shall be due and payable as such. This remedy shall be in addition to such other remedies as the Landlord may have hereunder by reason of the breach by the Tenant of any of the covenants and conditions in this lease contained.

15th. Any equipment, fixtures, goods or other property of the Tenant, not removed by the Tenant upon the termination of this lease, or upon any quitting, vacating or abandonment of the premises by the Tenant, or upon the Tenant's eviction, shall be considered as abandoned and the Landlord shall have the right, without any notice to the Tenant, to sell or otherwise dispose of the same, at the expense of the Tenant, and shall not be accountable to the Tenant for any part of the proceeds of such sale, if any.

16th. If there should occur any default on the part of the Tenant in the performance of any conditions and covenants herein contained, or if during the term hereof the premises or any part thereof shall be or become abandoned or deserted, vacated or vacant, or should the Tenant be evicted by summary proceedings or otherwise, the Landlord may either by force or otherwise, without being liable for prosecution therefor, or for damages, re-enter the said premises and the same have and again posses and enjoy; and as agent for the Tenant or otherwise, re-let the premises and receive the rents therefor and apply the same, first to the payment of such expenses, reasonable attorney fees and costs, as the Landlord may have been put to in re-entering and repossessing the same and in making such repairs and alterations as

may be necessary; and second to the payment of the rents due hereunder. The Tenant shall remain liable for such rents as may be in arrears and also the rents as may accrue subsequent to the re-entry by the Landlord, to the extent of the difference between the rents reserved hereunder and the rents if any, received by the Landlord during the remainder of the unexpired term hereof, after deducting the aforementioned expenses, fees and costs; the same to be paid as such deficiencies arise and are ascertained each month.

If the Tenant surrenders the premises in operating order with all collateral intact, providing for an orderly transfer, there shall be no suit against Tenant for monetary damages.

17th. Upon the occurrence of any of the contingencies set forth in the preceding clause, or should the Tenant be adjudicated a bankrupt, insolvent or placed in receivership, or should proceedings be instituted by or against the Tenant for bankruptcy, insolvency, receivership, agreement of composition or assignment for the benefit of creditors, or if this lease or the estate of the Tenant hereunder shall pass to another by virtue of any court proceedings, writ of execution, levy, sale, or by operation of law, the Landlord may, if the Landlord so elects, at any time thereafter, terminate this lease and the term hereof, upon giving to the tenant or any trustee, receiver, assignee or other person in charge of or acting as custodian of the assets or property of the Tenant, five days notice in writing, of the landlord's intention so to do. Upon the giving of such notice, this lease and the term hereof shall end on the date fixed in such notice as if the said date was the date originally fixed in this lease for the expiration hereof; and the Landlord shall have the right to remove all persons, good, fixtures and chattels therefrom, by force to otherwise, without liability for damages.

18th. The tenant acknowledges that no services are to be furnished or supplied by the landlord.

19th. The various rights, remedies, options and elections of the Landlord, expressed herein, are cumulative, and the failure of the Landlord to enforce strict performance by the Tenant of the conditions and covenants of this lease or to exercise any election or option or to resort or have recourse to any remedy herein conferred or the acceptance by the landlord of any installment of rent after any breach by the Tenant, in any one or more instances, shall not be construed or deemed to be a waiver or relinquishment for the future by the Landlord of any such conditions and covenants, options, elections or remedies, but the same shall continue in full force and effect.

20th. This lease and the obligation of the Tenant to pay the rent hereunder and to comply with the covenants and conditions hereof, shall not be affected, curtailed, impaired or excused

by reason of any rule, order, regulation or preemption by any governmental entity, authority, department, agency or subdivision or for any delay which may arise by reason of negotiations for the adjustment of any fire or other casualty loss or because of strikes or other labor trouble or for any cause beyond the control of the Landlord.

20.1 The Tenant has brought to the attention of the Landlord and the Landlord has verified that there is a possibility that during the term of this agreement the State of New Jersey may take action which will result in the re-alignment of U.S. Highway 9. In the event there is actual construction work performed by the State of New Jersey beginning during the first six years of the term of this agreement and such work interferes with the Tenant's operation of the diner business that is the subject of this agreement, then and in that event, the Tenant will be permitted to defer six monthly payments on the note. These payments will be made at the end of the term of the note only and not lease and will extend said term by six months.

In the event there is actual construction work performed by the State of New Jersey beginning during the seventh through the twelfth year of the term of the note and security agreement referred to in this agreement and such work interferes with the Tenant's operation of the diner business that is the subject of this agreement, then and in that event, the Tenant will be permitted to defer three monthly payments on the note. These payments will be made at the end of the term of the note only and will extend said term by three months.

21st. The terms, conditions, covenants and provisions of this lease shall be deemed to be severable. If any clause or provision herein contained shall be adjudged to be invalid or unenforceable by a court of competent jurisdiction or by operation of any applicable law, it shall not affect the validity of any other clause or provision herein, but such other clauses or provision shall remain in full force and effect.

22nd. All notices required under the terms of this lease shall be given and shall be complete by mailing such notices by certified or registered mail, return receipt requested, to the address of the parties as shown at the head of this lease, or to such other address as may be designated in writing, which notice of change of address shall be given in the same manner. Any notice to landlord shall also be faxed and mailed, certified, return receipt requested, to Vincent E. Halleran, Jr., 56 West Main Street, P.O. Box 1059, Freehold, NJ 07728 (fax number 732-431-3561).

23rd. The Landlord covenants and represents that the landlord is the owner of the premises herein leased and has the right and authority to enter into, execute and deliver this lease; and does further covenant that the Tenant on paying the rent and performing the conditions and covenants herein contained, shall and may peaceably and quietly have, hold land enjoy the leased premises for the term aforementioned.

24th. This lease and the Agreement for Sale of Assets contains the entire contract between the parties. No representative, agent, or employee of the landlord has been authorized to make any representations or promises with reference to the within letting or to vary, alter or modify the terms hereof. No additions, changes or modifications, renewals or extensions hereof, shall be binding unless reduced to writing and signed by the landlord and the Tenant.

24.1 A default in the Note shall constitute a breach of this lease.

24.2 A breach of this lease shall constitute a default of the Note.

25th. The Tenant shall pay all taxes levied against the property when the same come due, providing Landlord with proof of payment each half year. The said sum shall be considered as additional rent and shall be paid in as many equal installments as there are tax bills issued by the taxing authorities.

26th. If any mechanics' or other liens shall be created or filed against the leased premises by reason of labor performed or materials furnished for the Tenant in the erection, construction, completion, alteration, repair or additions to any building or improvement, the Tenant shall within fifteen (15) days thereafter, at the Tenant's own cost and expense, cause such lien or liens to be satisfied and discharged of record together with any Notices of Intention that may have been filed. Failure so to do, shall entitle the landlord to resort to such remedies as are provided herein in the case of any default of this lease, in addition to such as are permitted by law.

27th. The Tenant waives all rights of recovery against the Landlord or Landlord's agents, employees or other representatives, for any loss, damages or injury of any nature whatsoever to property or person for which the Tenant is insured. The Tenant shall obtain from the Tenant's insurance carriers and will deliver to the landlord, waivers of the subrogation rights under the respective policies.

27.1 The Tenant shall maintain fire and extended coverage insurance in an amount not less than $1,850,000, or replacement value, whichever is greater, for the benefit of the Landlord to protect against total destruction of the building. The total amount due (including prepayment penalty) will be paid to the Landlord unless the building is totally re-built. The building must be rebuilt for not less than existing square footage and at least the same occupancy.

28th. The Landlord may pursue the relief or remedy sought in any invalid clause, by conforming the said clause with the provision of the statues or the regulations of any governmental agency in such case made and provided as if the particular provisions of the applicable statues or regulations were set forth herein at length.

29th. In all references herein to any parties, persons, entities or corporations the use of any particular gender or the plural or singular number is intended to include the appropriate gender or number as the text of the within instrument may require. All the terms, covenants and conditions herein contained shall be for and shall insure to the benefit of and shall bind the respective parties hereto, and their heirs, executors, administrators, personal or legal representatives, successors and assigns.

30th. If, at any time during the term of this lease, the Landlord decides to sell the subject property, the Tenant shall have the right of first refusal to purchase on the same terms and conditions that the landlord offers to a third party. The landlord shall notify the Tenant of Landlord's decision to sell the property. The Tenant shall then have a period of thirty (30) days to notify the Landlord of Tenant's decision. If the Tenant decides to purchase, notification of said decision shall be accompanied by a deposit similar to that required in connection with the offer to a third party.

30.1 Tenant shall have the right to meet any bona fide offer from a third party for the premises. Tenant must accept within thirty (30) days of receipt of notice along with a copy of the offer from Landlord, with closing to occur within sixty (60) days, or this right is deemed waived.

***In Witness Whereof***, the parties hereto have hereunto set their hands and seals or caused these presents to be signed by their proper corporate officers and their proper corporate seal to be hereto affixed, the day and year first above written.

Signed, Sealed and Delivered
in the presence of or Attested by:

GEORGE SARRIS

ADELPHIA & ELIAS L.L.C.
By: ~~Elias Pahountis~~, Member

Member
NICK PAHOUNTIS

Member
WILLIAM PAHOUNTIS

11

**ASSIGNMENT OF LEASE**

THIS ASSIGNMENT OF LEASE is made on the 22 day of June 2009 by and between ADELPHIA AND ELIAS, LLC, having an address at ____________________, New Jersey (hereinafter referred to as the "Assignor") and the ALL SEASONS DINER & RESTAURANT II, INC. having an address 176 Wycoff Road, Eatontown, New Jersey 07724 (hereinafter referred to as the "Assignee").

KNOWN ALL MEN BY THESE PRESENTS that for and in consideration of the sum of TEN DOLLARS and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor by these presents does grant, convey, assign and transfer and set over unto the Assignee all of Assignors interests as tenant under a certain ground lease, dated June 15, 1999 by and between by George Sarris, as Lessor ("Sarris"), and Assignor for premises for land located at 4135 Route 9 North, Freehold Township, New Jersey 07728 ("Assigned Lease"). A copy of the Assigned Lease is attached hereto and made a part hereof. Assignor by its execution hereby warrants and represents the following:

(a) There is no lease security deposit now being held by Landlord

(b) Assignor has paid all sums due and owing to Landlord under the Assigned Lease through the date hereof.

(c) Assignor has the right to execute this Assignment without securing the consent of any other individual or entity for same to be in full force and effect.

(d) Assignor agrees to hold Assignee harmless from any and all lost, cost or damage arising out of or related to any untrue statements made by Assignor in the within Assignment of Lease.



**EXHIBIT "G"**

Assignee by its execution hereof assume all of the obligations of Assignor as lessee under the Assigned Lease and agrees to hold Assignor harmless from any and all loss, cost or damage arising out of or related to Assignees failure to comply with the terms of the Assigned Lease.

IN WITNESS WHEREOF, Assignor and Assignee have executed the within Assignment of Lease with Consent as of the day and year first above written.

Witness:

____________________

ADELPHIA & ELIAS, LLC, Assignor

By: ____________________
Managing Member

ALL SEASONS DINER & RESTAURANT II, INC.

____________________
MIHAIL HATZIMINAS

By: ____________________
MICHAEL ZAVOLAS, President

::ODMA\PCDOCS\GHCDOCS\692069\1

2

**EXHIBIT "G"**

# PROFESSIONAL QUALIFICATIONS OF
# Michael R. Pallitto

## APPRAISAL EXPERIENCE

To date I have completed over 500 commercial appraisal reports, including full and partial interest appraisals, market value, prospective market value, tax appeals, estate tax & planning, condemnation, easements and riparian grants for a variety of properties. I have also completed in excess of 1,000 residential form appraisals. Properties have been located in New Jersey and New York with some experience in the following:

| | | | | |
|---|---|---|---|---|
| Mixed Use | Apartments | Developable Land | Single Family | Easements |
| Office | Retail Centers | Condominiums | Vacant Land | Eminent Domain |
| Industrial | Estate Valuations | Commercial | Partial Interest | Farmland Preservation |

## PROFESSIONAL LICENSES AND CERTIFICATIONS

State of New Jersey – General Certified Appraiser 42RG00253700
State of New Jersey Real Estate License

## PROFESSIONAL AFFILIATIONS

Realtor Associate, Monmouth & Ocean County Board of Realtors
Member of the New Jersey Association of Realtors
National Society of Leadership and Success – Society Alumni

## EDUCATION

**Rutgers University (2009-2013)** **New Brunswick, New Jersey**
*Bachelor's Degree Arts and Sciences*
*Major – Economics*

**McKissock Appraisal School (2013 – Present)**
**Appraisal Institute (2013 – Present)**

**Courses Conducted by Appraisal Institute & McKissock Appraisal School:**

| | |
|---|---|
| Real Estate Appraisal Principles | General Report Writing and Case Studies |
| Real Estate Appraisal Procedures | Statistics, Modeling, and Finance |
| 15 Hour USPAP Course | General Appraiser Sales Comparison Approach |
| General Appraiser Market Analysis and HBU | General Cost Approach & Site Valuation |
| General Appraiser Income Approach I | General Appraiser Income Approach II |
| Expert Witness For Commercial Appraisers | Commercial Appraisal Review |

# Exhibit “D”

# Columbia Bank

Mortgage Statement Ending 09/29/2026



19-01 Route 208 North • Fair Lawn, NJ 07410

Customer Service: 1-800-522-4167 columbiabankonline.com

| | |
|---|---|
| Account Number | [redacted] |
| Payment Due Date | 10/14/2026 |
| **Amount Due** | **$3,534.07** |

If payment is received after 10/28/2026 a late fee of $176.70 will be assessed.

>000011 8872980 0001 92994 10Z

SARRIS FAMILY LLC
47 RACHAEL DR
MORGANVILLE NJ 07751-4050

| Explanation of Amount Due | |
|---|---|
| Principal | $1,310.24 |
| Interest | $2,223.83 |
| Escrow Amount for Taxes and Insurance | $0.00 |
| **Regular Monthly Payment** | **$3,534.07** |
| Total Fees and Charges | $0.00 |
| Overdue Payments | $0.00 |
| **Total Amount Due** | **$3,534.07** |

| Account Information | |
|---|---|
| Property Address | 4135 Route 9<br>Freehold NJ 07728 |
| Outstanding Principal | $426,974.59 |
| Interest Rate (Until 10-14-2027) | 6.25000% |
| Prepayment Penalty | No |

**Past Payments Breakdown**

| | Paid Last Month | Paid Year to Date |
|---|---|---|
| Principal | $1,229.50 | $11,275.20 |
| Interest | $2,304.57 | $20,531.43 |
| Escrow (Taxes and/or Insurance) | $0.00 | $0.00 |
| Fees | $0.00 | $0.00 |
| **Total** | **$3,534.07** | **$31,806.63** |

**Important Messages**

**Partial Payment:** Any partial payments received are not applied to your loan. Payments are held in suspense until a full payment is received. Please contact us with questions or concerns at 1-800-522-4167.

**Housing Counseling Information:** If you would like counseling or assistance, you can contact the following: U.S. Department of Housing and Urban Development (HUD): for a list of homeownership counselors or counseling organizations in your area, go to https://www.hud.gov/offices/hsg/sfh/hcc/hcs.csm or call 800-569-4287.

**Payoff Fees: Please note that there may be a charge(s) (if approved in your state) for paying off. Please contact us for proper instructions and any questions at 1-800-522-4167.**

Detach and mail your coupon with your payment

# Columbia Bank

19-01 Route 208 North • Fair Lawn, NJ 07410

SARRIS FAMILY LLC
47 RACHAEL DR
MORGANVILLE NJ 07751-4050

____ For any address changes, check here and enter any changes to your account on the back of this coupon and mail in or to make changes online go to columbiabankonline.com.

YOUR PAYMENT WILL BE DEDUCTED AUTOMATICALLY ON YOUR DRAFT DATE.

Account Number: [redacted]

| Amount Due | |
|---|---|
| **Due By 10/14/2026** | **$3,534.07** |
| If payment is received after 10/28/2026 a late fee of $176.70 will be assessed.<br>Additional Principal: ____________<br>Additional Other: | |
| **Total Amount Enclosed** | $ |

Columbia Bank
PO Box 70402
Philadelphia, PA 19176-0402

000011 8872980 000015 000029 0001/0002

002801000372000003534072